# No. 16-3604

_____

## United States Court of Appeals
## for the Third Circuit

_____

## UNITED STATES OF AMERICA

### vs.

## ATIBA WARREN

_____

## Appeal from September 12, 2016
## Judgment in a Criminal Case

## Brief and Appendix Volume I Pages A-1 to A-50

R. Damien Schorr
Pa. Id. No. 62928
1015 Irwin Drive
Pittsburgh, PA 15236
(412) 884-1597

Counsel for Appellant
Atiba Warren

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

RELATED CASES AND PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.    Warrantless searches of residences are presumptively unreasonable. Police conducted just such a search of Warren's residence. Did the District Court err when it failed to suppress the results of the search of Warren's residence?. . 7

    A.    Establishing exigent circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.    The Mallory factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    The government failed to establish either probable cause or exigent circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.   Maryland treats robbery and robbery with a dangerous or deadly weapon as the same offense. Its definition of "force" or "violence" for robbery is broader than that used for Armed Career Criminal Act ("ACCA") purposes. The District Court held that Warren's conviction for robbery with a dangerous or deadly weapon was an ACCA predicate. To do so it discounted controlling Maryland law as "dicta". Is Warren serving an illegal sentence as a result? 12

    A.    Federal sentencing courts must look to a state's definition of the elements of its crimes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.    The Armed Career Criminal Act is directed at a narrow group of criminal defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.    "Crime of violence" for purposes of the "force" clause carries a specific definition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.    The physical force requirement under ACCA. . . . . . . . . . . . . . . 14

C.   The elements of Maryland's common law Robbery and Robbery With a
     Dangerous or Deadly Weapon are identical. . . . . . . . . . . . . . . . . . . . . .  15

     1.   Maryland's Robbery and Robbery with a Dangerous or Deadly
          Weapon are the same crime. . . . . . . . . . . . . . . . . . . . . . . . . .  15

     2.   "Violence" under Maryland law is broader than that term as
          used for Armed Career Criminal Purposes. . . . . . . . . . . . . . . .  16

          a.   Actual violent physical force is not required for a
               conviction under Maryland's common law robbery
               statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

          b.   Maryland robbery can be accomplished by fear of injury to
               one's property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

D.   Maryland common-law Robbery encompasses Robbery with a
     Dangerous or Deadly Weapon. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

E.   The District Court erred when it labeled controlling Maryland case law
     as "dicta". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

F.   Even if under *Mathis* Maryland Robbery with a Dangerous or Deadly
     Weapon is considered to be a separate offense from Robbery, it still
     does not constitute a crime of violence for ACCA purposes. . . . . . . . .  21

III.   The elements of a state conviction treated as a predicate for Armed Career
       Criminal Act purposes cannot be broader than their common law equivalents.
       The distribution element of the applicable Maryland drug statute is broader
       than the comparable element under 21 U.S.C. § 801 et seq. Did the District
       Court err in finding that Warren's May 6, 2002 Maryland Drug conviction is
       an ACCA predicate? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

A.   The categorical approach applies in determining whether a prior
     conviction qualifies as a "serious drug offense." . . . . . . . . . . . . . . . . .  23

     1.   When the modified categorical approach may be used. . . . . . .  24

     2.   Maryland's "distribute" element is broader than the comparable
          federal element. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

CERTIFICATES OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

# TABLE OF AUTHORITIES

## FEDERAL CASES:

*Descamps v. United States*, 133 S.Ct. 2276 (2013) . . . . . . . . . . . . . . . . . . . . . 14, 24, 25

*Dorman v. United States,* 435 F.2d 385 (D.C. Cir. 1970) . . . . . . . . . . . . . . . . . . . . . 8

*In re Nat. Football League Players Concussion Injury Litigation*, 775 F.3d 570 (3rd Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Johnson v. Rosemeyer*, 117 F.3d 104 (3rd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Johnson v. United States*, 559 U.S. 133 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Maryland v. Buie*, 494 U.S. 325 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Mathis v. United States,*    U.S.    136 S.Ct. 2243 (2016) . . . . . . . . . . . . 12, 21, 25

*Omargharib v. Holder*, 775 F.3d 192 (4th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . 25

*U.S. v. Brown*, 765 F.3d 185 (3rd Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-14

*United States v. Abbott*, 748 F.3d 154 (3rd Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Anderson*, 644 Fed.Appx. 192 (3rd Cir. 2016) . . . . . . . . . . . . . . . . . 8

*United States v. Blair*, 734 F.3d 218 (3rd Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Brown*, 765 F.3d 185 (3rd Cir. 2014) . . . . . . . . . . . . . . . . . . . . . 12, 14

*United States v. Coles*, 437 F.3d 361 (3rd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Henderson*, 841 F.3d 623 (3rd Cir.  2016)  . . . . . . . . . . . . . . . . . . 13

*United States v. Mallory*, 765 F.3d 373 (3rd Cir. 2014) . . . . . . . . . . . . . . . . . . . . . 7-9

*United States v. Parrott*, 450 F. App'x 228 (3rd Cir. 2011) . . . . . . . . . . . . . . . . . . 10

*United States v. Sandini*, 888 F.2d 300 (3rd Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Simmons*, 661 F.3d 151 (2nd Cir. 2011) . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Tucker*, 703 F.3d 205 (3rd Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Wolf*, 452 Fed. Appx 180 (3rd Cir. 2011) . . . . . . . . . . . . . . . . . 11, 12

*Unites States v. Crawley*, 837 F.2d 291 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 19

*Unites States v. Stearn*, 597 F.3d 540 (3rd Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . 7

*Warden v. Hayden*, 387 U.S. 294, 299 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Welsh v. Wisconsin*, 466 U.S. 740 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATE CASES:

*Bowman v. State*, 314 Md. 725, 552 A.2d 1303 (1989) . . . . . . . . . . . . . . . . . . . . . . . 16

*Coles v. State*, 821 A.2d 389, 374 Md. 114 (Md., 2003). . . . . . . . . . . . . . . . . . . . 15, 17

*Conyers v. State*, 693 A.2d 781 (Md. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Douglas v. State*, 267 A.2d 291 (Md. Ct. Spec. App. 1970) . . . . . . . . . . . . . . 16-18, 21

*Fetrow v. State*, 156 Md.App. 675 (Md. App.,2004) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Fortune v. State*, 2016 WL 1749767 (Md. App.,2016) . . . . . . . . . . . . . . . . . . . . . . . 16

*Giles v. State*, 261 A.2d 806 (Md. Ct. Spec. App. 1970) . . . . . . . . . . . . . . . . . . . 17-20

*Rosenberg v. State*, 12 Md.App. 20 (Md.App. 1971) . . . . . . . . . . . . . . . . . . . . . . . . 26

*Teixeira v. State*, 75 A.3d 371 (Md. Ct. Spec. App. 2013) . . . . . . . . . . . . . . . . . . . . 16

*Whack v. State*, 288 Md. 137 (Md., 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**FEDERAL STATUTES:**

18 U.S.C. § 922(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

18 U.S.C. § 924(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 23

18 U.S.C. § 924(e)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 924(e)(2)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

18 U.S.C. §924(e)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

21 U.S.C. § 801 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21 U.S.C. § 802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**STATE STATUTES:**

Md. Code, Crim. Law § 5-602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**OTHER AUTHORITIES:**

Aaronson, *Maryland Criminal Jury Instruction* § 7.46 . . . . . . . . . . . . . . . . . . . . . . 26

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

This is an appeal from a final Judgment in a Criminal Case. Appellant Atiba Warren was sentenced by the Honorable Mark R. Hornak on September 12, 2016 to a sentence of 192 months. A-2. Judge Hornak signed that Judgment on September 12, 2016 and it was entered on the docket on that same date. A timely Notice of Appeal was filed on September 13, 2016. A-1.

## ISSUES PRESENTED FOR REVIEW

I.    Warrantless searches of residences are presumptively unreasonable. Police conducted just such a search of Warren's residence. Did the District Court err when it failed to suppress the results of the search of Warren's residence?

II.   Maryland treats robbery and robbery with a dangerous or deadly weapon as the same offense. Its definition of  "force" or "violence" for robbery is broader than that used for Armed Career Criminal Act ("ACCA") purposes. The District Court held that Warren's conviction for robbery with a dangerous or deadly weapon was an ACCA predicate. To do so it discounted controlling Maryland law as "dicta". Is Warren serving an illegal sentence as a result?

III.  The elements of a state conviction treated as a predicate for Armed Career Criminal Act purposes cannot be broader than their common law equivalents. The distribution element of the applicable Maryland drug statute is broader than the comparable element under 21 U.S.C. § 801 et seq. Did the District Court err in finding that Warren's May 6, 2002 Maryland Drug conviction is an ACCA predicate?

## RELATED CASES AND PROCEEDINGS

To the best of counsel's knowledge, there are no related cases or proceedings before this Court.

## STATEMENT OF THE CASE

On October 23, 2012, Officers Steven Sywyj and Kevin Swimkosky of the City of Pittsburgh Police were directed to a residence at 520 Lincoln Avenue in the Larimer section of Pittsburgh. A-71 (Suppression Hearing Transcript) There, they found Duwane Hayes on the front porch. He had been stabbed. Mr. Weathers, a friend of Mr. Hayes, was rendering aid to him. A-74. Mr. Hayes's mother lived at 520 Lincoln Avenue, though he did not live there himself. A-57 Officer Sywyj already had a description of Hayes's assailant when he arrived at the residence - - a black male wearing a gray vest. A-74.

After paramedics treating Mr. Hayes left the scene with him, Mr. Weathers wanted to go inside the residence to talk to Mr. Hayes's family. Officer Sywyj accompanied Mr. Weathers to the front door to keep him under observation. He did not want Mr. Weathers to leave without further questioning. A-74-75.

Officer Sywyj alleged that he saw Mr. Warren inside the residence holding a firearm. Officer Sywyj alerted other officers that a firearm was present, ordered everyone out of the house. A-75-77. He and Officer Lance Hoyston searched the residence and recovered the firearm. A-77-78.

No evidence was adduced that Warren or any other occupant at 520 Lincoln Avenue acted in a threatening manner toward police. No evidence was adduced that Officer Sywyj knew that Warren was not permitted to possess a firearm. Nor was any evidence adduced that there was any criminal activity occurring at 520 Lincoln Avenue while police were there. Mr. Warren was detained, handcuffed, and placed

3

in a police car. There, he was questioned by Officer Lance Hoyson of the City of Pittsburgh Police. Officer Hoyson alleged that Mr. Warren told him that he bought the firearm on the street. A-97.

Warren moved to suppress the firearm seized. He argued that there was no probable cause to conduct a warrantless search of 520 Lincoln Avenue nor were there exigent circumstances. A-411 (Defendant's Motion to Suppress Evidence with Citation of Authority). He also moved to suppress his purported statement. The District Court denied his suppression motions. A-20 & 21 (Order Denying Motion to Suppress Evidence with Citation to Authority and related Memorandum Opinion).

Mr. Warren's criminal history included three prior convictions pertinent to this appeal. The first conviction dated May 6, 2002, was for Distribution of Heroin. He was sentenced to five years imprisonment, with four years suspended and three years probation. Presentence Investigation Report ("PSR") ¶ 30. The second conviction dated October 7, 2002 was for Robbery With a Dangerous and Deadly Weapon. Mr. Warren was sentenced to ten years imprisonment, with seven years suspended, and four years probation. PSR ¶¶ 27-29. The third conviction occurred on May 23, 2007 for Possession With Intent to Distribute Cocaine. Mr. Warren was sentenced to three years imprisonment. PSR ¶ 33. Based on these convictions, Mr. Warren was charged in the United States Court for the Western District of Pennsylvania as a felon-in-possession in violation of 18 U.S.C. §922(g)(1). A-408 (Indictment).

The district court determined that Warren was an Armed Career Criminal pursuant to 18 U.S.C. 924(e). A-12-14 (Amended Tentative Findings). He therefore was subject to a mandatory minimum sentence of fifteen years. If he were not an Armed Career Criminal, no mandatory minimum sentence would apply. He would have faced a maximum sentence of ten (10) years. Warren objected to the District Court's determination that he was an Armed Career Criminal, arguing that at least one of his prior convictions from Maryland did not qualify as a predicate conviction for ACCA purposes. A-432 (Defendant's Position With Respect to Sentencing Factors). This issue was litigated extensively. A-438 (Supplemental Objections to Sentencing Factors), A-456 (Reply to Government's Omnibus Response), A-460 (Defendant's Brief Submitted Pursuant to Order of August 22, 2016), and A-463 (Supplemental Brief Concerning Robbery Conviction). The District Court sentenced Warren to 192 months (16 years). A-2-10 (Judgment in a Criminal Case)

## SUMMARY OF ARGUMENT

Warren was arrested after police conducted a warrantless search of his residence, without either probable cause or exigent circumstances. The results of that improper search led to the federal charges against him. The results of the search should have been suppressed. The District Court erred in failing to suppress the seizure of the firearm recovered from Warren's residence and his purported statement made after his arrests.

Warren is serving an illegal sentence. He was improperly classified as an Armed Career Criminal for sentencing purposes, meaning that he was subject to a mandatory minimum sentence of fifteen years, instead of the maximum sentence of ten years he otherwise faced. The District Court erred in its application of Maryland state law in concluding that Warren was an Armed Career Criminal.

## ARGUMENT

**I.    Warrantless searches of residences are presumptively unreasonable. Police conducted just such a search of Warren's residence. Did the District Court err when it failed to suppress the results of the search of Warren's residence?**

### Standard of Review

"We conclude that, on appeal from a decision involving the presence or absence of exigent circumstances justifying a warrantless search or seizure, this Court will review the district court's findings of fact for clear error, but will review its conclusion that those facts establish a legal exigency de novo." *U.S. v. Mallory*, 765 F.3d 373, 383 (3rd Cir. 2014)

"Warrantless searches and seizures inside someone's home (or in this case, a hotel room) are presumptively unreasonable unless the occupants consent or probable cause and exigent circumstances exist to justify the intrusion." *U.S. v. Coles*, 437 F.3d 361, 365 (3rd Cir. 2006). "Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, . . . and danger to the lives of officers or others. *Id.* at 366. "Probable cause to believe contraband is present is necessary to justify a warrantless search, but it alone is not sufficient ... Mere probable cause does not provide the exigent circumstances necessary to justify a search without a warrant." *Id.*

"Probable cause is a 'fluid concept' that 'turn[s] on the assessment of probabilities in particular factual contexts.'" *United States v. Stearn*, 597 F.3d 540, 554 (3rd Cir. 2010)

7

### A.     Establishing exigent circumstances

Factors that support a finding of exigent circumstances include: (1) the gravity of the crime that has been committed; (2) a reasonable belief that the suspect is armed; (3) a clear showing of probable cause based upon reasonably trustworthy information; (4) a strong belief that the suspect is in the premises; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) peaceable entry, affording the suspect "an opportunity to surrender ... without a struggle and thus to avoid the invasion of privacy involved in entry into the home."

*United States v. Anderson*, 644 Fed.Appx. 192, 195 (3ʳᵈ Cir. 2016) (citing *Dorman v. United States,* 435 F.2d 385, 392-396 (D.C. Cir. 1970)

Where exigent circumstances exist, "[t]he common thread is imminence - the existence of a true emergency.[O]nce the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further search of the premises." *Mallory*, 765 F.3d at 384 (citing *United States v. Simmons*, 661 F.3d 151, 157 (2ⁿᵈ Cir. 2011). The Supreme Court has concluded "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984)

8

## B.    The Mallory factors

This Court in *Mallory* listed factors that were "useful" in determining whether the search was "justified by a reasonable belief that it was necessary to protect officer safety." They included:

1.    How soon after the alleged offense the search occurred;

2.    Whether the alleged offense was violent in nature;

3.    Whether the search occurred prior to or contemporaneous with the suspect's apprehension;

4.    Whether the premises as a whole had been secured, or whether it was possible that unknown individuals remained in the house;

5.    Whether the suspect or any of his family members had acted in an aggressive or threatening manner toward the police;

6.    Whether other members of the family were free to move about the house unsupervised by an officer;

7.    How easily the suspect or a family member could have obtained and used the firearm; and

8.    The degree of intrusiveness of the search.

       *Mallory* at 386.

In Warren's case, the offense for which the police were called - - a stabbing - - had already occurred some time before the search. The offense, a stabbing, was violent in nature. Warren was not seen with a knife, he had a firearm. Officer Swywj had no way of knowing at the time that Warren was not permitted to possess

9

a firearm. Police were not in the process of making an arrest. Police had a

description of the suspect. No evidence was adduced that he was anywhere near 520

Lincoln Avenue.

The search of Warren's residence was not part of an attempt to apprehend

the suspect. The residence at 520 Lincoln Avenue was secured by police. Nobody at

the scene acted in an aggressive or threatening manner toward the police.

It is not a crime in Pennsylvania to possess a firearm in his home in the

presence of a police officer. The police had removed everyone from the residence

before conducting their search, ostensibly to make sure no one else was inside. This

was despite the fact that no police officer articulated any reason to believe that the

residents of 520 Lincoln Avenry were a threat in any way.

### C.    The government failed to establish either probable cause or exigent circumstances.

The District Court found that probable cause to enter Warren's home existed

because he was seen inside, with a firearm, in the immediate aftermath of a

stabbing. It relied on *Warden v. Hayden*, 387 U.S. 294, 299 (1967) to find that the

police acted reasonably in searching Warren's home. Yet in *Hayden*, the police were

searching for a suspect seen entering the residence less than five minutes before

police arrived. That key fact is absent. No such urgency existed. The same holds

true for *United States v. Parrott*, 450 F. App'x 228, 230 (3ʳᵈ Cir. 2011), also cited by

the District Court.  The police in *Parrott* were responding to a call about shots being

fired. They saw a man with a shotgun run into the house they ultimately searched. The police were in hot pursuit in that case. They were not in Warren's.

Warren's case is also distinguishable from *Maryland v. Buie*, 494 U.S. 325 (1990), also cited by the District Court. There, police arrived at a house with an arrest warrant for Buie. After arresting Buie, they searched the basement room where he was hiding to make sure no one else was there. In doing so they recovered clothing believed to have been worn by Buie during the commission of a robbery. The Supreme Court upheld the search, but in doing so noted "we should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a *person* may be found." *Id*. at 494 U.S. 335 (emphasis added).

When Officer Sywyj saw Warren with a firearm, no crime was in progress, there was no reason to believe that he or any other police officer was in any danger. He did not even know where the stabbing itself occurred.  Nor did the government elicit any testimony to establish any belief on the party of Officer Sywyj that whoever stabbed Mr. Weathers was inside 520 Lincoln Avenue, or that any potential danger existed for the police. There was no "imminent" emergency, no exigent circumstances.

This case is analogous to an unreported decision of this Court, *United States v. Wolf*, 452 Fed. Appx 180, 2011 WL 5822154 (3ʳᵈ Cir. 2011). This Court held that a search of residence was improper when (1) the violent crime occurred somewhere

other than the residence searched and the officer searching saw the victim being

taken to the hospital. The only exigent circumstance that existed has passed. There

was no exigent circumstances that justified a warrantless search. There was no

objectively reasonable basis to believe that other victims or threats were present in

the residence. *Wolfe* at *4. That is the case here.


**II.    Maryland treats robbery and robbery with a dangerous or deadly weapon as the same offense. Its definition of  "force" or "violence" for robbery is broader than that used for Armed Career Criminal Act ("ACCA") purposes. The District Court held that Warren's conviction for robbery with a dangerous or deadly weapon was an ACCA predicate. To do so it discounted controlling Maryland law as "dicta". Is Warren serving an illegal sentence as a result?**


### Standard of Review

Whether a prior conviction constitutes a crime of violence is a question of law

over which this Court exercises plenary review. *United States v. Brown*, 765 F.3d

185, 188 (3rd Cir. 2014)

A defendant's prior convictions must be examined to determine whether they

are predicate convictions under the Armed Career Criminal Act. The categorical

approach is used and the elements of the crime of conviction are compared to the

elements of the generic crime. *Mathis v. United States*, __ U.S. __ 136 S.Ct. 2243,

2248 (2016)

## Introduction

The force or violence element of Maryland Robbery and Robbery With a Dangerous or Deadly Weapon is broader than the same element in the Armed Career Criminal Act. Consequently, Warren's 2002 conviction for Robbery With a Dangerous or Deadly Weapon is not a predicate conviction for ACCA purposes.

### A.    Federal sentencing courts must look to a state's definition of the elements of its crimes.

Federal courts are bound by state court determinations of the elements of state crimes. *Johnson v. United States*, 559 U.S. 133, 138 (2010). In determining whether a state court conviction qualifies as an ACCA predicate, the " Supreme Court has explained that '[t]he prior conviction qualifies as an ACCA predicate only if the statute's *elements are the same as, or narrower than, those of the generic offense.'* In other words, 'when a statute sets out a single (or 'indivisible') set of elements to define a single crime,' this Court's analysis is 'straightforward' because we need only 'line[ ] up that crime's elements alongside those of the generic offense and see[ ] if they match.'" *United States v. Henderson*, 841 F.3d 623, 627 (3rd Cir. 2016) (quoting *Mathis*)

"[T]he Supreme Court has made it clear that states define the elements of state offenses." *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3rd Cir. 1997). Convictions under state statutes with elements that sweep more broadly than the federal definitions of those elements cannot be used as ACCA predicates. *Brown* at189.

13

### B.    The Armed Career Criminal Act is directed at a narrow group of criminal defendants.

A defendant convicted of a violation of 18 U.S.C. § 922(g)(1) is classified as a "armed career criminal" if his criminal record includes three prior convictions for "violent felonies" or "serious drug offenses". Armed Career Criminals are subject to mandatory minimum sentence of 15 years for violations of 18 U.S.C. § 922(g)(1).

A "violent felony" under ACCA is any crime punishable by imprisonment for a term exceeding one year that:

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. §924(e)(2)(B).

### 1.    "Crime of violence" for purposes of the "force" clause carries a specific definition.

Determining whether an offense is a "crime of violence" under the "force" clause of ACCA requires the categorical approach. *Descamps v. United States*, 133 S.Ct. 2276, 2283 (2013); *Brown* at 188-189. The analyzing court can only look to the statutory definition of the offense in determining whether the offense is a "crime of violence."

### 2.    The physical force requirement under ACCA

For an offense to be a "crime of violence" under ACCA's "force" clause, it *must have as an element* the use, attempted use or threatened use of "physical force"

14

against another person or property. *Brown* at 189. "Physical force" in this context is defined as *violent* force – that is "strong physical force," which is "capable of causing physical pain or injury to another person." *Johnson*, 559 U.S. at 140 (emphasis in original).

### C. The elements of Maryland's common law Robbery and Robbery With a Dangerous or Deadly Weapon are identical.

Maryland robbery is defined as "the felonious taking and carrying away of the personal property of another, from his person or in his presence, by violence, or by putting him in fear." *Coles v. State*, 821 A.2d 389, 394, 374 Md. 114, 123 (Md., 2003). It can be accomplished by either the "application of physical force," or "by the intimidation or putting in fear of the victim." *Giles v. State*, 261 A.2d 806, 807 (Md. Ct. Spec. App. 1970).

### 1. Maryland's Robbery and Robbery with a Dangerous or Deadly Weapon are the same crime.

Maryland courts have explicitly said that Robbery With a Dangerous or Deadly Weapon is not a separate crime from common-law Robbery. "In Maryland, robbery is a single common law offense. Art. 27, §§ 486 and 488[1], *do not create separate statutory offenses but merely fix the penalties for the one crime of robbery.*" *Whack v. State*, 288 Md. 137, 140 (Md. 1980) (emphasis added); *see also Conyers v. State*, 693 A.2d 781, 796-797 (Md. 1997) (Maryland "[r]obbery with a deadly weapon is not a substantive offense, but if the State can prove that a defendant used a

---

[1] The pertinent statutes in effect at the time of Warren's offense.

deadly weapon during the commission of the robbery the defendant is subject to harsher penalties."); *Teixeira v. State*, 75 A.3d 371, 381 (Md. Ct. Spec. App. 2013) (holding the same). Maryland therefore treats a "dangerous or deadly weapon" as a sentencing factor and not an element of robbery. Maryland courts have specifically stated that the presence of a weapon merely provides the "necessary element of force or violence or putting in fear" that elevates a crime from larceny to robbery. *Fetrow v. State*, 156 Md.App. 675, 688 (Md. App.,2004). A dangerous or deadly weapon is not a separate element under Maryland law. It is included in the spectrum of "force" defined by Maryland courts.

"As we stated in *Douglas v. State*, 9 Md. App. 647, 653, 267 A .2d 291 (1970), 'actual violence is not required; constructive violence, which is present through intimidation, is sufficient.'

> At one end of the spectrum, then, the use of a deadly weapon generally constitutes 'the necessary element of force or violence or putting in fear sufficient to raise the taking of property from the person from larceny to robbery.' Constructive force, i.e., intimidation or the intent to frighten, occupies the other end of the spectrum."

*Fortune v. State*, 2016 WL 1749767, at *9 (Md. App. 2016) (quoting *Bowman v. State*, 314 Md. 725, 730, 552 A.2d 1303 (1989).

### 2. "Violence" under Maryland law is broader than that term as used for Armed Career Criminal Purposes.

Although Maryland courts use the label "violence," Maryland robbery does not require actual violent physical force , i.e., strong physical force against a person,

as required under the force clause. Rather, whether the Maryland "violence" element is accomplished by either "application of physical force" or "putting in fear," neither means of committing a Maryland robbery satisfies the terms of the "force" clause. Indeed, the "force" or "violence" element of Maryland Robbery extends to threats to property.

### a.    Actual violent physical force is not required for a conviction under Maryland's common law robbery statute.

Maryland courts define robbery as "the felonious taking and carrying away of the personal property of another, from his person or in his presence, by violence, or by putting him in fear." *Coles* at 821 A.2d 394. It can be accomplished by either the "application of physical force," or "by the intimidation or putting in fear of the victim." *Giles* at 807. In *Giles*, the Maryland Court of Special Appeals held that Maryland robbery can be accomplished by putting someone in fear of injury to the person or to the property "for example a threat to burn down a house." *Id.* at 807. Fear of great bodily harm - - or any bodily harm at all - - is not a requirement. *Douglas* at 267 A.2d at 295. The *Giles* court noted that simply threatening to accuse another of an unnatural crime such as sodomy, and as a result gets property from the victim, can be a way to get property from him. *Giles*, at 267 A.2d 808, n.1.

### b.    Maryland robbery can be accomplished by fear of injury to one's property.

The Maryland Court of Special Appeals held in *Giles* that Maryland robbery can be accomplished simply by putting someone in fear of "injury to the person *or to*

17

*the property*, as for example a threat to burn down a house." *Giles*, 261 A.2d at 807 (emphasis added). In *Douglas v State*, 267 A.2d 291, 295 (Md. Ct. Spec. App. 1970), the Court repeated: "That the fear be of great bodily harm *is not* a requisite. Nor need the fear be of bodily injury at all. The fear may be of injury to the person or to property, as for example, a threat to burn down a house." *Id.* (quoting *Giles*, 267 A.2d at 807) (emphasis added).

**D.    Maryland common-law Robbery encompasses Robbery with a Dangerous or Deadly Weapon.**

Maryland treats Robbery With a Deadly or Dangerous Weapon as providing the "force or violence" element necessary for Robbery. The same elements as Robbery apply and Robbery's force element is too broad for  convictions under either Robbery or Robbery With a Dangerous or Deadly Weapon to be predicates for ACCA purposes.

**E.    The District Court erred when it labeled controlling Maryland case law as "dicta".**

Both *Giles* and *Douglas* established Maryland's broad definition of "force"or "violence" in that state's robbery statute. The District Court dismissed *Giles* and *Douglas*'s definition of Maryland robbery on the grounds that the applicable language was "dicta". It erred.

**1.    Dicta is language not essential to a court's opinion.**

Dicta is "'a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding - that, being

peripheral, may not have received the full and careful consideration of the court that uttered it.' Being clear about how district courts can best navigate our holding, to avoid confusion, is not something we regard as peripheral discussion." *In re Nat. Football League Players Concussion Injury Litigation*, 775 F.3d 570, 584 (3rd Cir. 2014).

"Dicta" is "a general argument or observation unnecessary to the decision.... The basic formula [for distinguishing holding from dictum] is to take account of facts treated by the judge as material and determine whether the contested opinion is based upon them. A dictum is 'any statement made by a court for use in argument, illustration, analogy or suggestion. It is a remark, an aside, concerning some rule of law or legal proposition that is not necessarily essential to the decision and lacks the authority of adjudication.' It is 'a statement not addressed to the question before the court or necessary for its decision.'" *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988). Under either definition, neither *Giles* nor *Douglas* can be considered "dicta".

> **2.    *Giles* defined the scope of violence as an element of Maryland Robbery. It is far broader than the same element under ACCA.**

*Giles* addressed the appellant's argument that the element of force required for a robbery conviction was not proven. "Appellant claims that the evidence did not establish that the property was stolen from the person of the victim by violence." *Giles* at 723.

19

The *Giles* court rejected that argument, establishing that the amount of force or violence, or putting in fear of the victim required for robbery was minimal. It stated that the fear could be of injury to property, not necessarily one's person.

What is noteworthy is the apparent absence of any violence during the robbery in Giles:

> The victim of the robbery, John Webster, a route salesman for a bakery, testified that he was in his truck preparing to take merchandise into a store at 2900 Springhill Avenue when 'I got held up * * * by two men. * * * They wanted my money they told me. * * * Then they took it. * * * Then they left and they told me to sit down in the seat and I sit down in the seat.' He said they took cash and checks out of his pockets; 'They went through my pockets while I was in the truck and took the money.' The court asked why he let them take the money and why he sat on the seat when they told him to do so. He replied, 'That's what they told me. * * * Just what they told me, that's what I did.' Again asked by the court why he let them take the money he said, 'I wasn't going to do anything about it.' Asked why not, he said, 'I didn't want to.' He had no reason why he did not want to; he did not know why he did not object-'I just didn't.'

*Giles* at 724.

*Giles* defined the scope of "violence" as an element of Maryland Robbery. The *Giles* court stated Maryland's law on this issue in response to a claim that the element of violence was not established . *Giles* defined the scope of an element of robbery - force or violence. It was necessary for the decision. It was not an "aside". *Giles*'s discussion on this point could not be deleted without impairing the analytical foundation of the holding.

3.    ***Douglas* defined the scope of Maryland's force or violence element, rejecting the idea that actual or fear of great bodily harm is required.**

The issued addressed in *Douglas* is similar to *Giles*. The appellant argued that the trial court erred in rejecting his requested jury instruction concerning robbery. Douglas's trial counsel objected to a jury instruction concerning robbery:

> Your Honor, I would except to the charge in regard to the definition of robbery, that I respectfully submit that it should start or be embellished to the extent that it is violence actual or being placed in fear, or being placed in fear of great bodily harm, and that such fear is, in fact, reasonable.

> *Douglas v. State*, 9 Md.App. 647, 652–53 (Md.App. 1970)

The *Douglas* court rejected that argument and defined, like *Giles*, the scope of violence or fear of violence. It quoted *Giles*'s and held "The instruction as requested did not state the proper rule of law." *Id*. at 9 Md.App., p. 654. The *Douglas* court was again defining the scope of an element of robbery in Maryland in the context of a disputed jury instruction. It's statement is not dicta.

The District Court erred in characterizing the pertinent language in both *Giles* and *Douglas* as "dicta".

F.    **Even if under *Mathis* Maryland Robbery with a Dangerous or Deadly Weapon is considered to be a separate offense from Robbery, it still does not constitute a crime of violence for ACCA purposes.**

The District Court relied on *Mathis* to hold that the use of a deadly or dangerous weapon is an element of the crime in Mr. Warren's 2002 conviction. But

that does not necessarily mean that Maryland's Robbery with a Dangerous or Deadly Weapon qualifies as a crime of violence under ACCA's "force" clause.

Because Maryland robbery can be committed by threatening injury to property, it logically follows that Maryland robbery with a dangerous or deadly weapon can also be accomplished by threatening injury to one's property with that weapon. For example, the offense could be accomplished by threatening to fire a gun into property, either real or personal, damaging property with a knife, or smashing windows with a club, rock or brick. Nothing limits the application of Maryland's Robbery With a Dangerous or Deadly Weapon to situations where the threatened use of a weapon has to be directed against a person.

The breadth of Maryland's "force" or "violence" element for Robbery and Robbery With a Dangerous or Deadly Weapon is the same. It is broader than ACCA's comparable element. The District Court erred in failing to acknowledge that the scope of this element is broader than the same element under the Armed Career Criminal Act.

III.   **The elements of a state conviction treated as a predicate for Armed Career Criminal Act purposes cannot be broader than their common law equivalents. The distribution element of the applicable Maryland drug statute is broader than the comparable element under 21 U.S.C. § 801 et seq. Did the District Court err in finding that Warren's May 6, 2002 Maryland Drug conviction is an ACCA predicate?**

### Standard of Review

The standard of review when a new or different theory is raised on appeal is plain error. *United States v. Sandini*, 888 F.2d 300, 304-308 (3rd Cir. 1989).

### Introduction

A prior conviction for Maryland distribution [or possession with intent to distribute to a controlled substance] under Maryland law fails to qualify as a "serious drug offense" under 18 U.S.C. § 924(e)(2)(A)(ii) because "distribution" as defined under Maryland law is an indivisible term that encompasses an offer to sell a controlled substance.  Such conduct does not constitute a "serious drug offense." Therefore, Warren is not an armed career criminal.

A.   **The categorical approach applies in determining whether a prior conviction qualifies as a "serious drug offense."**

Pursuant to 18 U.S.C. 924(e), a defendant is an armed career offender criminal if, among other factors, "the defendant has three prior felony convictions of either a violent felony or serious drug offense."   The term "serious drug offense" is defined as:

> (i) an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951

et seq.), or chapter 705 of title 46 for which a maximum term of imprisonment of ten years or more is prescribed by law; or

(ii) an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law.

18 U.S.C. § 924(e)(2)(A)

In determining whether a conviction qualifies as a "serious drug offense," sentencing courts must employ the categorical approach. *Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013). This approach requires that courts "look only to the statutory definitions - i.e., the elements - of a defendant's [offense] and not to the particular facts underlying [the offense]" in determining whether the offense qualifies as a "controlled substance offense" *Descamps*, 133 S. Ct. at 2283 (citation omitted); In addition, under the categorical approach, a prior offense is only a ACCA predicate if the elements of the statute are the same as or narrower than the generic federal predicate. *United States v. Tucker*, 703 F.3d 205, 209 (3ʳᵈ Cir. 2012).

### 1. When the modified categorical approach may be used.

For the limited purpose of "help[ing to] implement the categorical approach," in a "narrow range of cases," a federal sentencing court may look beyond the legal definition of the offense to a small list of judicial documents (known as *Shepard*-authorized documents) to determine whether the defendant pleaded guilty

to a an ACCA predicate. *Descamps*, 133 S. Ct. at 2283, 2285.   This approach, known as the "modified categorical approach", is also driven by the elements.

In *Descamps*, the Supreme Court clarified that federal sentencing courts "may apply the modified categorical approach only if the state crime at issue is divisible." *United States v. Blair*, 734 F.3d 218, 223 (3rd Cir. 2013) (citing *Descamps* at 2283).  An offense is divisible if it has alternative elements - some which constitute a 'serious drug offense" and some which do not. *Blair* at 223 (citing *Descamps* at 2283-84).  If a statute is divisible, a federal sentencing court may look at the limited number of authorized documents only "to determine which of a statute's alternative elements formed the basis of the defendant's prior conviction." *Descamps*, 133 S. Ct at 2284.

Just because an offense is defined by multiple disjunctive phrases separated by the word "or" does not automatically render the crime divisible. *Omargharib v. Holder*, 775 F.3d 192, 198 (4th Cir. 2014) (citing *Descamps* at 2283). "Some statutes, however, have a more complicated (sometimes called 'divisible') structure, making the comparison of elements harder. A single statute may list elements in the alternative, and thereby define multiple crimes." *Mathis* at136 S.Ct. 2249. Alternatively, some statutes enumerate various "Factual means of committing a single element." *Id.*

"Under *Descamps*, the modified categorical approach may be used when a statute underlying a prior conviction 'lists multiple, alternative elements,'rather

than a 'single, indivisible set of elements' . The Supreme Court referred to such statutes as 'divisible statutes.'" *United States v. Abbott*, 748 F.3d 154, 157 (3rd Cir. 2014)

### 2. Maryland's "distribute" element is broader than the comparable federal element.

Maryland courts had defined the element of "distribute" to mean "the actual, constructive, or attempted transfer, exchange, or delivering of a controlled dangerous substance from one person to another with or *without remuneration*, whether or not there exists an agency relationship.'" *Rosenberg v. State*,  12 Md.App. 20, 22, n.1. (Md.App. 1971) (emphasis added). Pattern jury instructions in Maryland further define "distribution" as a single element with alternative factual means:

> The defendant distributed a controlled dangerous substance if [he] [she] sold the substance, which includes exchanging, bartering, or *offering it for money.*

> Aaronson, *Maryland Criminal Jury Instruction* § 7.46 (emphasis added).

The finding that a defendant "distributed" an controlled substance does not require a finding as to the means by which the "distribution" occurred. It can be by exchange, barter or offering it for money. This portion of the statute is indivisible. The means of accomplishing the distribution predicate is irrelevant.

In *Rosenburg* the Court of Special Appeals explained that the "sale" of drugs includes "barter, exchange, or offer therefor…" *Rosenberg*, 276 A.2d at 711 (citing

Code, Art. 27 § 276(k) (now re-codified and incorporated under Md. Code, Crim. Law § 5-602)).

In Maryland therefore, once a jury agrees that a defendant "distributed" a controlled substance, it does not have to agree on the means by which he or she "distributed," whether it be exchanging, bartering, or offering it for money. Because this portion of the statute is indivisible, the means by which a client commits the predicate "distribution" is of no consequence. Thus, the distribution offense is indivisible. In turn, if any one of the factual means of committing a distribution [or possession with intent to distribute] offense fails to constitute a "serious drug offense," then a prior conviction for distribution [or possession with intent to distribute] under Maryland's drug statute in effect at the time, Article 27, § 286 can never qualify as a "serious drug offense" under 18 U.S.C. § 924(e)(2)(A)(ii), no matter what the actual factual basis was for the conviction.

Title 21, U.S.C. § 841(a)(1) makes it unlawful to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." "Distribute" is defined as "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical. 21 U.S.C. § 802. While "deliver" means "the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship."

Title 21, U.S.C. § 802 makes no reference to "offer to sell" in its definition of distribution. Maryland's distribution element is therefore more broadly defined than its federal equivalent. Consequently, Warren's May 6, 2002 heroin conviction

27

cannot be a predicate conviction of the Armed Career Criminal Act.

The District Court erred in treating Warren's May 6, 2002 conviction as an ACCA predicate.

## CONCLUSION

Warren's conviction should be vacated due to the warrantless search conducted of his residence without probable cause or exigent circumstances. If his conviction is upheld, he is serving an illegal sentence, having erroneously been classified as an armed career criminal.

Respectfully submitted,

/s/ R. Damien Schorr
R. Damien Schorr
Counsel for appellant Atiba Warren

Dated: May 2, 2017

28

# CERTIFICATES OF COMPLIANCE

## Certificate of Compliance

I certify that this brief contains 6,374 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(A).

/s/R. Damien Schorr
R. Damien Schorr

## Certificate of Bar Membership

I, R. Damien Schorr, certify that I am a member of the bar of this Court.

/s/R. Damien Schorr
R. Damien Schorr

## Identical PDF & Hard Copy Certificate

The undersigned certifies that the PDF file and Hard Copies of this brief are identical.

/s/R. Damien Schorr
R. Damien Schorr

## Virus Scan Certificate

This email and the attached electronic brief have been scanned by Trend Microvirus Version 11.1.1045. No viruses were found.

/s/R. Damien Schorr
R. Damien Schorr

## CERTIFICATE OF SERVICE

I, R. Damien Schorr, counsel for appellant Atiba Warren, certify that I served

on this 2nd day of May, 2017, two copies of the foregoing Brief and the attached

Appendix Volume I for Appellant by both electronic mail (one copy of each) and

Federal Express upon the following:

AUSA Rebecca R. Haywood Esq.
Rebecca.Haywood@usdoj.gov
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

/s/R. Damien Schorr
R. Damien Schorr

**TABLE OF CONTENTS**
**APPENDIX VOLUME I**

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1

Judgment in a Criminal Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-2

Amended Tentative Findings and Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-12

Order Denying Motion to Suppress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-29

Opinion as to Motion to Suppress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-30

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Cr. No. 13-270 |
| | ) | |
| ATIBA WARREN | ) | |

**NOTICE OF APPEAL**

Notice is hereby given that Atiba Warren, defendant in the above named case, hereby

appeals to the United States Court of Appeals for the Third Circuit from the Judgement entered

in this action on September 12, 2016.

/s/ R. Damien Schorr
R. Damien Schorr
Pa. Id. No. 62928

Attorney for defendant
Atiba Warren

Dated: September 13, 2016

A - 1

AO 245B (Rev. 02/16)   Judgment in a Criminal Case
    Sheet 1

# UNITED STATES DISTRICT COURT

Western District of Pennsylvania

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| | Case Number:    2:13-cr-270-1 |
| ATIBA WARREN | USM Number:    34900068 |
| | R. DAMIEN SCHORR |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
    which was accepted by the court.

☒ was found guilty on count(s)    1
    after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 922(g)(1) | POSSESSION OF A FIREARM BY A CONVICTED FELON | 10/23/2012 | 1 |

    The defendant is sentenced as provided in pages 2 through ____6____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

9/12/2016
Date of Imposition of Judgment

_Signature of Judge_

MARK R. HORNAK, UNITED STATES DISTRICT JUDGE
Name and Title of Judge

9/12/2016
Date

CERTIFIED FROM THE RECORD
Date  9/13/2016
ROBERT V. BARTH, JR., CLERK
By _____
                  Deputy Clerk

A - 2

AO 245B (Rev. 02/16) Judgment in Criminal Case
Sheet 2 — Imprisonment

DEFENDANT:      ATIBA WARREN                            Judgment—Page    2    of    6
CASE NUMBER:    13-270-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

ONE-HUNDRED AND NINETY-TWO (192) MONTHS

☒ The court makes the following recommendations to the Bureau of Prisons:
   THAT THE DEFENDANT BE INCARCERATED AT A FEDERAL MEDICAL CENTER AS CLOSE TO
   BALTIMORE, MD AS POSSIBLE, AND SPECIFICALLY, AT FMC BUTNER. THAT THE TIME SERVED BY
   THE DEFENDANT WHILE IN STATE CUSTODY BE APPLIED TO HIS FEDERAL SENTENCE TO THE
   EXTENT PERMITTED BY LAW. THAT THE DEFENDANT RECEIVE ALL APPROPRIATE MENTAL
   HEALTH AND DRUG/ALCOHOL EVALUATIONS AND TREATMENT.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at        ☐ a.m.    ☐ p.m.    on

   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 2 p.m. on

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on                                        to

at                                        , with a certified copy of this judgment.

                                                        UNITED STATES MARSHAL

                                                        By

                                                        DEPUTY UNITED STATES MARSHAL

A - 3

AO 245B  (Rev. 02/16) Judgment in a Criminal Case
     Sheet 3 — Supervised Release

Judgment—Page    3    of    6

DEFENDANT:      ATIBA WARREN
CASE NUMBER:    13-270-1

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

### FIVE (5) YEARS

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☒   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☒   The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐   The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐   The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

A - 4

AO 245B  (Rev. 02/16) Judgment in a Criminal Case
    Sheet 3B — Supervised Release

Judgment—Page    4    of    6

DEFENDANT:      ATIBA WARREN
CASE NUMBER:    13-270-1

## ADDITIONAL STANDARD CONDITIONS OF SUPERVISION

14) THE DEFENDANT SHALL PARTICIPATE IN A MENTAL HEALTH ASSESSMENT AND/OR TREATMENT PROGRAM APPROVED BY THE PROBATION OFFICER, UNTIL SUCH TIME AS THE DEFENDANT IS RELEASED FROM THE PROGRAM BY THE COURT. THE DEFENDANT SHALL BE REQUIRED TO CONTRIBUTE TO THE COSTS OF SERVICES IN AN AMOUNT DETERMINED BY THE PROBATION OFFICE.  THESE COSTS SHALL NOT EXCEED THE ACTUAL COST OF THE SERVICE. THE PROBATION OFFICE IS AUTHORIZED TO RELEASE THE DEFENDANT'S PRESENTENCE REPORT TO THE TREATMENT PROVIDER IF SO REQUESTED.

15) THE DEFENDANT SHALL SUBMIT HIS PERSON, PROPERTY, HOUSE, RESIDENCE, VEHICLE, PAPERS, BUSINESS OR PLACE OF EMPLOYMENT, TO A SEARCH, CONDUCTED BY A UNITED STATES PROBATION OR PRETRIAL SERVICES OFFICER AT A REASONABLE TIME AND IN A REASONABLE MANNER, BASED UPON, BASED UPON REASONABLE SUSPICION OF CONTRABAND OR EVIDENCE OF A VIOLATION OF A CONDITION OF SUPERVISION. FAILURE TO SUBMIT TO A SEARCH MAY BE GROUNDS FOR REVOCATION.  THE DEFENDANT SHALL INFORM ANY OTHER RESIDENTS THAT THE PREMESIS MAY BE SUBJECT TO SEARCHES PURSUANT TO THIS CONDITION.

16) THE DEFENDANT SHALL PARTICIPATE IN AN ALCOHOL AFTERCARE TREATMENT PROGRAM APPROVED BY THE PROBATION OFFICER, WHICH MAY INCLUDE URINE TESTING, UNTIL RELEASED FROM THE PROGRAM BY THE COURT. THE DEFENDANT IS PROHIBITED FROM CONSUMING ALCOHOL.  THE DEFENDANT SHALL BE REQUIRED TO CONTRIBUTE TO THE COSTS OF SERVICES IN AN AMOUNT DETERMINED BY THE PROBATION OFFICE.  THE COSTS SHALL NOT EXCEED THE ACTUAL COST OF THE SERVICE.

17) THE DEFENDANT SHALL PARTICIPATE IN A PROGRAM OF TESTING AND, IF NECESSSARY, TREATMENT FOR SUBSTANCE ABUSE, SAID PROGRAM TO BE APPROVED IN ADVANCE BY THE PROBATION OFFICER, UNTIL SUCH TIME AS THE DEFENDANT IS RELEASED FROM THE PROGRAM BY THE COURT.  FURTHER, THE DEFENDANT SHALL BE REQUIRED TO CONTRIBUTE TO THE COSTS OF SERVICES FOR ANY SUCH TREATMENT IN AN AMOUNT DETERMINED BY THE PROBATION OFFICER, BUT NOT TO EXCEED THE ACTUAL COST.  THE DEFENDANT SHALL SUBMIT TO ONE DRUG URINALYSIS WITHIN 15 DAYS AFTER BEING PLACED ON SUPERVISION AND AT LEAST TWO PERIODIC TESTS THEREAFTER.

18) IT IS FURTHER ORDERED THAT THE DEFENDANT SHALL NOT INTENTIONALLY PURCHASE, POSSESS AND/OR USE ANY SUBSTANCE(S) DESIGNED TO SIMULATE OR ALTER IN ANY WAY THE DEFENDANT'S OWN URINE SPECIMEN. IN ADDITION, THE DEFENDANT SHALL NOT PURCHASE, POSSESS AND/OR USE ANY DEVICE(S) DESIGNED TO BE USED FOR THE SUBMISSION OF A THIRD PARTY URINE SPECIMEN.

19) THE DEFENDANT SHALL COOPERATE IN THE COLLECTION OF DNA AS DIRECTED BY THE PROBATION OFFICER, PURSUANT TO 28 C.F.R. § 28.12, THE DNA FINGERPRINT ACT OF 2005, AND THE ADAM WALSH CHILD PROTECTION AND SAFETY ACT OF 2006.

20) THE DEFENDANT SHALL FORFEIT TO THE UNITED STATES THE FOLLOWING PROPERTIES WHICH ARE ALSO IDENTIFIED IN THE FORFEITURE ALLEGATION. SPECIFICALLY, THE DEFENDANT SHALL FORFEIT ONE (1) TAURUS INTERNATIONAL, THE JUDGE, .45LC/.410 CALIBER PISTOL BEARING SERIAL NUMBER CT 834363.

A - 5

AO 245B (Rev. 02/16) Judgment in a Criminal Case
    Sheet 5 — Criminal Monetary Penalties

| | Judgment — Page | 5 | of | 6 |
|---|---|---|---|---|

DEFENDANT:      ATIBA WARREN
CASE NUMBER:      13-270-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

A - 6

AO 245B  (Rev. 02/16) Judgment in a Criminal Case
      Sheet 6B — Schedule of Payments

|  | Judgment—Page | 6 | of | 6 |
|---|---|---|---|---|

DEFENDANT:       ATIBA WARREN
CASE NUMBER:    13-270-1

## ADDITIONAL FORFEITED PROPERTY

1) THE DEFENDANT SHALL FORFEIT TO THE UNITED STATES THE FOLLOWING PROPERTIES WHICH ARE ALSO IDENTIFIED IN THE FORFEITURE ALLEGATION. SPECIFICALLY, THE DEFENDANT SHALL FORFEIT ONE (1) TAURUS INTERNATIONAL, THE JUDGE, .45LC/.410 CALIBER PISTOL BEARING SERIAL NUMBER CT 834363.

A - 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **2:13-cr-270-1** |
| | ) | |
| **ATIBA WARREN** | ) | |

## AMENDED TENTATIVE FINDINGS AND CONCLUSIONS[1]

Although the decision of the United States Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), held that the Sentencing Guidelines are no longer mandatory, the "remedial majority" opinion in the case instructs that the Sentencing Guidelines must still be taken into account pursuant to 18 U.S.C. § 3553(a) when fashioning an appropriate sentence. *See Booker*, 543 U.S. at 247;[2] *see also Kimbrough v. United States*, 552 U.S. 85 (2007) (courts must still "give respectful consideration to the Guidelines"); *Gall v. United States*, 552 U.S. 38 (2007) ("Guidelines should be the starting point and the initial benchmark"). It remains appropriate, therefore, in this case to consider and resolve any Sentencing Guidelines disputes in order to determine a sentencing range for Defendant, which will then be one of the § 3553(a) factors to be considered in imposing an appropriate sentence.

In accordance with § 6A1.3 of the United States Sentencing Guidelines ("U.S.S.G.") and Local Criminal Rule of Court 32(C)(7), the Court makes the following Tentative Findings and Rulings with respect to the U.S.S.G. sentencing factors.

---

[1] The Court's prior Tentative Findings and Conclusions, ECF No. 199, are hereby vacated.

[2] Title 28, United States Code, § 3553(a)(4) requires the Guidelines sentencing range to be considered as one of the factors in sentencing. Subsection (a)(6) requires the sentencing court to consider "the need to avoid unwarranted sentence disparities;" and Subsection (c) requires the sentencing court to state the reasons for the imposition of a particular sentence, including the reasons for any deviation from the Guidelines sentencing range and the effects of the other § 3553(a) factors in setting the sentence.

A - 12

On October 8, 2013, a Criminal Indictment was returned at Criminal Action 13-270 which charged the Defendant at Count One with Possession of a Firearm by a Convicted Felon (18 U.S.C. § 922(g)(1)). On October 30, 2015, the Defendant was found guilty by a jury after a trial. A Draft Presentence Investigation Report ("PSR") was prepared by the Probation Office on January 14, 2016, with a Final Report prepared on January 29, 2016 and an Addendum thereto on February 6, 2016.

In accordance with Local Criminal Rule of Court 32(C)(4), the parties are required to file a pleading with the Court, detailing the respective party's position on sentencing, including any objections to the PSI and setting forth any anticipated grounds for either a departure outside of the applicable guidelines sentencing range or a sentence outside of the applicable guideline sentencing range pursuant to 18 U.S.C. § 3553(a). The Government had not filed any objections, material corrections, or additions to the Presentence Report. The Defendant has filed a Memorandum in Aid of Sentencing and multiple position statements and motions taking issue with various provisions of the PSR relative to the calculation of the Advisory Guidelines, and the designation of the Defendant as an "Armed Career Criminal" for sentencing purposes. The Government has responded to those matters, and the Court held hearings and heard arguments in open Court in the presence of the Defendant on May 10, 2016 and August 25, 2016. The parties requested leave to file supplemental papers after each such proceeding, which was granted, and such papers have been filed and considered by the Court.

## I. Mr. Warren's Armed Career Criminal Status

Mr. Warren objects to his designation as an Armed Career Criminal subject to an enhanced sentence under 18 U.S.C. § 924(e), based on the criminal history detailed in the PSR. Specifically, Mr. Warren challenges two prior convictions—a 2002 Maryland state conviction

for robbery with a dangerous or deadly weapon and a 2002 Maryland state conviction for distribution of heroin—which he argues are not qualifying under the Armed Career Criminal Act ("ACCA"). He does not challenge the third ACCA qualifying conviction as reported at PSR paragraph 33. Because the Court concludes that both the challenged robbery conviction and the challenged distribution of heroin conviction are predicate convictions for ACCA purposes, Mr. Warren is properly designated as an Armed Career Criminal, and is subject to a 180 month mandatory minimum sentence of imprisonment under 18 U.S.C. § 924(e).

### a. **The Maryland Robbery Conviction**

First, Mr. Warren argues that his 2002 conviction for robbery with a dangerous or deadly weapon is not a predicate conviction for ACCA purposes because in Maryland, robbery is a common law offense. ECF No. 181, at 2. Instead, Mr. Warren argues, robbery with a dangerous or deadly weapon merely subjects Maryland robbery defendants to harsher penalties. *Id.* The United States counters that this is a predicate conviction under the ACCA's "force" clause. ECF No. 190, at 3. The Court would note, as set forth in the PSR at paragraphs 27, 28, and 29 and its Addendum, that the Defendant was charged and convicted upon his guilty pleas for three (3) separate such armed robberies all in the same episode but with three distinct victims. For assessment of Criminal History Points under the Advisory Guidelines, such Points are assessed only once as they all arose out of one incident, but as also reported in the PSR, they were in reality, three (3) state convictions. For ease of reference, they are for these purposes referred to here as "the robbery conviction."

The ACCA defines a violent felony as one which (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary, arson, or extortion, involves the use of explosives, or (3) otherwise involves conduct that presents a

3

A - 14

serious potential risk of physical injury to another.[3] 18 U.S.C. § 924(e)(2)(B). It is the "force" clause that is at issue here. Convictions are qualifying under the "force" clause only if they require force that is capable of causing physical pain or injury to another person. *Johnson v. United States*, 559 U.S. 133, 140 (2010).

The operative statute (that is, the one under which Mr. Warren was convicted) is Article 27 section 487 of the Maryland Criminal Code.[4] That statute provided:

> (a)    A person may not commit or attempt to commit a robbery under § 486 of this subheading with a dangerous or deadly weapon.
> (b)    A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 20 years.

Section 486(b)(1), in turn, defines "robbery" as:

> "retain[ing] its judicially determined meaning, except that a robbery conviction requires proof of intent to deprive another of property; or (2) Robbery includes obtaining the service of another by force or threat of force."

Finally, "simple" robbery under section 486, as judicially defined by Maryland courts is: "the felonious taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear." *Fetrow v. State*, 847 A.2d 1249, 1256 (Md. Ct. Spec. App. 2004) (quoting *Metheny v. State*, 755 A.2d 1088, 1104 (Md. 2000)).

In determining whether this conviction is a predicate for ACCA purposes, "the key . . . is elements, not facts." *Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013); *see also Sykes v. United States*, 564 U.S. 1, 7 (2011) ("[W]e consider [only] the *elements of the offense* [,] without inquiring into the specific conduct of this particular offender.") (emphasis in original). "'Elements' are the 'constituent parts' of a crime's legal definition—the things that the

---

[3] The third alternative (the "residual clause") was invalidated in *Johnson v. United States*, 135 S. Ct. 2551 (2015).

[4] This statute was in effect as of October 1, 2000, before Mr. Warren was charged. *See* ECF No. 151-1.

'prosecution must prove to sustain a conviction.'" *Mathis v. United States*, No. 15-6092, slip. op. at 2 (U.S. June 23, 2016) (quoting Black's Law Dictionary 634 (10th ed. 2014)). "They are what the jury must find beyond a reasonable doubt to convict the defendant [and] . . . they are what the defendant necessarily admits to when he pleads guilty." *Mathis*, slip. op. at 2. On the other hand, "facts" are "circumstances" or "effects" which have "no legal effect or consequence." *Id.* (alterations omitted).

So, then, the first step is to identify the elements of robbery with a dangerous or deadly weapon in Maryland. It appears the Mr. Warren and the United States agree that in Maryland robbery consists of (1) the taking, (2) and carrying away of, (3) the personal property of another, from his person or in his presence, (4) by violence, or (5) by putting him in fear. ECF No. 181, at 3 (citing *Coles v. State*, 821 A.2d 389, 394 (Md. 2003)); ECF No. 151, at 3 (citing *Conyers v. State*, 693 A.2d 781, 795–96 (Md. 1997)). Thus, the dispute here centers on the effect of "with a dangerous or deadly weapon." Mr. Warren argues that this is merely a sentencing enhancement, not an element of the crime. In effect, what he is really arguing is that "with a dangerous or deadly weapon" is but one *means* of carrying out the overarching crime of robbery, such that it is not an element of the offense which might trigger the ACCA's force clause. And if "with a dangerous or deadly weapon" is not an element, Mr. Warren contends that the Maryland robbery statute sweeps more broadly than the generic definition of robbery because Maryland robbery can be committed without physical force (*i.e.* "putting in fear").[5] ECF No. 181, at 2–3.

In evaluating whether something is an element as a matter of *federal* law under the ACCA, the United States Supreme Court most recently instructed that district courts should look to several equally-authoritative sources. *Mathis*, slip. op. at 16–17. Sometimes, "a state court

---

[5] Under the ACCA, if a criminal statute sweeps more broadly than the generic definition of the offense, a conviction under that statute cannot be a qualifying conviction. *Descamps*, 133 S. Ct. at 2283.

decision definitively answers the question." *Id.* And other times, "the *statute on its face* may resolve the issue." *Id.* (emphasis added). And in yet other circumstances, neither of those authorities may resolve the issue and "federal judges have another place to look: the record of a prior conviction itself." *Id.* at 17. Mr. Warren contends that Maryland state courts have repeatedly held that "use of a dangerous or deadly weapon" is *not* an element. ECF No. 181, at 2 (citing *Whack v. State*, 416 A.2d 265, 266 (Md. 1980) (Maryland "[r]obbery with a deadly weapon is not a substantive offense, but if the State can prove that a defendant used a deadly weapon during the commission of the robbery the defendant is subject to harsher penalties.") and *Teixeira v. State*, 75 A.3d 371, 381 (Md. Ct. Spec. App. 2013)). Mr. Warren also contends that this Court is conclusively bound by how Maryland courts interpret Maryland's laws. ECF No. 181, at 2. But *Mathis* makes crystal clear that the label Maryland attaches to "elements" (or non-"elements") does not conclude the matter for ACCA purposes.

Where, as here, the statute itself has alternatives which "carry different punishments, then under *Apprendi* they *must be elements*." *Mathis*, slip. op. at 17 (emphasis added). That is so because *Apprendi* holds that "only a jury, and not a judge, may find facts that increase a maximum penalty, except for the simple fact of a prior conviction." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).[6] As a matter of *Maryland* law then, there may only be "generic robbery" and "with a dangerous or deadly weapon" may well be a "sentencing enhancement" or "aggravating factor."[7] But as a matter of *federal* law, under *Apprendi* and *Mathis* "with a

---

[6] There was some argument at the August 25, 2016 hearing on whether *Apprendi* applied to Mr. Warren. It plainly does. It is a federal constitutional case that was decided on June 26, 2000, well before Mr. Warren was charged.

[7] That is not necessarily so, either. *See Fetrow*, 847 A.2d at 1257 ("the use of a deadly weapon generally constitutes 'the necessary element of force or violence or putting in fear sufficient to raise the taking of property from the person from larceny to robbery.'"). And as a matter of Maryland law, a sentencing factor is something that "supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense . . . [but] facts that expose a defendant to a punishment greater than that otherwise legally prescribed [are] 'elements' of a separate legal offense." *Parker v. State*, 970 A.2d 968, 978 (Md. Ct. Spec. App. 2009) (citing

dangerous or deadly weapon" *must be* and *is* an element because the statute (in a separate section) fixes a higher statutory maximum penalty for robbery with a dangerous or deadly weapon (20 years) than for simple robbery (15 years).[8] 27 Md. Code. Crim. Law §§ 486, 487 (2000). If, for example, Maryland robbery carried a statutory maximum of 25 years with no statutorily-fixed differential penalties for "simple robbery" as opposed to "robbery with a dangerous or deadly weapon," then the Maryland courts' "enhancement" nomenclature would control[9] under *Johnson*, 559 U.S. at 138, because an "enhancement" for use of a deadly or dangerous weapon could be applied without increasing the maximum penalty. Then there would be no *Apprendi* issue. But the Maryland statute *does* increase the statutory maximum penalty for robbery if it is committed with a dangerous or deadly weapon. As a matter of federal

---

*Apprendi*, 530 U.S. at 483 n.10, 494 n.19). Here, then, because robbery with a dangerous or deadly weapon exposes defendants to "a punishment greater than that otherwise legally prescribed," the use of such a weapon appears to be an "element" under Maryland law too, despite earlier pre-*Apprendi* cases containing language to the contrary.

[8] Two important things. First, Mr. Warren's citation to *Almendarez-Torres v. United States*, 523 U.S. 224 (1998) does not support his argument that robbery with a dangerous or deadly weapon is a mere sentencing enhancement that does not need to be proven beyond a reasonable doubt. *See* ECF No. 202, at 1–2. That case created the exception to the rule announced in *Apprendi* (and explicitly acknowledged in that case) for the fact of a prior conviction. *Almendarez-Torres*, 523 U.S. at 226–27. The binding Supreme Court case law remains that *"[o]ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490 (emphasis added). Here the issue concerns the use of a dangerous or deadly weapon, not the fact of a prior conviction, so *Almendarez-Torres* does not apply. Second, in *Mathis*, the Supreme Court was explicit—a maximum sentence-increasing factor was not "like an element," nor "akin to an element," nor even "considered an element." The Supreme Court said it *was* an element. Thus, even apart from the analysis set forth in these Tentative Findings, that designation of the use of a weapon as an element of the offense would appear to make the offense of conviction a qualifying offense as a "categorical" matter.

[9] To draw another example, this time from *Mathis* itself, the Iowa burglary statute prohibits unlawful entry into "any building, structure, or land, water, or air vehicle." Iowa Code § 702.12 (2013). The Iowa Supreme Court interpreted that to mean burglary could be committed by any one of the several "alternative methods." There, the interpretation ends the elements/means inquiry—they are means, not elements. But had the statute fixed one penalty for unlawful entry into buildings but a different penalty for air vehicles, the Iowa Supreme Court interpretation would run headlong into the federal constitutional rule announced in *Apprendi*. In such a case, a federal court would necessarily look to the statute itself.

constitutional law then, the fact of whether a dangerous or deadly weapon was used in the robbery must be decided by a jury and therefore is an element for ACCA purposes.[10]

This conclusion is bolstered by the Maryland Court of Appeals' decision in *Wadlow v. State*, 335 Md. 122, 128 (1994). There, the court noted the "distinction between sentence enhancement provisions that depend upon prior conduct of the offender and those that depend upon the circumstances of the offense. . . . [and] where the legislature has prescribed different sentences for the same offense, depending upon a particular circumstance of the offense, . . . the presence of that circumstance must be alleged in the charging document, and must be determined by the trier of fact applying the reasonable doubt standard." Further, the *Wadlow* court said "robbery is ordinarily characterized as one offense, with the division between armed robbery and simple robbery being for the purpose of punishment, but the charge must be specific and the determination of the seriousness of the offense is for the trier of fact." *Id.* at 129. Put simply, Mr. Warren could not have been convicted, and could not have been subjected to the 20 year statutory maximum penalty, unless it was proved beyond a reasonable doubt that he used a dangerous or deadly weapon.

Having determined that "with a dangerous or deadly weapon" is an element as a matter of federal law and for ACCA purposes, the Court must next evaluate whether such a conviction is a crime of violence. Mr. Warren asserts that "determining whether an offense is a 'crime of violence' under the 'force' clause of ACCA *requires* the categorical approach." ECF No. 181, at 3 (citing *Descamps*, 133 S. Ct. 2776). The categorical approach, of course, requires courts to identify a crime's elements and then line them up alongside those of the generic definition of the

---

[10] If this is not enough, the third interpretive tool the Supreme Court has given us—the record of a prior conviction itself—confirms that Mr. Warren was charged with, and pled guilty to, robbery with a dangerous or deadly weapon, ECF No. 151-1, at 2; ECF No. 190-3, at 1, which carried a statutory maximum penalty of 20 years (more than the 15 years prescribed for simple robbery).

offense to see if they match. *Mathis*, slip. op. at 3. Mr. Warren's contention however, is based on a misreading of *Descamps*. That case held that courts may not employ the "modified categorical approach" when the statute is *indivisible*, *i.e.* it does not contain alternative elements. *Descamps*, 133 S. Ct. at 2281. So it is the character of the criminal statute—not the clause of the ACCA— that dictates which approach courts should use.

Therefore, the next step is to determine whether the Maryland robbery with a dangerous or deadly weapon statute is divisible in order to identify the proper approach (categorical or modified categorical). The Court concludes that because "robbery" can be committed with or without the additional element of "with a dangerous or deadly weapon," as discussed above, it is a "divisible statute" that "sets out one or more elements of the offense in the alternative." *See Descamps*, 133 S. Ct. at 2281–82. Moreover, it is noteworthy that those crimes existed in separate statutory sections of the Maryland criminal code and have two different statutorily-mandated maximum penalties. And using the modified categorical approach[11] to look at the charging documents, it is clear that Mr. Warren was charged with and convicted of "robbery using a dangerous or deadly weapon" and was subject to a 20 year statutory maximum penalty. ECF No. 151-1.

Finally, the Court must determine whether Mr. Warren's Maryland conviction for "robbery with a dangerous or deadly weapon" has "as an element . . . the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B). "The meaning of 'physical force' . . . is a question of federal law, not state law." *Johnson*, 559 U.S. at 138. And federal law says that "physical force" must be "force . . . capable of causing physical pain or injury to another person." *Id.* at 141. Contrary to Mr. Warren's argument that robbery with a dangerous or deadly weapon could be committed with *de minimis* force, the Court

---

[11] *See* note 8, above.

concludes that as a matter of federal law, the element of using a dangerous or deadly weapon in committing the robbery satisfies the *Johnson* force standard. By definition, a dangerous or deadly weapon is dangerous or deadly because it can cause such physical pain or injury to another person. *See United States v. Moore*, 149 F. Supp. 3d 177, 182 (D.D.C. 2016); *see also Brooks v. State*, 552 A.2d 872, 880 (Md. 1989) (Maryland state law concurs that dangerous weapons are those "that may be used with dangerous or deadly effect."). Phrased differently, robbery with a dangerous or deadly weapon cannot be committed *without* the requisite force under *Johnson*. Therefore, the Court concludes that Mr. Warren's Maryland conviction for robbery with a dangerous or deadly weapon is a predicate offense under the ACCA.

That federal law compels this conclusion was predicted (rightly, in the Court's estimation after *Mathis*) by Judge Bates in *United States v. Moore*, 149 F. Supp. 3d 177 (D.D.C. 2016).[12] In that case, Judge Bates addressed many of the arguments that Mr. Warren makes here. Like in *Moore*, Mr. Warren relies on *Douglas v. State*, 267 A.2d 291 (Md. App. Ct. 1970) and *Giles v. State*, 261 A.2d 806 (Md. App. Ct. 1970) for the proposition that Maryland robbery can be accomplished either by applying physical force or by "putting in fear of the victim" or "fear of injury to one's property." ECF No. 181, at 5. But neither of those cases actually involved threats against property, and the statements to which Mr. Warren refers are dicta. Moreover, as Judge Bates points out, the Maryland Court of Appeals in *Spencer v. State*, 30 A.3d 891, 898 (Md. 2011) said that "when considering whether there has been a threat of force or intimidation," the test is "whether an ordinary, reasonable person under the circumstances would have been in fear of bodily harm." The dicta in *Douglas* and *Giles* doesn't appear to have been followed or applied

---

[12] In the *Moore* case, Judge Bates was interpreting the current codification of the Maryland robbery laws, but the current formulation is substantively indistinguishable from the statute under which Mr. Warren was convicted. Judge Bates also performed his analysis in the "career offender" context under the Guidelines, but we know that the analysis is the same for ACCA status. *United States v. Cabrera*, No. 14-4083, 2016 WL 4375632, at *4 (3d Cir. Aug. 17, 2016) ("authority interpreting one is generally applied to the other.").

in any other case, ever, so the Court will rely on Maryland's highest court's more recent pronouncement in concluding that Maryland robbery actually does require the use of threat of force against a person.[13]

A few final notes. Mr. Warren argues that the Fourth Circuit has concluded that Maryland assault convictions are not qualifying under the ACCA. ECF No. 181, at 7. That may be true, and robbery may loosely be defined as larceny combined with an assault, but as discussed above, that is not what Mr. Warren was convicted of. He was charged and convicted of robbery with a dangerous or deadly weapon, so the Fourth Circuit's observations as to assault have no bearing here. And the apparent concession by the United States in other cases that Maryland robbery is not a qualifying ACCA conviction does not affect the Court's conclusion in this case. The cases in which the United States made those concessions involved "simple" robbery, not as here, criminal informations and convictions for robbery with a dangerous weapon. Finally, the Court notes that it need not, and explicitly does not, look to any underlying conduct of Mr. Warren in making this determination. The elements of the statute and the specific charging and conviction documents compel its conclusion.

The Court concludes that Mr. Warren's Maryland conviction for robbery with a dangerous or deadly weapon is a violent felony for ACCA purposes and is thus a qualifying conviction.[14]

---

[13] The Court also agrees with Judge Bates' conclusion that even if Maryland robbery does not require the use or threat of force against a person, a taking of the property of another effectuated by the threat of violence to property would count as extortion—an enumerated qualifying offense under the ACCA. *Moore*, 149 F. Supp. 3d at 182. Further, given that under *Mathis*, the use of a dangerous or deadly weapon is an element of the offense, arguments based on *Douglas* and *Giles* would appear to be inapt.

[14] At the August 25, 2016 hearing, Mr. Warren made a statement on the record recounting that during the plea proceedings in the Maryland robbery case (in which he was represented by counsel) there was some colloquy in which Mr. Warren believes he was told by the court that some non-conviction, alternative disposition of those charges would later be entered. No documentation of any such thing has been proffered, and in any event, the

### b. **The Maryland Heroin Conviction**

Mr. Warren next argues that his conviction for heroin distribution is not a qualifying conviction under the ACCA. ECF No. 181, at 9. He says that he was only convicted under 27 Md. Code. § 286 which defines multiple offenses. *Id.* Mr. Warren argues that the indictment in the involved case does not specify under which part of § 286 Mr. Warren was convicted and moreover, a "CJIS Code" included on the charge summary indicates that he was convicted under § 286(b)(3) which carries a maximum sentence of five years (and thus would not be a qualifying ACCA conviction). *Id.* The United States submitted a series of certified Maryland docket documents that it says support its position that Mr. Warren was convicted of distributing heroin, which carries a statutory maximum penalty of 20 years in Maryland. ECF No. 179–80.

On this point, the record is clear. The charging documents plainly indicate that Mr. Warren was convicted of distributing heroin. ECF No. 180-4, at 9 (the indictment). Mr. Warren's signed commitment record indicates that he pled guilty to Count I, distributing heroin. *Id.* at 14. The sentencing judge's guidelines worksheet indicates that Mr. Warren was convicted of "distribution – heroin" which carried a statutory maximum sentence of 20 years. ECF No. 190-3. The inclusion of an errant "CJIS Code" does not change this Court's ultimate conclusion. CJIS Codes in and of themselves carry no independent legal significance in Maryland. *Battle v. United States*, No. 11-110, 2014 WL 2930750, at *5 (D. Md. June 26, 2014). Under Maryland law, citations to authority in charging documents "exist[] as a matter of convenience to the parties and the court, and thus possess no substance of [their] own." *Ayre v. State*, 291 Md. 155, 168 n.9 (Md. 1981); *see also* Md. Rules, R. 4-202. Indeed, "it is not the statutory reference that triggers the possible penalty, but, rather, the character of the offense alleged." *Thompson v. State*, 371

---

Maryland robbery conviction may not be impeached here on such grounds. *See United States v. Napolitan*, No. 15-1602, 2016 WL 3902164 (3d Cir. July 19, 2016).

Md. 473, 495 (Md. 2002). Here, Mr. Warren was clearly charged with—and clearly pled guilty to—distribution of heroin, which carried a statutory maximum penalty of 20 years. Any mistaken citation to the wrong CJIS Code does not change that, and it is the character of the offense (not the citation to authority) which subjected Mr. Warren to that 20 year statutory maximum penalty.

Finally, the Court's disposition of this issue is not altered by Mr. Warren's testimony at the May 10, 2016 hearing in this Court that he was advised by the Maryland sentencing judge that the statutory maximum penalty for the drug conviction was 5 years. Courts look to the trial record "including charging documents, plea agreements, transcripts of plea colloquies, findings of fact and conclusions of law from a bench trial, and jury instructions and verdict forms" when evaluating the specific offense of conviction. *United States v. Washington*, 629 F.3d 403, 409 (4th Cir. 2011). As described above, those documents plainly indicate that Mr. Warren was convicted of heroin distribution carrying a statutory maximum penalty of 20 years. Even if Mr. Warren was so advised, erroneously, he was nevertheless subject to the 20 year statutory penalty under Maryland law. Therefore, the 2002 heroin conviction is a predicate conviction under the ACCA.

## II.    Presentence Investigation Report ¶ 25

Mr. Warren next argues that no criminal history points should be assessed for a 2003 assault conviction described in paragraph 25 of the PSR. ECF No. 181, at 10. Mr. Warren asserts that the record is, at best, unclear as to whether Mr. Warren was represented by counsel and/or entered a valid guilty plea. *Id.* The United States argues that two (2) criminal history points should be assessed because Mr. Warren has not carried his burden to overcome the presumption of regularity that attaches to the conviction. ECF No. 190, at 7–8.

The record, as it is available to the Court, does not indicate whether Mr. Warren was in fact represented by counsel when he pled guilty to the assault charge. The right to counsel is a vital one, and courts must undertake a vigorous and searching inquiry into a defendant's intent to waive it. *See United States v. Thomas*, 357 F.3d 357, 362 (3d Cir. 2004); *United States v. Welty*, 674 F.2d 185, 188 (3d Cir. 1982). As the PSR indicates, available records do not provide for attorney representation. ECF No. 146, at 7. They do reflect that Mr. Warren was informed of the "right to, and importance of, counsel." *Id.* In the Court's view, that meager cautioning falls far below the "searching inquiry" necessary to ensure a knowing and voluntary waiver of the right to counsel. "Perfunctory questioning is not sufficient." *Welty*, 674 F.2d at 197.

Because the record does not support a finding that Mr. Warren was represented by counsel or that he knowingly and voluntarily waived his right to counsel when he was sentenced for the 2003 assault, no criminal history points will be assessed for that conviction.

## III. Weapons Enhancement

Mr. Warren next argues that a four (4) Level enhancement under U.S.S.G. § 2K2.1(b)(4)(B) is inappropriate because it would "increase his Sentencing Guidelines range to above the statutory maximum sentence he faces." ECF No. 189, at 2. The United States responds that the enhancement is proper because the firearm in this case had an obliterated serial number, a fact which it says was established at trial. ECF No. 190, at 8.

The Court concludes that the § 2K2.1(b)(4)(B) enhancement is properly applied here. The Court finds by a preponderance of the admissible evidence presented at trial that the firearm in question had an obliterated serial number. And U.S.S.G. § 2K2.1(b)(4)(B) provides that "[i]f any firearm . . . had an altered or obliterated serial number," a four (4) Level enhancement applies. Thus, the enhancement is proper in this case, regardless of whether Mr. Warren is considered as

A - 25

an Armed Career Criminal and regardless of whether it ultimately changes the Advisory Guidelines range. The Court is obligated to apply the enhancement if the record supports it, and if the resulting Advisory Guidelines Offense Level results in a sentence that is greater than the statutory maximum, then the Advisory Guidelines themselves provide that the statutory maximum becomes the top end of the Advisory sentence. *See* U.S.S.G. § 5G1.1(a).

## IV. Other Sentencing Issues

Finally, the Sentencing Memorandum filed by the Defendant's prior counsel objected to the consideration of matters at PSR paragraphs 60 and 63, relating to Defendant's mental health history on the grounds that that information was not authorized for release to the Probation Officer. Of note, Defendant's current counsel has, as noted above, expressly referenced the Defendant's mental health history, so it may be that this issue is now moot, but beyond that, as reported in the Addendum to the PSR, the information reported in the PSR came from the Defendant, and the Defendant (who now asks the Court to focus on his mental health situation) expressly declined to provide the necessary authorizations to the Probation Office to obtain those records. That Objection appears to not be well-taken, and will be overruled.[15]

Based on the Court's examination and consideration of the Presentence Report and Addendum, and its rulings on the Defendant's Objections and motions as set forth above, the Court adopts and finds the facts contained therein except as to the inclusion of the matters set forth in paragraph 25 as to the assessment of Criminal History Points. The Base Offense Level is 24 based on U.S.S.G. § 2K2.1(a)(2). There is an upward adjustment of +4 Levels pursuant to U.S.S.G. § 2K2.1(b)(4)(B). Pursuant to U.S.S.G. § 4B1.4(b)(3)(B), that is increased to Offense Level 33. This results in a Total Offense Level of 33. Defendant's applicable Criminal History

---

[15] The Defendant's previous requests for Departures pursuant to U.S.S.G. § 5H1.2 and 5H1.4 were withdrawn on the record at the August 25, 2016 hearing, the Defendant reserving the ability to raise such matters in conjunction with the application of the § 3553(a) sentencing factors.

Category is derived by reference to U.S.S.G. § 4B1.4. Based on 12 Criminal History Points (Criminal History Category V), taking into account this Court's ruling as to PSR paragraph 25 as noted above, the applicable Advisory Guidelines term of imprisonment would be 210 to 262 months. *See* Addendum to the PSR, ECF No. 152, at 4.

Based on the matters set forth in detail above, the Advisory Guidelines provide for a sentence of imprisonment of 210-262 months. There is by statute a mandatory minimum term of imprisonment of 180 months. 18 U.S.C. 922(g)(1) and 924(e)(1). Were Mr. Warren not designated as an Armed Career Criminal, the Total Offense Level would be 28, with a Criminal History Category of V, resulting in an Advisory Guidelines sentence range of 130-162 months of imprisonment, which would then be adjusted to a Guidelines sentence of 120 months in light of the maximum statutory sentence for the crime of conviction (120 months).

The sentencing hearing will proceed as scheduled on **September 12, 2016, at 9:30 a.m**. in **Courtroom 6A**, in accordance with the foregoing Tentative Findings and Conclusions. Defendant is currently in custody. Based on these Tentative Findings and Conclusions, Defendant will be presumptively sentenced based on a Total Offense Level of 33, with a Criminal History Category of V. Zone D of the Advisory Guidelines Sentencing Table applies. The applicable Advisory Guideline range of imprisonment is 210-262 months for the reasons noted above. There is a mandatory minimum term of imprisonment of 180 months. By statute, probation is not permitted. The Court must impose a term of supervised release of not more than five (5) years, and may pursuant to the Advisory Guidelines impose a fine of $17,500 to $175,000. Restitution is not applicable, and forfeiture is applicable. There is a mandatory special

16

A - 27

assessment of $100. The Court will consider the application of any timely motion for a departure or variance at the time of sentencing.

So ORDERED this 1st day of September, 2016.

BY THE COURT:

_s/ *Mark R. Hornak*_____
Mark R. Hornak
United States District Judge

cc:     Andrew A. Waszyn
        U.S. Probation Officer

        Katherine A. King, Esquire
        U.S. Attorney's Office

        R. Damien Schorr, Esquire
        Counsel for Defendant

17

A - 28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )     Criminal No. 2:13-cr-00270 |
| | ) |
| ATIBA WARREN | )     Judge Mark R. Hornak |
| | ) |
| | ) |
| | ) |
| | ) |

**ORDER**

AND NOW, this 7th day of July, 2015, after oral argument and evidentiary hearing on the pending Motions then before the Court, heard on March 3, 2015, and upon consideration of the filings and supplemental filings submitted to the Court by the United States and the Defendant, the record adduced, and the arguments presented, it is hereby ORDERED that Defendant's Motion to Suppress Evidence with Citation to Authority [ECF No. 42] is DENIED for the reasons set forth in the Opinion of this date.

A telephonic status and trial scheduling conference is set for July 10, 2015, at 10:15 a.m. The Court will initiate the call.

Mark R. Hornak
United States District Judge

cc: All counsel of record

A - 29

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     )
                                     )
            v.                  )     Criminal No. 2:13-cr-00270
                                     )
ATIBA WARREN              )     Judge Mark R. Hornak
                                     )
                                     )
                                     )
                                     )

## OPINION

**Mark R. Hornak, United States District Judge**

On October 8, 2013, a federal grand jury indicted the Defendant, Atiba Warren, for possessing a firearm as a convicted felon. ECF No. 1. The charge arose out of a series of events which occurred on October 23, 2012 at 520 Lincoln Avenue in Pittsburgh ("Residence"). Mr. Warren has filed a Motion to Suppress Evidence. ECF No. 42. Based on this Court's review of the Motion, along with all filings in support and in opposition thereto, ECF Nos. 46; 78; 81; 82; 87; 88, the evidentiary hearing and oral argument conducted in open Court on March 3, 2015, ECF No. 73, and for the reasons set forth below, Defendant's Motion will be DENIED.[1]

As an initial matter, the Court finds and concludes[2] that Mr. Warren has established that he had a reasonable expectation of privacy in 520 Lincoln Avenue such that he has standing to challenge the search. *See* ECF No. 42, at ¶¶ 1–2 (stating that Mr. Warren had two residences on the date in question, but that he slept, received mail, and stored his belongings at the Lincoln

---

[1] This Court previously denied without prejudice as moot all Motions pending before the Court as of March 3, 2015, except for Defendant's Motion to Suppress Evidence, based on the stipulation of the parties. *See* ECF No. 68; Hr'g Tr. at 178:23–179:25.

[2] The Court also so stated on the record in open Court on March 3, 2015. Hr'g Tr. at 15:24–16:17.

Avenue address); Hr'g Tr. at 7:17–8:11 (Estelle Hayes's testimony that she resided at 520 Lincoln Avenue on October 23, 2012 and that Mr. Warren resided there with her); *id.* at 11:22–12:10 (Estelle Hayes's testimony that Mr. Warren paid rent each month while living at the Residence); Def.'s Exs. I–K (mail addressed to Mr. Warren at 520 Lincoln Avenue). Based on the proffers of defense counsel in the initial motion and the evidence presented, the Court therefore concluded it was proper to proceed with conducting an evidentiary hearing on the suppression issues.

Testifying at the evidentiary hearing held on March 3, 2015 for the United States were Steven Sywyj and Lance Hoyson, two Pittsburgh Police Officers involved in arresting Mr. Warren. Witnesses called on behalf of the Defendant were Ms. Estelle Hayes, Mr. Warren's landlord on the date in question, and Mr. Travis Johnson, who in his profession at a company specializing in creating three-dimensional models of architectural structures, created a "virtual model" of the layout of the Residence.

## I.    FACTUAL FINDINGS

The Court initially observes that there did not appear to be any direct contradictions among the various fact witnesses' testimony. Rather, each fact witness offered a unique viewpoint dealing with specific events of the evening that largely did not overlap (or where they overlapped, they were not inconsistent with one another). The testimony of Mr. Johnson, the Defense's expert witness, was presented to cast doubt on some of the factual observations of Officer Sywyj (who had experienced the scene firsthand), using three-dimensional modeling and animations that attempted to mimic the spacing, depth, and lighting conditions as they existed on October 23, 2012 at around 10:30 p.m. The Court will review Mr. Johnson's testimony in greater detail below, but first will recount and assess the testimony of the three fact witnesses.

### A. Officer Sywyj's Testimony

On the night of October 23, 2012, Steven Sywyj, a Police Officer with the Pittsburgh Police Department, responded to a call at 520 Lincoln Avenue based on a report that a man had been stabbed.  Hr'g Tr. at 21:15–19.  Upon Officer Sywyj's arrival at what he described as a "chaotic" scene,[3] he found the "bloody" and "barely conscious" victim on the front porch of the Residence receiving aid from another man, later identified as DeShawn Weathers.  *Id.* at 23:4–10; 24:14–17; 30:9–11.  Medics arrived within a few minutes and removed the victim from the front porch, at which point Officer Sywyj turned his attention to Mr. Weathers.  *Id.* at 24:4–17.  Mr. Weathers asked Officer Sywyj's permission to go inside the Residence and speak with the family, and Officer Sywyj agreed, although he still needed to interview Mr. Weathers as a witness to the stabbing, and told him so.  *Id.* at 24:19–25:16.  Mr. Weathers then proceeded into the living room of the Residence to speak with those inside.  *Id.* at 25:21–22.

According to Officer Sywyj, he stood at the "threshold of the [front] door," which was wide open,[4] and watched Mr. Weathers speak with the family to confirm that Mr. Weathers did not attempt to leave the scene through the back door.  *Id.* at 26:3–8; 32:14–16.  As Mr. Weathers conversed with the family in the living room, Officer Sywyj witnessed another individual, later identified as the Defendant, "behind everybody, where everybody was, with a firearm," which the Defendant held "in his right hand at chest level."  *Id.* at 25:22–24; 26:17–18.[5]  Later, Officer Sywyj testified in response to the Court's question, and using Defendant's Exhibit A-6 as a demonstrative aid, that while he stood at the threshold of the front door, he first saw Mr. Warren

---

[3] The Court refers at various points in this Opinion to multiple Officers' descriptions of the scene as "chaotic."  The Court would note that no one testified that the scene at the Residence was anything other than chaotic or that the events occurred in less than a compressed period of time.

[4] The Officer could not recall whether the screen door was also wide open, but recalled that the larger door was.  *Id.* at 31:23–32:16.

[5] Officer Sywyj identified the weapon as a Taurus Judge.  Gov.'s Ex. 1; Hr'g Tr. at 28:20–24.

standing "within a couple feet of the archway" between the living room and dining room areas to the left of the fireplace. *Id.* at 168:13–169:1.

At that point, Officer Sywyj drew his own firearm, shouted "gun" to the other officers on the scene, and ordered everyone from the Residence. *Id.* at 26:1–2; 27:11–12. Officer Sywyj testified that Mr. Warren then "disappeared from one doorway and re-emerged a second or two later from a doorway further to the right, sans gun." *Id.* at 27:13–16. Officer Sywyj ordered Mr. Warren from the Residence, entered the Residence himself, and recovered the gun from "under a magazine on a table" behind the wall in between the two doorways.[6] *Id.* at 27:19–24. The firearm's serial number had been obliterated. *Id.* at 28:1–2. Because of that fact, Officer Sywyj requested that Mr. Warren be arrested. *Id.* at 29:24–30:4.

### B. Officer Hoyson's Testimony

Officer Hoyson testified that the scenes at these types of police calls were normally chaotic, and that the scene at 520 Lincoln on October 23, 2012 was no exception. *Id.* at 45:8–9; 16–19. Officer Hoyson initially assisted medics in loading the stabbing victim into an ambulance and then remained on the scene to gather evidence about the stabbing. *Id.* at 46:5–10. He testified that he heard Officer Sywyj "alert other officers on scene that he saw someone with a gun inside the house." *Id.* at 46:12–14. Officer Sywyj then entered the Residence and ordered the occupants to go outside, while Officer Hoyson entered the Residence to "perform a protective sweep for any other occupants with Officer Sywyj." *Id.* at 46:16–18. Officer Hoyson testified that Officer Sywyj found the gun, and that he, Officer Hoyson, "could hear noises upstairs." *Id.* at 46:19. Believing people may still be upstairs, the Officers again ordered anyone in the Residence to exit. *Id.* at 46:19–22. Officer Hoyson and another officer then proceeded upstairs to

---

[6] These refer to the internal archways between the first-floor rooms in the Residence.

find that a television set was turned on, which accounted for the noises heard from below. *Id.* at 46:23–47:1.

After realizing the noise had come from a television, Officer Hoyson left the Residence and joined Mr. Warren in the police car where he was detained. *Id.* at 47:3–4. Officer Hoyson testified that he "advised [Mr. Warren] of his Miranda rights, and interviewed him about the firearm." *Id.* at 47:4–5. Mr. Warren then made several statements, including that he bought the gun on the street with the serial numbers already filed off, and that he went and got his gun that night after hearing that his cousin had been stabbed. *Id.* at 47:6–15. On cross-examination, Officer Hoyson stated that he did not present Mr. Warren with any form informing him of his rights, but on redirect, he further explained that such forms are not typically carried by officers "on the streets." *Id.* at 47:20–48:6; 49:18–25.

### C. Estelle Hayes's Testimony

Ms. Estelle Hayes has been a resident at 520 Lincoln Avenue since July of 2011, and was Mr. Warren's landlord at that address on October 23, 2012. *Id.* at 7:16–21; 8:5–11.[7] The residence is a two-story, standalone home. *Id.* at 52: 2–10. At the hearing, Ms. Hayes identified various photographs of the Residence's exterior and interior,[8] one of which depicts the view of the interior of the Residence from the front door. Def.'s Ex. A-5.[9]

---

[7] Ms. Hayes and Mr. Warren were the only residents of the house on October 23, 2012. *Id.* at 14:7–14.

[8] The photographs were taken on February 9, 2015, at approximately 9:00 a.m., and were offered into the record based on Ms. Hayes's testimony generally describing the residence, though some aspects such as the interior wall paint color had changed between when the incident occurred and when the photographs were taken. *Id.* at 69:24–70:8.

[9] The view that Officer Sywyj would have had when he initially saw Mr. Warren. Although according to the transcript, defense counsel referred to the photograph in a question during the hearing as A-4, the Court notes that A-4 is in fact a photograph of the outside of the residence and the descriptions provided by Ms. Hayes in response to questioning in fact match those depicted in A-5. Hr'g Tr. at 55:18–56:3.

5

A - 34

Ms. Hayes testified that on October 23, 2012, she retired to her bedroom at around 7:00 p.m. and that Mr. Warren was already upstairs in his bedroom at that time. *Id.* at 61:7–12. Later in the evening, Ms. Hayes heard Mr. Weathers calling out to her from downstairs, saying that her son had been stabbed. *Id.* at 61:17–20; 62:10–12.[10] Upon hearing this, Ms. Hayes "jumped out of bed and ran downstairs." *Id.* at 62:13–14. Several people were on the front porch when Ms. Hayes arrived, including the police, medics, and her son, the victim. *Id.* at 63:12–16.

Ms. Hayes also testified that her general routine when she retired in the evenings was to "check all the doors" and "turn off the lights," though she would leave both the porch light and a kitchen light over the stove on. *Id.* at 60:17–18. It was also part of her general routine to keep the windows covered, *id.* at 155:15–24; 157:10–12, and although the curtains she used were not "black-out curtains," *id.* at 158:3–4, they were also not see-through and light from street lights generally did not come in through the front window, *id.* at 158:18–159:8.

Ms. Hayes stated that on October 23, 2012, the main lights were off when she ran downstairs after hearing that her son had been stabbed. *Id.* at 68:1–3. However, she did not need to turn on a light when she went downstairs because the light coming from outside, including the police lights, made it bright enough to see. *Id.* at 68:4–13. Indeed, when counsel for the United States asked on cross-examination if it was "pretty bright in [Ms. Hayes's] house," Ms. Hayes responded, "Uh-huh." *Id.* at 68:8–9.

**D. Travis Johnson's Expert Testimony**

Mr. Travis Johnson has worked for seven (7) years at Cadnetics, a company which specializes in producing precision drawings and three-dimensional modeling of structures using a

---

[10] Mr. Weathers had entered the house by breaking in through the back door, according to Ms. Hayes. *Id.* at 61:21–62:5.

laser scanner[11] and related computer software.  *Id.* at 73:10–18; 82:1–12; 84:14–19.  The company is typically engaged by architects, engineers, and building contractors.  *Id.* at 76:12–19.  Based on defense counsel's initial questioning and counsel for the United States's *voir dire*, the Court found that based on Mr. Johnson's education and experience, he would be permitted to testify in the form of an opinion during the suppression hearing.  However, the Court reserved ruling during on the ultimate admissibility of any opinion offered by Mr. Johnson under Federal Rule of Evidence 702.  *Id.* at 90:15–22.[12]

On December 19, 2014, Mr. Johnson visited 520 Lincoln Avenue and performed laser scans of the first floor interior and exterior of the Residence, which he then used to produce scaled models and animations of the residence.  *Id.* at 91:5–92:25.  Mr. Johnson used the measurements gathered and additional information provided by defense counsel to attempt to recreate the scene at the Residence as it was on October 23, 2012 at approximately 10:30 p.m.  *Id.* at 99:10–19; 101:17–18.  Among the exhibits introduced were animations showing the Residence from exterior to interior based on the viewpoint of a male whose line of sight would be approximately five-feet, six-inches off the ground.  Def.'s Exs. E; F; Hr'g Tr. at 100:25–101:11.  The exhibits include a rendering of an individual near the bottom of the staircase, which is information provided by defense counsel and is meant to represent the Defendant's position when Officer Sywyj saw him.  Hr'g Tr. at 101:12–18.  The difference between Exhibits E and F is that Exhibit E used lighting conditions from during the day, while Exhibit F was "created for the night scene."  *Id.* at 102:2–9.  For the night scene, Mr. Johnson testified that he applied various lighting

---

[11] Mr. Johnson stated that a laser scanner "is an object that you place in a room and it measures distances to surfaces that it can see."  *Id.* at 82:5–6.  Laser scanners can take "[m]illions" of measurements of a given space when operating.  *Id.* at 82:10–12.

[12] It is to the advocacy credit of defense counsel to identify and then attempt to use such technological analysis.  As noted below, however, the actual applicability of it as an evidentiary tool in this specific case comes up short.

sources based on "given information," attempting to account for various amounts of light emitted from the kitchen light Ms. Hayes leaves on, the porch light, and various other sources. *Id.* at 102:6–103:25. He also identified exhibits showing a birds-eye vantage point based on the models, which presumably replicate the scene at 10:30 p.m., and also show the scene as viewed from the front door looking toward the kitchen and include an individual who presumably represents Mr. Warren. Def.'s Exs. H-2–4; Hr'g Tr. at 107:5–15.

Cross-examination of Mr. Johnson focused on potential flaws in his process that could have thrown off the accuracy (and hence probative value) of his models of the scene, specifically with regard to the lighting and the research Mr. Johnson conducted to obtain that information, and also with regard to the information provided about where the person representing Mr. Warren was standing in the models. *E.g.,* Hr'g Tr. at 113:15–16; 119:21–120:8; 121:13–122:18; 124:9–10. Notably, the models do not take into account lights from the police cars or flashlights on the scene (of which there were likely several, since there were roughly twelve (12) Officers present). *Id.* at 127:21–24.

Mr. Johnson also testified that in his conversation with defense counsel, they talked about Mr. Johnson's prospective that "the animation was not to prove what the person can or cannot see," but rather that it accurately reflects "what physics are" without being indicative of what any specific person could see at a specific point, because people's eyes adjust to lighting differently. *Id.* at 124:11–125:5. However, on redirect examination, Mr. Johnson then testified by way of his opinion that based on where the representative person in the model was standing, a person at the front door would not be able to see that person in his entirety given the lighting conditions at the time. *Id.* at 142:1–9.[13]

---

[13] In this regard, the Court would observe that notwithstanding his expertise in laser-assisted architectural renderings, Mr. Johnson was not shown to have any particular expertise as to issues of visual acuity.

8

Additionally, Mr. Johnson testified on cross-examination that the person in the diagram representing Mr. Warren was positioned based on "a point in that general area" (referring to the bottom of the staircase in the dining room) rather than a point closer to the front door as had been stated in the testimony of Officer Sywyj. *Id.* at 144:10–18. Mr. Johnson also testified that his model did not take into account any light that was coming through the window of the living room, *id.* at 145:11–16, although Ms. Hayes explained that her curtains were not "black-out curtains," *id.* at 158:3–4.

## II. ANALYSIS

Searches performed without a warrant are presumptively unreasonable under the Fourth Amendment, and the United States bears the burden of proving the reasonableness of officer conduct under the circumstances. *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). One well-known exception to the warrant requirement is the presence of probable cause[14] coupled with exigent circumstances, which include a threat to the safety of law enforcement officers or the public. *See Warden v. Hayden*, 387 U.S. 294, 298–99 (1967) (finding officers acted reasonably to protect their lives and the lives of others when they entered a home to search for both a man who

---

[14] In neither the hearing nor their briefs did the parties call into question or meaningfully address the probable cause element. Probable cause to enter a house to search is different from the probable cause required to make an arrest. *United States v. Myers*, 308 F.3d 251, 263–64 (3d Cir. 2002). Upon consideration of the record, the Court finds and concludes that probable cause existed to enter the home as soon as Officer Sywyj saw a person less than twenty (20) feet away from him with a gun, and that he acted reasonably to secure the gun and the Residence while other individuals may have remained present inside. *See Warden v. Hayden*, 387 U.S. 294, 299 (1967) (search of house for weapons that could be used against police proper); *United States v. Parrott*, 450 F. App'x 228, 230 (3d Cir. 2011) (probable cause and exigent circumstances existed to allow search of the house when several factors were present, including that officers did not know the number of people inside the house and that someone inside may attempt to use a shotgun against officers); *cf. Maryland v. Buie*, 494 U.S. 325, 334 (1990) (authorizing limited protective sweep incident to arrest when it was possible that "an attack could be immediately launched" from certain spaces). Then, the fact that the serial number was obliterated gave officers probable cause to arrest Mr. Warren, who had been witnessed holding the weapon. *See Myers*, 308 F.3d at 264 (explaining that a child's account to police officers that her mother and father were fighting inside the house and that her father had a gun "created a sufficient exigency to allow [the officer] to enter her home to investigate," though it did not itself authorize the officer to arrest anyone). An officer's sighting of an individual with a gun less than twenty (20) feet away, in the immediate aftermath of a violent crime still being actively investigated, justified that entry to ensure that no one else was present who had access to the firearm while the area remained an active, unsecured crime scene.

9

A - 38

perpetrated an armed robbery and for the weapons "he had used in the robbery or might use against them"); *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006) ("Examples of exigent circumstances include, but are not limited to . . . danger to the lives of officers or others."); *Estate of Smith v. Marasco*, 318 F.3d 497, 518 (3d Cir. 2003) ("[A] warrantless seizure in a person's home violates the Fourth Amendment unless both probable cause and exigent circumstances are present.").[15]  Whether exigent circumstances justify a warrantless search is an objective inquiry based on the totality of the circumstances encountered by law enforcement officers "*at the time they took their actions*."  *Marasco*, 318 F.3d at 518 (emphasis added).  An officer's subjective state of mind is irrelevant to the inquiry.  *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006).

Even if exigent circumstances are present at some point during the course of events based on the need to protect officer safety, an exigency justifying a warrantless search may dissipate if, for instance, the search occurs after the premises has been secured and after a suspect has been arrested, as opposed to prior to securing the premises and prior to or contemporaneous with the arrest.  *United States v. Mallory*, 765 F.3d 373, 386 (3d Cir. 2014).[16]  "Imminence" is a touchstone of exigent circumstances.  *Id.* at 384.

---

[15] In such a situation, "the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion." *Coles*, 437 F.3d at 366 (citing *Hayden*, 387 U.S. at 298–99).  Our Court of Appeals has recognized that when officers "had reason to believe that a laser-sighted weapon was being pointed at them, they had reason to fear for their own safety.  Consequently, there were exigent circumstances." *Marasco*, 318 F.3d at 518.

[16] The full set of factors identified by the Third Circuit in *Mallory* as relevant, though not exhaustive, are:

> [(1)] how soon after the alleged offense the search occurred; [(2)] whether the alleged offense was violent in nature; [(3)] whether the search occurred prior to or contemporaneous with [the defendant's] apprehension; [(4)] whether the premises as a whole had been secured, or whether it was possible that unknown individuals remained in the house; [(5)] whether [the defendant] or any of his family members had acted in an aggressive or threatening manner toward the police; [(6)] whether other members of the family were free to move about the house unsupervised by an officer; [(7)] how easily [the defendant] or a family member could have obtained and used the firearm; and [(8)] the degree of intrusiveness of the search.

*Id.* at 386.

The core issues with regard to Mr. Warren's Motion to Suppress are (1) whether exigent circumstances existed to justify Officer Sywyj's entry into the Residence and subsequent seizure of the firearm without a warrant, and (2) whether any exigency which existed at any point had dissipated by the time the search was actually conducted. With regard to the first issue, Mr. Warren's argument essentially boils down to an allegation (which he attempts to bolster through Mr. Johnson's testimony) that Officer Sywyj could not possibly have seen Mr. Warren inside the Residence with the firearm if he remained standing in the open doorway—he must have entered the Residence before seeing the gun. ECF No. 78, at 13–20. Mr. Warren attempts to undermine Officer Sywyj's credibility in a larger sense as well, alleging the existence of various inconsistencies and omissions in his testimony and report from the incident. *Id.* at 18–19.[17]

In assessing Officer Sywyj's credibility, the Court considers the following factors:

> 1) the opportunity and ability of the witness to see or hear or know the things about which the witness testified; 2) the quality of the witness's knowledge, understanding, and memory; 3) the witness's appearance,

---

[17] Mr. Warren specifically points out that Officer Sywyj (1) placed Mr. Warren in two different places on the first-floor level for his initial sighting; (2) stated that multiple individuals were present inside the living room not counting Mr. Weathers or Mr. Warren when in fact only those men and Ms. Hayes were inside the house at the time; (3) testified to but did not place in his report any conversation between himself and Mr. Warren in which Mr. Warren apparently claimed the firearm was a "toy"; and (4) testified for the first time at the hearing that Mr. Warren "emerged, disappeared, and then re-emerged from different portions of the first floor." *Id.* at 18–19.

As to the first point, the Court finds and concludes that the spot to which Officer Sywyj pointed in Court and the place he described first seeing Mr. Warren are consistent when reviewing the testimony in conjunction with the hearing Exhibits. Looking at Defendant's Exhibits A-5 and A-6, if the family members were positioned on the left side of the living room, from Officer Sywyj's viewpoint at the front door he undoubtedly could have seen Mr. Warren both "behind everybody, where everybody was," holding a firearm "at chest level," Hr'g Tr. at 25:22–24; 26:17–18, and "within a couple of feet of the archway" between the living room and dining room areas to the left of the fireplace, *id.* at 168:13–169:1. As to the second point, the number of people in a room at a given time is not necessarily indicative of an inability to see an individual holding a firearm. As to the third point, the Court found Officer Sywyj's explanation as to why he did not include the conversation in his report in the first instance worthy of belief. At the time he prepared his report, Mr. Warren had already confessed to possessing the weapon to Officer Hoyson so Officer Sywyj did not believe it was necessary to include it, and any failure to include it was otherwise an innocent omission (if an "omission" at all). As to the fourth point, the Court concludes that any description of Mr. Warren appearing and reappearing is not conclusive as to the reasonableness or urgency involved in the decision of whether the circumstances warranted entering the house. The situation remains that Mr. Warren was seen with a gun in his hand roughly eighteen (18) feet from Officer Sywyj, and that he no longer had the weapon after Officer Sywyj ordered him from the house. Exactly where he placed the gun in the meantime is irrelevant to the objectively reasonable assessment by law enforcement that they next needed to secure the home to prevent any other occupants from getting and using the gun Officer Sywyj had just seen against them or others.

> behavior, and manner while testifying; 4) whether the witness has an
> interest in the outcome of the case or any motive, bias, or prejudice; and 5)
> whether the witness's testimony was consistent or inconsistent with other
> evidence.

*United States v. Terry*, No. 10-0029, 2010 WL 4639068, at \*2 (W.D. Pa. Nov. 8, 2010) *aff'd*, 518

F. App'x 125 (3d Cir. 2013). The Court finds and concludes that taking all of these factors into

account, Officer Sywyj was in the best position of any law enforcement officer on the scene to

observe the scene—he responded to the stabbing, spoke to one of the witnesses (Mr. Weathers),

and was positioned in the doorway of the Residence (keeping an eye on Mr. Weathers) when he

saw Mr. Warren with the firearm. Officer Sywyj had four-plus years of experience with the

Pittsburgh Bureau of Police at the time of the incident and had responded to various types of calls

in the neighborhood ranging "from the mundane . . . to very violent crime." Hr'g Tr. at 19:10–21;

21:22–22:6. Officer Sywyj forthrightly admitted when he did not remember some details, such as

whether the screen door was open or closed, but was unequivocal in his testimony as it related to

the facts material to the Court's analysis. And although police officers might not be generally

considered to be wholly disinterested in the outcome of a proceeding, the Court finds and

concludes that Officer Sywyj's testimony did not contradict, and in fact lined up with, the

accounts provided by Ms. Hayes and/or Officer Hoyson, who also testified. Of specific

importance, the Court notes the consistency in Officer Sywyj's testimony that he could see Mr.

Warren holding a gun from his position in the doorway and Ms. Hayes's testimony that she did

not need to turn on a light when she went downstairs because the light coming from outside,

including the police lights, made it bright enough to see. *Id.* at 68:1–13. In sum, though he

described an incident that occurred over two and a half years ago, based on the consideration of

his testimony in the context of all of the evidence, and the Court's personal observations and

assessment of the witnesses and testimony in open Court, the Court finds Officer Sywyj credible

and his factual account plausible. Given that, and the fact that no other fact witness or other evidence from the scene[18] contradicted his testimony, the Court finds and concludes that exigent circumstances existed to justify Officer Sywyj's actions in ordering everyone from the house and entering it.

This is true even considering Mr. Johnson's testimony and the accompanying Defense exhibits. The Court finds and concludes that the models and animations he created may indeed assist the trier-of-fact based on sufficient data and facts, in that they stem from facially reliable architectural and technological principles and methods consistent with the standards set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–92 (1993). The problem with regard to Mr. Johnson's testimony, both at the hearing and to this day, is whether those principles and methods actually apply to the facts of this case. In other words, do they "fit"? "Fit" is a central element to the Daubert standard applying Federal Rule of Evidence 702. In considering the tests laid out in *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146–47 (3d Cir. 2000), and *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 743–45 (3d Cir. 1994), the Court concludes that Mr. Johnson's testimony and the accompanying exhibits will be accepted into the record for purposes of the suppression hearing, and views the United States's objections to his testimony for these purposes as going principally to the weight they should be given, although its arguments also question whether his methods were reasonably reliable. Nonetheless, doing so gives the Defendant a pretty significant benefit of the doubt as to "fit," as noted and explained below. Should the United States seek to exclude that evidence at trial on *Daubert* grounds, the Court will

---

[18] While the Defendant argues that Mr. Johnson's testimony contradicted the observations set forth by Officer Sywyj, the Court concludes that because Mr. Johnson's animations and images were based partially but materially on somewhat speculative information provided to him by defense counsel as to important facts, such as where Mr. Warren was standing and the amount of light in the house, Mr. Johnson's testimony and the exhibits in this regard cannot be viewed as actually contradicting the otherwise credible testimony of Officer Sywyj.

readdress the issue at that time and the Court's consideration of that testimony here is not conclusive of its ultimate admissibility applying Federal Rules of Evidence 702 and 403.

Even with that more liberal evidentiary approach, however, the Court also concludes that Mr. Johnson's testimony and exhibits are of limited (if any) aid to the fact-finder (here, the Court) in determining what could or could not have been seen by Officer Sywyj on the night in question. Indeed, there are meaningful internal contradictions within Mr. Johnson's testimony. *Compare* Hr'g Tr. at 124:11–125:5 (explaining that the animation is not meant to take into account what could be seen) *with id.* at 142:1–9 (stating that the person represented in the animations could likely not be seen in his entirety by someone standing in the doorway). The animations and other exhibits simply do not obviate the testimony of both Officer Sywyj that he could see Mr. Warren holding the gun and Ms. Hayes that it was bright enough in her home as she ran downstairs such that she did not need to turn on any lights. *Id.* at 68:1–13.[19] This is especially true when Officer Sywyj's testimony was that Mr. Warren would have been positioned in a materially different spot, significantly closer to the front door, than the individual depicted in the Johnson animations. *See id.* at 168:13–169:1 (indicating that Mr. Warren was standing "within a couple of feet of the archway" between the living room and dining room areas to the left of the fireplace [rather than near the staircase, as the animation shows]). Therefore, while the Court declines to strike on *Daubert* grounds the testimony and exhibits relating to Mr. Johnson's testimony, as requested by the United States, the Court also concludes that the presentation does not undercut the testimony of the fact witnesses such that the Court should conclude either (1) that Officer Sywyj "must have

---

[19] And indeed, although defense counsel argues that the animation "gave the Government a bit of the benefit of the doubt" in terms of erring on the side of making it lighter in the depiction and hence easier to see, Hr'g Tr. at 149:19–23, the Court would note that turning on the light in the foyer for purposes of the night animation shown in Defendant's Exhibit F just as likely could make it harder, rather than easier, for a human eye to adjust and see into a dark room immediately beyond than it would be if that foyer light was off, as well as those in the next room. Along with the lack of accounting for other lights entering the Residence, including from multiple emergency or law enforcement vehicles, this example further demonstrates the issue of "fit" with regard to the exhibits associated with Mr. Johnson's testimony.

14

A - 43

been" inside the Residence at the time he saw Mr. Warren holding the firearm or (2) he could not have possibly seen it at all.

As this is the case, the Court's overall conclusion is that Officer Sywyj acted reasonably and lawfully under the circumstances. The Court found him quite credible when he spoke of the relevant events, and the Defendant has not presented evidence to discredit that testimony, which placed Mr. Warren, carrying a firearm, within Officer Sywyj's line of sight from the front doorway. His reaction to this sighting given the surrounding circumstances was reasonable.[20]

Turning to the second issue, Mr. Warren argues that since the Residence was actually empty after Officer Sywyj first ordered the occupants out, any exigent circumstances which arose when he saw the firearm had dissipated before the Officer entered the Residence and found the

---

[20] The Court also declines to accept the Defendant's invitation to view the Residence to assist the Court's decision as to what Officer Sywyj could or could not see. The decision of whether to view a scene, at least when dealing with jury views, is discretionary. *See Gov't of Virgin Islands v. Taylor*, 375 F.2d 771, 771–72 (3d Cir. 1967) (per curiam) ("A view is not a matter of right; a grant or denial thereof rests in the sound discretion of the trial court."); *United States v. Sanford*, 173 F. App'x 943, 947 (3d Cir. 2006). Courts making such a determination weigh multiple factors, including whether there is "'sufficient evidence describing the scene in the form of testimony, diagrams, or photographs.'" *St. Paul Fire & Marine Ins. Co. v. Nolen Grp., Inc.*, No. 02-8601, 2007 WL 2571524, at *21 (E.D. Pa. Aug. 31, 2007) (quoting *Kelley v. Wegman's Food Markets, Inc.*, No. 02-1377, 2003 WL 21091390, at *5 (E.D. Pa. May 15, 2003) *aff'd*, 98 F. App'x 102 (3d Cir. 2004)). In this case, the Court has seen and assessed numerous exhibits depicting the Residence, both in the form of traditional photographs and in the form of models and animations. From that evidence, the Court is more than equipped to understand the distances at issue. *See, e.g.*, Def.'s Exs. H-2–H-4 (indicating distances from front doorway to areas inside the Residence). With regard to lighting, the Court finds and concludes that not only would a site visit require an exceptional commitment of resources to coopt more than a few (enough as would have been on the scene when twelve (12) officers were present) police vehicles and other emergency vehicles in order to recreate the lighting conditions as they existed on October 23, 2012, but even doing that would create a highly uncertain (at best) duplication of the conditions on the night in question. Even if that were done, it would be highly improbable (if not impossible) to get the night sky, positions of all persons and vehicles, internal/external/ambient light, shadows, and the like to "match" the night in question in order to provide anything more accurate or precise than what is already in the record. Reviewing Def.'s Ex. H-2, for instance, the Court concludes that even if the lighting was configured in exactly the manner depicted, it does not sufficiently undercut Officer Sywyj's testimony that he could see Mr. Warren so as to render his otherwise credible testimony improbable or implausible. With the amount and quality of evidence introduced at the hearing, the Court therefore concludes that a view is not necessary to further educate it regarding the Residence's layout or conditions. *Cf. United States v. Woolfolk*, 197 F.3d 900, 906 (7th Cir. 1999) (holding despite arguments that the jury needed to see the lighting in a lounge to determine whether a partition could have obstructed a view, ample evidence was presented to allow the jury to make a fair and reasonable determination without a view). Although Mr. Warren advocates that another court in this District performed such a viewing in what he describes as a similar case, the Court points out that in that case, "both sides requested a view." ECF No. 82, at 7. In this case, the United States's position is that a view is not necessary. ECF No. 81, at 8 n.4 (citing *United States v. Simmons*, 174 F. App'x 913, 918 (6th Cir. 2006), which held that no view was necessary when ample evidence was provided at the suppression hearing). Notwithstanding that, based on the Court's review of the record and relevant law, it concludes that a view is not required, nor is it necessary, to aid the Court in its determinations here.

gun.  ECF No. 78, at 19–20.  On this point Mr. Warren explains that no one else was found in the

Residence, "although a human voice on the top floor was actually that of an audible television

set."  *Id.* at 19.  It is this point that the Court finds determinative as to that argument, though other

factors also demonstrate the reasonableness of law enforcement's actions.  Officer Hoyson

testified that after the occupants of the Residence's first floor had exited, he and Officer Sywyj

entered the Residence to secure it, and he heard noises from the second floor.  Hr'g Tr. at 46:19.

The Court concludes that when the Residence had not yet been secured, and an Officer downstairs

heard noise coming from above, it was reasonable under the circumstances to believe that

someone else may be in the Residence who could have access to the gun if the Officers waited to

obtain a warrant before reentering.  This view comports with case law in this Circuit.  *Compare*

*United States v. Parrott*, 450 F. App'x 228, 229–30 (3d Cir. 2011) (holding officers had probable

cause and a reasonable basis to believe exigent circumstances existed after the defendant had been

handcuffed but before the house had been secured when they recovered a weapon they had seen

the defendant carrying) *with Mallory*, 765 F.3d at 388 (holding the exigency had dissipated once

officers had secured the premises and apprehended the defendant, and noting that the case fell

"just outside" the outer limit of the Fourth Amendment).  Here, as in *Parrott*, the Officers had not

yet secured the Residence to confirm that no one else was inside at the time when Officer Sywyj

searched for and recovered the weapon.

The reasonableness of their actions is also bolstered by consideration of the other factors

set out in *Mallory*.  First, the search occurred immediately after Officer Sywyj saw a man with a

weapon in the wake of responding to a violent crime with the victim having been removed from

the porch of the Residence only shortly before.  Second, both the stabbing (though not perpetrated

by Mr. Warren) and possession of a weapon could be viewed as violent in nature.  Third, the

16

A - 45

search occurred prior to Mr. Warren's arrest, although it was contemporaneous with his being essentially in the custody of law enforcement when he exited the Residence.  Fourth, and most importantly in this Court's view, the search occurred before the premises had been secured and while it was objectively reasonable to believe unknown individuals remained in the Residence, presumably with access to the gun the Officer had just seen.  The fifth and sixth factors tip in Mr. Warren's favor, as he did peacefully exit the Residence and did not threaten officers after his exit, and his family (or any individuals associated with him known to have been inside the Residence) similarly acted without aggression.  The seventh factor pertaining to the ease with which a family member could access and use the firearm is a closer issue but relates to the fourth factor, as police did not at the moment know whether all occupants were out of the Residence[21] or where the gun was.  The eighth and final factor dealing with the degree of intrusiveness of the search counsels that the search was reasonable: although Officers did proceed throughout the Residence to secure the premises, no Officer testified that their search included opening drawers or anything similarly intrusive.  Indeed, Officer Sywyj recovered the gun after observing it "protruding from under a magazine on a table," which would place it in plain view.  Hr'g Tr. at 27:21–24.[22]

This situation is notably distinguishable from the facts as related in the Third Circuit's opinion in *Mallory*.  In that case, officers saw a revolver on the defendant while speaking with him outside, and pursued him when he fled into a house.  765 F.3d at 377.  Police searched for Mallory inside the home and also searched for the firearm.  *Id.*  The officers ordered everyone out of the house, and after searching the remainder of the house they came across the locked bathroom "which they had at first overlooked" and found Mallory inside.  *Id.* at 377–78.  They handcuffed the defendant inside the house and brought him through the first floor toward the front

---

[21] This is a big difference from the facts in *Mallory*.

[22] This is another significant difference from the facts in *Mallory*.

door. *Id.* at 378. As the officers were on their way out, someone checked behind the open front door and found the revolver under some umbrellas. *Id.*

The District Court held that exigent circumstances existed when officers first entered the house, and the Third Circuit noted that this fact was not disputed. *Id.* at 378, 383. However, both the District Court and the Third Circuit concluded that once the police had secured the defendant and house, those exigent circumstances had dissipated and the continued search for and seizure of the gun was unreasonable. *Id.* at 378, 388. Our Court of Appeals found it important that "[b]y the time Officer Hough searched behind the door and under an umbrella to find the gun, the police had secured Mallory, the family, and the home, and were in control of the situation." *Id.* at 386. "The house had been thoroughly swept and there were no persons left unaccounted for who might attack the officers by surprise." *Id.* at 387. Regardless of whether the police were in control of the first emergency situation for which they were called to the scene (the stabbing), the Court also finds and concludes that at the moment Officer Sywyj saw Mr. Warren with the gun, a new exigency existed. That exigency must be viewed in the context of all of the circumstances faced by the Officers and those circumstances included that a stabbing had taken place, no suspect was then in custody, officers did not know whether the Residence was completely secured, and there were other ways into and out of the Residence other than the door that they monitored. As the Court emphasized above, the reasonable belief that others remained in the Residence justified a continued search even after Mr. Warren had left the Residence.

To sum up, although Mr. Warren appropriately identifies some similarities between this case and *Mallory*, in that neither defendant was armed or posed a danger to others at the time the weapon was found, and he emphasizes that he "peacefully departed from the home, remained orderly outside amidst the police presence, and offered no resistance upon a later decision to

arrest him," two stark differences between *Mallory* and this case remain: police had not yet secured the Residence in this instance, while that task had been completed prior to recovering the weapon in *Mallory*, ECF No. 78, at 19–20, and unlike the situation in *Mallory*, the Officer here saw the gun both in an occupant's hand and then in plain view. Mr. Warren admits that a television set was turned on upstairs, *id.* at 19, which is consistent with Officer Hoyson's testimony that he heard noises in the Residence. Granted, as it turned out, there was in fact no one else in the Residence who might have access to the gun—but the Officers had to make a swift and reasonable determination based on the circumstances as they existed at the time. *Marasco*, 318 F.3d at 518. At the time, the Officers knew they were responding to a violent crime, that they saw someone inside with a gun, and when they entered the Residence they heard voice-like noises from upstairs. The Court concludes that it was reasonable for them to believe that someone else might be present in the Residence and that a gun was just seen but had not yet been located and secured, all of which justified a warrantless search for any other people and for the firearm. While this would be a much closer call if the premises had been secured prior to the recovery of the weapon, as was the case in *Mallory*, in this "chaotic" aftermath of a violent crime when a suspect had not been apprehended, the investigation was very much ongoing, and the witness had just been permitted to enter the Residence, the Court concludes that this limited search of the Residence, and seizure of the firearm, was reasonable.[23]

In his original Motion to Suppress, Mr. Warren made the point that "[t]he mere existence of a gun in one's home . . . is not of itself incriminating or indicative of an ongoing criminal activity." ECF No. 42, at ¶ 8(a). True enough. But when the Court examines the totality of the

---

[23] Indeed, the United States makes the legitimate point that since Officer Sywyj could not see behind the wall of the fireplace, and he last saw Mr. Warren with the gun on one side of that wall, he had no way of knowing before entering the house if another person was standing on the other side of that interior wall with access to the weapon. ECF No. 87, at 2. Moreover, this concern was relevant even before Officer Hoyson heard noises from upstairs.

circumstances as they existed at the time, the Court finds and concludes that the Officers faced the following situation: (1) they were called to the scene of a violent crime and assisted medics on the front porch of a home after a man had been stabbed; (2) the scene was chaotic, with law enforcement, medics, residents of the home, and at least one other person (Mr. Weathers) on site; (3) Mr. Weathers, a witness to the stabbing, went inside the Residence to speak to family members, and Officer Sywyj watched these actions because he had not finished interviewing Mr. Weathers; and (4) Officer Sywyj then saw an individual holding a firearm at chest level inside the Residence.  With the amount of police vehicles positioned outside (Officer Sywyj confirmed in his testimony that there were likely twelve (12) police officers at the scene, Hr'g Tr. at 36:21–25), the Court finds and concludes that it was reasonable for Officer Sywyj to believe that anyone in the Residence would know police were present, and that anyone openly carrying a firearm within the Residence was a potential threat.  The Court concludes that Officer Sywyj acted objectively reasonably under the circumstances in ordering everyone out of the Residence, conducting a security sweep of it, and seizing the gun he had seen moments before.[24]

Finally, Mr. Warren makes much of the United States's reference to the fact that the neighborhood in question was a "high-crime area" and argues that the Court should not give that factor disproportionate weight in applying the totality of the circumstances test.  ECF No. 82, at 1–2.  The Court agrees that the Fourth Amendment applies in every neighborhood.  That said, the Court also concludes that regardless of the neighborhood involved, the police officers in this case were responding at night to the scene of a stabbing[25] that occurred quite recently with no suspect

---

[24] Officer Hoyson also testified that (5) he heard noises coming from upstairs upon entering the Residence.  It was therefore reasonable to continue the search while ensuring no other individuals remained inside who could access the weapon.

[25] As the United States pointed out, Officers did not know at the time of their arrival that the stabbing had taken place in a different location and that the victim had been moved to the front porch of the home before their arrival.  ECF No. 46, at 11.

20

A - 49

in custody. Given the events as they further unfolded, the Court concludes it would have been objectively reasonable to perform the search, regardless of the neighborhood police found themselves in at the time.[26]

Based on the foregoing findings of fact and applying the relevant law, the Court concludes that the search performed by the Officers at 520 Lincoln Avenue on October 23, 2012 was objectively reasonable under the exigent circumstances exception to the warrant requirement.[27]

## III.  CONCLUSION

Because the Court concludes that both the search, and the seizure of the gun, were reasonable and lawful under the Fourth Amendment, Defendant's Motion is DENIED. Further, in light of this ruling, and Officer Hoyson's uncontroverted testimony that he "Mirandized" Mr. Warren after placing him in custody, the Motion as it pertains to suppression of post-arrest statements made by the Defendant is similarly DENIED.

s/ Mark R. Hornak
Mark R. Hornak
United States District Judge

cc:  All counsel of record

Dated: July 7, 2015

---

[26] Because the Court concludes that the search did not violate the Fourth Amendment, the Court will not reach the issue of whether the good faith exception should apply to the Officers' conduct, as argued by the United States. ECF No. 87, at 2–5.

[27] This conclusion means that the Court need not reach the question of whether Mr. Warren's incriminating statements should also be suppressed as the fruit of the poisonous tree. Nor would the statements be suppressed for any other reason, such as failure to Mirandize Mr. Warren, as Officer Hoyson's testimony that he informed Mr. Warren of his Miranda rights was not contradicted and was otherwise credible.

A - 50