No. 16-3604

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

UNITED STATES OF AMERICA,

Appellee,

v.

ABITA WARREN,

Appellant.
_____

Appeal from Judgment of Conviction and Sentence
Entered by the United States District Court
for the Western District of Pennsylvania at
No. 13-270 (Hornak, J.)

_____

BRIEF FOR APPELLEE

_____

SOO C. SONG
Acting United States Attorney

Laura Schleich Irwin
Assistant U.S. Attorney
Attorney for Appellee

700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219
Tel:     (412) 644-3500
Fax:     (412) 644-6995
Email: laura.irwin@usdoj.gov

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................... i

TABLE OF AUTHORITY .................................................. iv

JURISDICTION ................................................................1

ISSUES PRESENTED AND STANDARDS OF REVIEW .....................................2

STATEMENT OF RELATED CASES AND PROCEEDINGS .............................4

STATEMENT PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 28(e) ................................................5

SUMMARY OF ARGUMENT ....................................7

ARGUMENT ...............................................................11

I.    The District Court Properly Denied Warren's Motion To Suppress Because Exigent Circumstances Existed To Allow Police To Enter And Remain In 520 Lincoln Avenue.....................................11

    A.    The District Court's Uncontested Findings Of Fact Support The Exigent Circumstances Ruling. ............................12

        1.    Warren Resides With Estelle Hayes. ........................................12

        2.    A 911 Call Leads Police To Estelle's House And A Stabbing Victim. ......................................13

        3.    After The Medics Remove Hayes From The Scene, Police Turn To Investigating The Crime. ............................14

        4.    Officer Sywyj Allows Weathers To Go Into The House. ........15

        5.    Standing At The Open Front Door, Officer Sywyj Sees Warren Holding A Pistol. ..........................................16

i

6.      After Receiving *Miranda* Warnings, Warren Admits To Ownership Of The Pistol. ........................................................18

7.      Warren's Expert, Johnson, Attempts To Recreate The Night In Question.....................................................................18

8.      The District Court Denies Warren's Motion To Suppress. ......19

B.     Exigent Circumstances Provide An Exception To The Warrant Requirement Of The Fourth Amendment. .............................................20

C.     Warren's Challenge To The District Court's Conclusion That Exigent Circumstances Existed Lacks Any Foundation In The Record Or Case Law. ...............................................................................21

II.    The District Court Properly Ruled That Warren's Maryland Conviction For Robbery With A Dangerous Or Deadly Weapon Qualifies As A Violent Felony Under ACCA. ......................................................................27

A.     Warren's Prior Convictions Result In His ACCA Sentence.................27

B.     Application Of ACCA Necessitates A Multi-Step Process With Close Allegiance To The Statutes At Issue............................................30

C.     The Multi-Step Approach Demonstrates That Warren's Maryland Armed Robbery Conviction Qualifies As An ACCA Predicate............32

1.      Maryland Robbery Is Divisible And "With A Dangerous Or Deadly Weapon" Is An Element Of The Offense. .............32

2.      Applying The Modified Categorical Approach, Warren Pled Guilty To Robbery With A Dangerous Or Deadly Weapon. .................................................................................39

3.      Maryland Armed Robbery Requires Force That Is Capable Of Causing Physical Pain Or Injury To Anther Person............40

III.   Warren's Maryland Conviction For Distribution Of Heroin Is A Serious Drug Offense Under ACCA. ......................................................................45

A.    Maryland Distribution Of Heroin Is A Serious Drug Offense Because It "Involves" The Distribution Of A Controlled Substance................................................................................................46

    1.    Used In ACCA To Define A Serious Drug Offense, The Term "Involving" Is Construed Broadly. ................................47

    2.    Maryland Distribution Of Heroin Is Closely Related And Connected Closely To Manufacturing, Distributing, Or Possessing A Controlled Substance.........................................49

B.    Maryland "Distribute" Substantially Corresponds To The Federal Definition of "Distribute" And Therefore, Maryland Distribution Of Heroin Categorically Qualifies As A Serious Drug Offense............52

CONCLUSION ........................................................................................56

# TABLE OF AUTHORITY

## FEDERAL CASES                                                PAGE(S)

Apprendi  v. New Jersey, 530 U.S. 466 (2000) ................................................. 35, 36

Brigham City, Utah v. Stuart, 547 U.S. 398 (2006) ................................... 20, 23, 24

Connecticut Nat'l Bank v. Germaine, 503 U.S. 249 (1992)...................................47

Descamps v. United States, 133 S. Ct. 2276 (2013)....................................... passim

Gonzales v. Duenas–Alvarez, 549 U.S. 183 (2007) .................................................42

Johnson v. United States, 559 U.S. 133 (2010) .................................... 30, 36, 41, 42

Leocal v. Ashcroft, 543 U.S. 1 (2004)....................................................................47

Maryland v. Buie, 494 U.S. 325 (1990)...................................................................25

Mathis v. United States, 136 S. Ct. 2243 (2016) .......................................... passim

Moncrieffe v. Holder, 133 S. Ct. 1678 (2013).................................................. 42, 55

Shepard v. United States, 544 U.S. 13 (2005) ................................................. passim

Taylor v. United States, 495 U.S. 575 (1990).................................................. passim

United States v. Alexander, 331 F.3d 116 (D.C. Cir. 2003)...................................48

United States v. Brandon, 247 F.3d 186 (4th Cir. 2001) ................................. 48, 50

United States v. Bynum, 669 F.3d 880 (8th Cir. 2012) ................................... 46, 51

United States v. Calabretta, 831 F.3d 128 (3d Cir. 2016) ......................................54

United States v. Castleman, 134 S. Ct. 1405 (2014) ..............................................42

United States v. Coles, 437 F.3d 361 (3d Cir. 2006)....................................... 20, 25

United States v. DeMichael, 461 F.3d 414 (3d Cir. 2006) ......................................11

United States v. Garrison, 612 F. App'x 655 (4th Cir. 2015)..................................41

iv

United States v. Gibbs, 656 F.3d 180 (3d Cir. 2011) ..................................... passim

United States v. Henderson, 841 F.3d 623 (3d Cir. 2016)........................................3

United States v. Jackson, 849 F.3d 540 (3d Cir. 2017) ...........................................55

United States v. Jones, 740 F.3d 127 (3d Cir. 2014) ..............................................32

United States v. Joseph, 730 F.3d 336 (3d Cir. 2013) ............................................24

United States v. King, 325 F.3d 110 (2d Cir. 2003)......................................... 47, 48

United States v. Mallory, 765 F.3d 373 (3d Cir. 2014) .............................. 2, 20, 21

United States v. Marrerro, 743 F.3d 389 (3d Cir. 2014) .........................................53

United States v. McDaniels, 147 F. Supp.3d 427  (E.D. Va. 2015) ........................42

United States v. McKenney, 450 F.3d 39 (1st Cir. 2006) ............................... 47, 48

United States v. Moore, 149 F. Supp.3d 177 (D.D.C. 2016)............... 36, 40, 41, 42

United States v. Olano, 507 U.S. 725 (1993) .......................................................3, 45

United States v. Parrott, 450 F. App'x 228 (3d Cir. 2011)......................................24

United States v. Redrick, 841 F.3d 478 (D.C. Cir. 2016)............................... passim

United States v. Rice, 813 F.3d 704 (8th Cir. 2016) ...............................................42

United States v. Riddick, 156 F.3d 505 (3d Cir. 1998) ................................... 11-12

United States v. Riley, 856 F.3d 326 (4th Cir. 2017) .............................................41

United States v. Strevig, 663 F. App'x 908 (11th Cir. 2016) ..................................41

United States v. Teran-Salas, 767 F.3d 453 (5th Cir. 2014)...................................54

United States v. Toomer, No.01-573, 2017 WL 1508842
  (E.D. Pa. Apr. 27, 2017) .............................................................................. passim

United States v. Vickers, 540 F.3d 356 (5th Cir. 2008) ................................. passim

United States v. Villella, No. CR 06-06, 2017 WL 1519548
   (W.D. Pa. Apr. 27, 2017)..........................................................................50

United States v. Whindleton, 797 F.3d 105 (1st Cir. 2015) ........................... passim

United States v. White, 837 F.3d 1225 (11th Cir. 2016).......................................54

United States v. Wolfe, 452 F. App'x 180 (3d Cir. 2011)............................... 25, 26

Warden v. Hayden, 387 U.S. 294 (1967)................................................... 21, 23, 24

Welsh v. Wisconsin, 466 U.S. 740 (1984).............................................................20


## **STATE CASES**

Brooks v. State, 314 Md. 585 (1989)......................................................................40

Brooks v. State, No.0164, 2016 WL 7587712
   (Md. Ct. Spec. App. Dec. 27, 2016) ....................................................38

Coles v. State, 374 Md. 114 (2003) .......................................................................40

Conyers v. State, 345 Md. 525 (1997)....................................................................37

Cunningham v. State, 318 Md. 182 (1989)..............................................................54

Douglas v. State, 9 Md. App. 647 (1970) ...............................................................43

Fetrow v. State, 156 Md. App. 675 (2004) ...................................................... 33, 40

Fortune v. State, No.0547, 2016 WL 1749767
   (Md. Ct. Spec. App. May 3, 2016) .......................................................38

Ganey v. State, No.0416, 2017 WL 999475
   (Md. Ct. Spec. App. Mar. 15, 2017)......................................................38

Giles v. State, 8 Md. App. 721 (1970) ....................................................................43

Handy v. State, 357 Md. 685 (2000)............................................................ 33, 38, 40

Metheny v. State, 359 Md. 576 (2000) ...................................................................33

Rosenberg v. State, 12 Md. App. 20 (1971) ...........................................................53

Snowden v. State, 321 Md. 612 (1991) ................................................................43

Snyder v. State, No.01848, 2017 WL 1058573
    (Md. Ct. Spec. App. Mar. 21, 2017) ....................................................38

Stallard v. State, 225 Md. App. 400 (2015)...........................................................54

State v. Giddens, 335 Md. 205 (1994)...................................................................53

Teixeira v. State, 213 Md. App. 664 (2013) ..........................................................37

Wadlow v. State, 335 Md. 122 (1994)............................................................. 37, 38

Whack v. State, 288 Md. 137 (1980)......................................................................37

## FEDERAL STATUTES

18 U.S.C. §3231 .........................................................................................................1

18 U.S.C. §3742(a)(1)................................................................................................1

18 U.S.C. §922(g)(1).......................................................................................... 5, 6, 27

18 U.S.C. §924(a)(2)................................................................................................29

18 U.S.C. §924(e) ......................................................................................... passim

18 U.S.C. §924(e)(2)(A)(ii) .......................................................................................9

18 U.S.C. §924(e)(2)(B) ...........................................................................................30

21 U.S.C. §802(11) ..................................................................................................53

28 U.S.C. §1291.........................................................................................................1

## **STATE STATUTES**

Md. Code §3-403 ...................................................................................33

Md. Code §5-601 ...................................................................................54

Md. Code §5-602 ...................................................................................52

Md. Code §277(1) ..................................................................................52

Md. Code §286 .......................................................................... 52, 53, 55

Md. Code §286(a)(1) ...................................................................... 52, 54

Md. Code §287 .......................................................................................54

Md. Code §291 .......................................................................................53

Md. Code §486 .......................................................................................32

Md. Code §486(b)(1) .............................................................................33

Md. Code §486(d) ..................................................................................35

Md. Code §487 .......................................................................... 32, 33, 35

## **FEDERAL SENTENCING GUIDELINES**

U.S.S.G. §2K2.1(a)(2) ................................................................ 27, 28, 29

U.S.S.G. §2K2.1(a)(4)(A)........................................................................29

U.S.S.G. §2K2.1(b)(4)(B).................................................................. 28, 29

U.S.S.G. §4B1.4(b)(3)(B)........................................................................28

## <u>JURISDICTION</u>

This is a direct appeal from the conviction and sentence of Appellant, Abita Warren.  The District Court had jurisdiction over the action by virtue of 18 U.S.C. §3231.  The judgment of sentence was entered on the docket on September 12, 2016 (A487, Dk.No.208).[1]   Warren noticed a timely appeal (SA13, Dk.No.209).

This Court has jurisdiction to decide the appeal pursuant to 28 U.S.C. §1291. Warren has a right to appeal his sentence under 18 U.S.C. §3742(a)(1).

---

[1] Citations to "A" refer to the Appendix filed by Warren; citations to "SA" refer to the Supplemental Appendix filed by the United States.  Unless otherwise indicated, the document cited is the transcript of the suppression hearing.

1

## ISSUES PRESENTED
## AND STANDARDS OF REVIEW

1.    Whether the District Court properly denied Warren's motion to suppress because exigent circumstances existed for police to enter and remain in the residence in which a police officer, standing at the front entry, observed Warren inside the home and holding a pistol at chest level.

a.    The issue is preserved (A411, Motion to Suppress).

b.    "[O]n appeal from a decision involving the presence or absence of exigent circumstances justifying a warrantless search or seizure, this Court will review the district court's findings of fact for clear error, but will review its conclusion that those facts establish a legal exigency de novo." United States v. Mallory, 765 F.3d 373, 383 (3d Cir. 2014).  When the question is whether a previously-existing exigency has dissipated, the Court applies de novo review.  Id.

2.    Whether the District Court correctly ruled that Warren's Maryland conviction for robbery with a dangerous or deadly weapon qualifies as a violent felony under the Armed Career Criminal Act, 18 U.S.C. §924(e).

a.    The issue is preserved (A432, Warren's Position on Sentencing Factors).

2

b.     The Court exercises plenary review over the purely legal question of whether a prior conviction qualifies as a predicate under ACCA.  United States v. Henderson, 841 F.3d 623, 626 (3d Cir. 2016).

3.     Whether the District Court correctly ruled that Warren's Maryland conviction for distribution of heroin qualifies as a serious drug offense under ACCA.

a.     Warren's present argument for reversal was not raised below (Warren Br.23).

b.     To establish plain error, Warren must show that (1) the District Court erred; (2) the error was clear or obvious, rather than subject to reasonable dispute, and (3) the error affected his substantial rights, which in the ordinary course means that there is a reasonable probability that the error affected the outcome of the proceedings.  If all three elements are established, then the Court may exercise its discretion to award relief.  See United States v. Olano, 507 U.S. 725, 736 (1993). That discretion should be exercised only in cases where the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  Id.

3

## <u>STATEMENT OF RELATED CASES AND PROCEEDINGS</u>

There are no related cases.

## STATEMENT PURSUANT
## TO FEDERAL RULE OF APPELLATE PROCEDURE 28(e)

A 911 call about a stabbing victim led Pittsburgh Police to 520 Lincoln Avenue (A71). After tending to the victim, the first officer on scene, Officer Steven Sywyj, began to question DeShawn Weathers, the person found with the victim on the porch of the home (A73-75; A80-81). When Weathers sought permission to enter the home to talk with relatives inside, Officer Sywyj agreed, but made it clear that the interview was not over (A74-76; A83-84). After Weathers entered the home, Officer Sywyj stood at the entry of the home; the screen door was closed, but the front door was open (A76-78; A82-84; A105-06). Looking through the screen door and to his right into the home, Officer Sywyj saw a man, later identified as Warren, holding a large black firearm in his right hand at chest level (A75-79; A85).

This observation led to clearing the home and discovery in plain view, in the room where Officer Sywyj had seen Warren, of a Taurus Judge .45 caliber pistol (A76-66; A85-86; SA95; A212-13). The gun had an obliterated serial number (A77-78).

Warren was arrested (A78-88). After verbal <u>Miranda</u> warnings and when asked about the firearm, Warren admitted it was his (A97-100).

An indictment charged Warren with violating 18 U.S.C. §922(g)(1) (A408). Warren moved to suppress, arguing that no exigency or probable cause existed for

the police to enter the home without a warrant, and that his statements to police following his arrest should be suppressed due to the absence of <u>Miranda</u> warnings (A4111; A416; A424; SA17, SA36; SA55; SA69).  The District Court denied the motion (A29).  Warren proceeded to trial and was convicted (A482, Dk.No.135).

At sentencing, Warren qualified as an armed career criminal under the Armed Career Criminal Act, 18 U.S.C. §924(e), and thus faced a mandatory minimum term of 15 years of incarceration (PSR ¶¶33, 70; A387).  This enhanced sentence is triggered when a defendant is convicted of violating §922(g)(1) and has three prior felony convictions for either a violent felony or a serious drug offense.  Warren had a Maryland conviction for robbery with a dangerous or deadly weapon (PSR ¶¶27, 28, 29), a Maryland conviction for distribution of heroin (PSR ¶30), and a Maryland conviction for possession with intent to distribute cocaine (PSR ¶33; A387).  His advisory Guidelines Range was 210-62 months of incarceration, stemming from a total offense level of 33 and a criminal history category of V (A387).  The District Court varied downward to sentence Warren to 192 months (A399).  This appeal followed.

6

## **SUMMARY OF ARGUMENT**

Warren raises three issues on appeal; the first questions the denial of his motion to suppress; the second and third address two of his three prior convictions that required his sentencing as an armed career criminal. None of these issues has merit.

**First**, as a matter of law, the District Court properly ruled that exigent circumstances existed to permit, without a warrant, a police officer to enter and remain in the home in which Warren resided. The police officer, standing at the threshold of the home to which he had been called to respond to a stabbing victim on the front porch, looked through a screen door and into the home; he saw Warren holding a large pistol in his right hand at chest level. When the officer saw the firearm, he shouted, "gun" and ordered the people in the home to exit. While undertaking a protective sweep and hearing noises from the second floor, the officer found the gun in plain view in the very room he saw Warren move into when the officer announced the presence of the firearm and directed the people inside to exit. Under these circumstances—a recent stabbing, the presence of a gun, and other people inside the home—it was reasonable for the officer to enter and stay in the home for purposes of self-protection. Warren sustained no violation of his rights protected by the Fourth Amendment.

**Second**, as a matter of law, Warren's prior Maryland conviction for robbery with a dangerous or deadly weapon qualifies as a violent felony under the Armed Career Criminal Act.  The offense is divisible, inasmuch as it covers both simple robbery and robbery with a dangerous or deadly weapon.  The requirement of "with a dangerous or deadly weapon" is, as a matter of federal law, an element, not a means.  Ample Maryland authority requires a jury to find "with a dangerous or deadly weapon" beyond a reasonable doubt in order to trigger the 20-year statutory maximum penalty applicable to armed robbery, rather than the 15-year maximum penalty applicable to simple robbery.  These points, considered with the documents permitted under Shepard v. United States, 544 U.S. 13 (2005), establish that Warren's conviction was for robbery with a dangerous or deadly weapon.  And, Maryland robbery of this type inherently contains the requisite force to qualify as a violent felony:  Maryland robbery with a dangerous or deadly weapon necessarily is committed with physical force that is capable of causing physical pain or injury to another person.

Warren's concern that other, ostensibly non-forceful weapons may be used to commit Maryland armed robbery is meritless.  Aside from the need for at least some level of physical force, it is the force against the victim that matters, not necessarily a defendant's exertion of that force.  Similarly faulty is Warren's contention that

Maryland robbery can be accomplished by threatening injury to property; instead, Maryland requires that the target of the force be a person, not property.

**Third**, under plain error review (or any standard, for that matter), Warren's Maryland conviction for distribution of heroin qualifies as serious drug offense for purposes of ACCA.   The statute defines a serious drug offense as one "involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance."  §924(e)(2)(A)(ii).  In United States v. Gibbs, 656 F.3d 180 (3d Cir. 2011), the Court ruled that the term "involving" means "to relate closely" or to "connect closely" and that the term must be given a broad construction to fulfill Congress' intent behind ACCA.  Gibbs, then, requires that the meaning of serious drug offense properly extends beyond the precise offenses of distributing, manufacturing, or possessing a controlled substance to encompass offenses that are related to or connected with such conduct.  Maryland distribution of heroin, even if distribution is defined as Warren reads it to include "offer to sell," necessarily is related to or connected to actually selling, manufacturing, or possessing such a substance.  At least three courts of appeals have so ruled, and this Court should apply those holdings here.  To hold otherwise would require reading the word "involving" out of the statute, which would violate the resolute principle that courts should give meaning to every word in a statute.

9

Warren's proffered argument—that the meaning of "distribute" controls and Maryland defines the term to include "offer to sell"—is incorrect, for any number of equally-availing reasons. First, he relies on incorrect and improper sources for his definition. Second, even if this were not the case, the Maryland and federal definition of distribute substantially correspond, eliminating any overbreadth concern. Any minor variation between the definitions does not change this conclusion not only because the essence of both is a prohibition against trafficking of controlled substances, but also because Warren's other proffered reading of the definition amounts to a prohibited "theoretical possibility" that Maryland would apply its statute in that manner. Moreover, any debate over Maryland's definition of distribution does not alter the outcome of the modified categorical approach and consideration of the <u>Shepard</u> documents: that Warren was charged with and pled guilty to Maryland distribution of heroin, a serious drug offense.

## **ARGUMENT**

### I.   **The District Court Properly Denied Warren's Motion To Suppress Because Exigent Circumstances Existed To Allow Police To Enter And Remain In 520 Lincoln Avenue.**

Warren asks for reversal of his conviction on the ground that the District Court erred in denying his motion to suppress.  His specific challenge is not to any particular finding of fact, but instead is a claim that the District Court erred as a matter of law when it ruled that exigent circumstances existed and remained, thus overcoming the need for a warrant.[2]

This approach, however, is fraught with pitfalls.  Most detrimental to his effort is Warren's representation of "facts" in his Brief that lack any basis in the record or in the District Court's findings of fact.  Warren's reliance on cases that he reads as exposing legal error by the District Court, upon close examination, do not deliver. Elucidation of these points, along with a construction of the record in the light most favorable to the Government, as required, see United States v. Riddick, 156 F.3d

---

[2] In his Summary of Argument, Warren indicates that his appeal includes a challenge to the District Court's refusal to suppress his statements made to police following his arrest (Warren Br.6).  However, the body of his Brief includes no reference whatsoever to this issue (Warren Br.7-12).  Consequently, he has waived this issue.  See United States v. DeMichael, 461 F.3d 414, 417 (3d Cir. 2006).  In any event, the District Court ruled correctly on the issue (A50 n.27, Suppression Opinion).

505, 509 (3d Cir. 1998), establish that the District Court committed no error whatsoever in denying Warren's suppression motion.

### A.    The District Court's Uncontested Findings Of Fact Support The Exigent Circumstances Ruling.

At the suppression hearing, the Government presented the testimony of Officer Sywyj (A68-91; A210-20) and Officer Hoyson (A92-100). Warren offered testimony from Estelle Hayes, the owner of and resident at 520 Lincoln Avenue and Warren's landlord (A57-64; A101-19; A204-10), and the testimony of an expert witness, Travis Johnson, who attempted to mimic the interior of the home on the date and at the time of the events at issue using three-dimensional modeling and animations (A122-96).

### 1.    Warren Resides With Estelle Hayes.

Estelle Hayes rented a stand-alone home at 520 Lincoln Avenue, in the Larimer neighborhood of Pittsburgh (A57; A70-71; A102; SA76; SA77). The front entry is on the left hand side; it consists of a wooden door and a screen door (A81-82; A104-05; SA77). The front door leads to a small foyer (A105-06; SA78);[3] to the right is the living room (A105-06; SA79). Behind the living room is the dining

---

[3] As noted by the District Court (and undisputed by Warren), SA78, Defense Exhibit A-5, is the correct photo to correspond with this portion of the home (A34 n.9, Suppression Opinion).

room; the two rooms are separated by two archways on either side of a fireplace (A106; SA79; SA80).  From the dining room, there is an entrance into the kitchen (A106; SA80).  The stairs leading to the second floor are also in the dining room, on the left and as indicated by a railing (A106-07; SA80).

Warren had been living with Estelle Hayes (A58; A108-10).  Estelle had a son, Duwane Hayes, who went by the nickname Bull (A111-15).  Warren and Duwane Hayes were cousins (A97).

### 2.    A 911 Call Leads Police To Estelle's House And A Stabbing Victim.

At 7 p.m. on the evening of October 23, 2012, Hayes locked up the house, turned off the lights (save the front porch light and a light over the kitchen stove), and drew the curtains on the windows, curtains that generally kept out light from the street lights (A110-11; A205-09).  She retired to her bedroom (A110-11); Warren was already in bed (A111; A117).

At approximately 10:30 p.m., police received a 911 call for a stabbing victim at 520 Lincoln Avenue (A71).  City of Pittsburgh Police Officer Sywyj was assigned to Larimer and knew the neighborhood to be a high crime area replete with very violent crime (A69-72).  Officer Sywyj and his partner, both in uniform and patrolling in a marked police vehicle, were only a few blocks away when the 911 call came in (A71-72).

13

Officer Sywyj, his partner, and another police team arrived at 520 Lincoln Avenue to a "chaotic" scene: the victim Duwane Hayes was bleeding profusely and "barely conscious" on the front porch of the house and DeShawn Weathers was rendering aid (A72-74; A95). At this point, Officer Sywyj did not know any details of the stabbing, including where it had occurred (A72; A75). He recognized the scene as one 'potentially on or near" where somebody had "just committed a violent act" (A81). Along with medics, 11 officers were on site with multiple police vehicles at the front of the house, with their lights and rooftop lights on (A73-74; A86). Officer Sywyj was on the porch and assisting with the victim (A80-81).

### 3.    After The Medics Remove Hayes From The Scene, Police Turn To Investigating The Crime.

Estelle Hayes was half asleep when she heard Weathers calling out to her from downstairs, saying "Momma, Momma, Bull's been stabbed" (A111-12). Weathers had broken into Estelle's home and come in through the back door (A111-12).

Estelle went downstairs; Weathers told her that Bull was on the front porch (A112-13). She went to the front entry to see several people on the front porch, including the police and the medics who were tending to her son (A112-13). Estelle did not need to turn on a light when she went downstairs because the light coming from outside, including the police lights, made it "pretty bright" in the home such

14

that there was enough to see inside the house, and she could see her son "good" (A118).

Medics quickly tended to Hayes (A74).  City of Pittsburgh Police Officer Hoyson aided the medics with getting Hayes into an ambulance (A95-96).  Like Officer Sywyj, Officer Hoyson knew Larimer to be a neighborhood of violent activity and violent crime (A94-95).

### 4.    Officer Sywyj Allows Weathers To Go Into The House.

With Hayes under the care of medics, Officer Sywyj began to question Weathers (A74).  Weathers stated that he and Hayes were together at the time of the stabbing and that, after the stabbing, he helped Hayes get to the porch of 520 Lincoln Avenue (A75).

Weathers asked if he could go inside the home to talk with family (A74); Officer Sywyj was concerned that Weathers might try to leave the scene through the back door of the residence (A76; A83-84).  Officer Sywyj made clear to Weathers that the interview was not complete, and allowed him to enter the home (A74-75; A83).  Although Officer Sywyj had no idea who or how many people were inside the home, he hoped that Weathers would be more cooperative if permitted to go inside before the interview continued (A74; A80-81; A83-84).

15

### 5.    Standing At The Open Front Door, Officer Sywyj Sees Warren Holding A Pistol.

The front door of the home was wide open; Officer Sywyj later could not recall if the screen door was open or shut at this time (A84; A81-82).  Weathers went inside the home, stepping into the foyer and turning right into the living room (A75; A105-06; SA77; SA78).  To ensure that Weathers did not try to exit the home via the back door and in order to keep an eye on Weathers, Officer Sywyj moved to stand at the "threshold of the [front] door" (A82-84; A76).

While standing at the threshold and looking to his right, Officer Sywyj could see into the home and he saw Weathers speak with the family (A75-76; SA78; SA79).  Officer Sywyj saw a man, later identified as Warren, "behind everybody, where everybody was" holding a large pistol, later identified as a Taurus Judge, in his right hand at chest level (A75-76; A78-79; SA75; A85; SA79; A212).  Warren was standing a few feet into the dining room, near the left archway separating the living room and the adjoining dining room (A212-13; A218-19; SA75; SA79; A106).

Officer Sywyj drew his own firearm, shouted "gun" to the other officers on the scene, and ordered everyone to exit the house (A76-77; A85; A96; A212-13).  At this, Warren looked at Officer Sywyj: Officer Sywyj then saw Warren "disappear[] from one doorway and re-emerge[] a second or two later . . . sans gun"

16

from the archway to the right of the fireplace (A77, A85; A212-13; SA79). According to Officer Sywyj, this area was "well lit" (A213).

Officer Sywyj asked Warren, "Where's the gun?" to which Warren responded, "Oh, that's a toy" (A77; A85). Officer Sywyj ordered Warren to exit the house and Officer Sywyj entered the house (A77).

Hearing Officer Sywyj's alert, Officer Hoyson entered the house and, with Officer Sywyj, began to "perform a protective sweep" (A96; A77). Officer Hoyson was with Officer Sywyj when he found the Taurus Judge: the firearm was in the room into which Officer Sywyj had seen Warren disappear; the gun was protruding from under a magazine on a table (A77; A96; SA80; SA79). Officer Sywyj saw that the pistol's serial number had been obliterated and so he requested Warren's arrest (A78-80).

Both Officer Sywyj and Officer Hoyson "could hear noises upstairs" and, believing people were upstairs, they, along with a third officer, again ordered anyone in the home to exit (A96). The officers then conducted a sweep of the second floor (A96). There they found a television set that was on, which accounted for the noise heard from below (A96-97).

17

### 6. After Receiving *Miranda* Warnings, Warren Admits To Ownership Of The Pistol.

Officer Hoyson then joined Warren, who had been arrested by another officer and placed in a marked police car (A97). Officer Hoyson advised Warren of his <u>Miranda</u> rights (A97-99). Officer Hoyson did not present Warren with any paper form informing him of his rights because paper forms are not typically carried by officers "on the streets" (A97-100).

Officer Hoyson asked Warren about the firearm (A97-99). Warren stated that he took the gun out when he heard his cousin had been stabbed (A97). Warren claimed that he bought the gun on the street and that, when he purchased it, the serial numbers already had been filed off of it (A97).

### 7. Warren's Expert, Johnson, Attempts To Recreate The Night In Question.

Warren offered his expert, Johnson, in an effort to discredit Officer Sywyj's "observational abilities" as "being able to observe what he said he saw from the threshold" (A181; A183). Johnson's modelling did not account for any light coming into the home from vehicles outside, and based on representations from Warren's counsel, Johnson placed Warren as having been walking down the stairs from the second floor into the dining room when observed by Officer Sywyj (A147; A169-70; A177; A185-86; A195; SA80).

### 8.    The District Court Denies Warren's Motion To Suppress.

The District Court credited Officer Sywyj's testimony on the crucial issue of where Warren was standing when the officer observed him holding the firearm (A41-42, Suppression Opinion).  Regarding Johnson's testimony, the District Court ruled that his testimony and exhibits were helpful to the finder of fact, but that the "fit" of the evidence was missing due to "meaningful internal contractions within" Johnson's testimony, as well as "somewhat speculative information . . . as to important facts, such as where Mr. Warren was standing and the amount of light in the house" (A42-43; A42 n.18).

Relying on Officer Sywyj's testimony, then, the District Court found that at the moment Officer Sywyj saw Warren with the gun an exigency existed to permit police entry into the residence (A38-42; A45-50).  The District Court reasoned that in light of all of the circumstances—officer safety, "that a stabbing had taken place, no suspect was then in custody, officers did not know whether the Residence was completely secured, and there were other ways into and out of the Residence other than the door that they monitored"—it was reasonable for officers to enter the residence (A47).  As to Warren's claim that the exigency dissipated by the time Officer Sywyj actually saw the pistol, the District Court disagreed (A44-45).  The gun was discovered while the officers were securing the residence—they saw it in plain view before they cleared the second floor (A45).  On these facts, it was

19

reasonable for the officers to believe that someone else in the home could have access to the gun if the officers waited to obtain a warrant (A45).

### B.    Exigent Circumstances Provide An Exception To The Warrant Requirement Of The Fourth Amendment.

"Warrantless searches of the home 'are presumptively unreasonable unless the occupants consent or probable cause and exigent circumstances exist to justify the intrusion.'" Mallory, 765 F.3d at 383 (quoting United States v. Coles, 437 F.3d 361, 365 (3d Cir. 2006)).  An objective standard is employed to determine whether exigent circumstances exist; necessarily, then, "the subjective intent of the officer is irrelevant." Id. (citing Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006)).  The Government bears the "heavy" burden of establishing that exigent circumstances justified a warrantless search.  Welsh v. Wisconsin, 466 U.S. 740, 749–50 (1984).

"Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." Coles, 437 F.3d at 366.   Factors that bear on whether exigent circumstances exist:

> may include, but are not limited to:  how soon after the alleged offense the search occurred; whether the alleged offense was violent in nature; whether the search occurred prior to or contemporaneous with [defendant's] apprehension; whether the premises as a whole had been secured, or whether it was possible that unknown individuals remained in the house; whether [defendant] or [other individuals] had acted in an aggressive or threatening manner toward the police; whether other [individuals] were free to move about the house unsupervised by an

20

officer; how easily [defendant] or [others] could have obtained and used the firearm; and the degree of intrusiveness of the search.

Mallory, 765 F.3d at 386.   As this Court has explained, "[t]he common thread is imminence—the existence of a true emergency." Id. at 384.  Accordingly, "once the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further search of the premises." Id.

### C.   Warren's Challenge To The District Court's Conclusion That Exigent Circumstances Existed Lacks Any Foundation In The Record Or Case Law.

The District Court's decision, complete and thorough in every respect, faithfully adheres to the record evidence and this Court's precedents (A30-50, Suppression Opinion).  The District Court considered all of the particular facts and circumstances, not the least of which was that the seizure of the pistol occurred prior to the residence having been secured.  Compare Warden v. Hayden, 387 U.S. 294, 298-99 (1967) ("the seizures occurred prior to or immediately contemporaneous with Hayden's arrest"), with Mallory, 765 F.3d at 384 (gun found after premises had been secured).

Warren's first tactic on appeal—presentation of "facts" lacking any basis in the record—fails to expose any error in the District Court's ruling.  Warren focuses on the requirement of imminence, but without evidence or findings by the District Court to support him, he makes no headway.

21

Warren begins by maintaining that "the offense for which the police were called—a stabbing—had already occurred sometime before the search" (Warren Br.9). While literally true—the stabbing necessarily pre-dated the call to police to respond to a stabbing—the record contains absolutely no evidence to support the inference Warren seeks to draw (and impermissibly in his favor)—that more, instead of less, time passed from the time of the stabbing to the time of observation of the firearm. Instead, the District Court found the exact opposite: the District Court concluded that "no one testified that the scene . . . was anything other than chaotic or that the events occurred in less than a compressed period of time" (A32 n.3, Suppression Opinion). Warren's effort to re-size events is necessarily unsuccessful.

Next, Warren contends that "Police had a description of the suspect. No evidence was adduced that he was anywhere near 520 Lincoln Avenue" (Warren Br.10). But, the record reveals only that police had a "cursory description of an actor" (A72); no portion of the record supports the Warren's claim about the whereabouts of such a person. And, while it is true that Hayes suffered from a knife wound and Warren was seen holding a pistol—two different tools of violence—the fact remains that a chaotic scene with stabbing victim and a gun being shown only served to heighten the need for offices to protect their own safety. Indeed, the "Fourth Amendment does not require police officers to delay in the course of an

22

investigation if to do so would gravely endanger their lives." <u>Hayden</u>, 387 U.S. at 298-99.

Warren's failure to adhere to the record continues, with the averment that police had cleared the residence before conducting their search (Warren Br.10).  The record reveals the exact opposite:  as the District Court explained, the officers were in the course of securing the home when they found the firearm and heard noises from the second floor (A45-49 & n.23, Suppression Opinion).  This understanding of the facts, true to the record, reveals as meritless Warren's effort to reconstruct the timeline by omission of key facts.

Warren further argues, without citation to any evidence, that when Officer Sywyj saw him holding the pistol, "there was no reason to believe that he or another police officer was in any danger" (Warren Br.11).  But, this ignores the District Court's reasonable conclusion that objectively reasonable people would consider the events on the night of October 23 as presenting an imminent danger to responding police officers (A48-49, Suppression Opinion).  This properly reflects that the ultimate touchstone of the Fourth Amendment is reasonableness.  <u>Brigham City</u>, 547 U.S. at 403.

When he turns to a legal attack on the District Court's Opinion, Warren starts with probable cause (Warren Br.7).  This is a curious approach for several reasons.

Before the District Court, Warren never "question[ed] or meaningfully address[ed] the probable cause element" (A9, n.14, Suppression Opinion), a stance that indicates waiver.  See United States v. Joseph, 730 F.3d 336, 337 (3d Cir. 2013).  But, in any event, the District Court's finding of probable cause is firm (A38 n.14 & citing cases).

The District Court determined that probable cause existed to enter the home as soon as Officer Sywyj saw a person less than twenty feet away from him with a gun, and that he acted reasonably to secure the gun and the residence while other individuals may have remained inside (A38 n.14).  For support, the District Court relied on Hayden, 387 U.S. 294, and United States v. Parrott, 450 F. App'x 228 (3d Cir. 2011).  Warren tries to distinguish these cases to his benefit, but that effort fails.

Warren points out that Hayden involved a suspect who had fled into a house moments before police arrived, a fact absent here (Warren Br.10).  True enough, but this factual difference is of no import because each case turns on its own particular facts assessed under the totality of the circumstances.  Brigham City, 547 U.S. at 404.

In Parrott, 450 F. App'x 228, police saw a man with a shotgun run into a house that they then searched.  Again, the absence of similar facts here is of no moment.  Instead, what matters is what occurred here:  Officer Sywyj, in the process of

responding to a 911 call for a stabbing, saw a man just 20 feet away holding a pistol. The facts support probable cause to enter 520 Lincoln Avenue.

Warren's probable cause argument, properly viewed, is actually a challenge to the exigent circumstances portion of the analysis. His focus seems to be that hot pursuit must exist in order for exigent circumstances to be found. But, hot pursuit, as applied in Hayden, is only one example of an exigent circumstance. Coles, 437 F.3d at 366.

Similarly, Warren's turn to Maryland v. Buie, 494 U.S. 325 (1990), does not help him. In Buie, police searched the room in which the arrestee had been hiding to ensure that no one else was hiding there. Here, police legally searched the entire house because, as the District Court ruled, police reasonably believed based on the sounds they heard to believe others were inside the home (A96). Like Buie, police searched the second floor of 520 Lincoln Avenue because it was a space "where a person may be found" (Warren Br.11 (citing Buie, 494 U.S. at 335)). Warren's assertion that "there was no reason to believe that . . . any police officer was in danger" (Warren Br.11) is simply not accurate.

Warren's last effort is United States v. Wolfe, 452 F. App'x 180 (3d Cir. 2011), a case that turned on an exigent circumstance that had dissipated. In Wolfe, police legally entered a home to render emergency assistance to an injured occupant.

After an officer left with the victim of a gunshot wound, another officer entered the home and, seeing a trail of blood going up the stairs to the second floor, followed the trail to a bedroom where he found contraband.  Id. at 182.  This Court ruled that the exigent circumstances had dissipated by this point:  the officer had seen the victim leave the house and the officer taking him from the home gave no indication (nor did anything else, for that matter) that a threat remained inside the residence. Id. at 183-84.  Here, in contrast, the police heard sounds upstairs and reasonably believed that other persons were inside 520 Lincoln Avenue (A96).  Wolfe, then, is unhelpful to Warren.

As this discussion demonstrates, the District Court properly concluded that both probable cause and exigent circumstances existed and therefore that police acted within the boundaries of the Fourth Amendment when they entered and remained in the residence.   This Court, therefore, should affirm the District Court's denial of Warren's motion to suppress.

## II.    The District Court Properly Ruled That Warren's Maryland Conviction For Robbery With A Dangerous Or Deadly Weapon Qualifies As A Violent Felony Under ACCA.

The remainder of Warren's Brief is a challenge to two of the predicates that underlie his fifteen-year mandatory minimum sentence under ACCA, 18 U.S.C. §924(e) (Warren Br.12-28).  Warren first attacks the District Court's determination that his Maryland conviction for robbery with a dangerous or deadly weapon is a violent felony (Warren Br.12-22).  The District Court, considering the same arguments Warren presses here, rejected Warren's arguments (A14-22, Amended Tent. Findings).

On appeal, the outcome is no different:  Maryland robbery with a dangerous or deadly weapon is a divisible statute subject to the modified categorical approach. The available documents permitted by <u>Shepard</u>, 544 U.S. 13, reveal precisely that Warren pled guilty to this crime.  And, Maryland robbery with a dangerous or deadly weapon encompasses the force essential to qualify as a violent felony:  it requires force that is capable of causing physical pain or injury to another person.

### A.    Warren's Prior Convictions Result In His ACCA Sentence.

Applying the 2015 Edition of the Sentencing Guidelines, the District Court assigned Warren a base offense level of 24, U.S.S.G. §2K2.1(a)(2) (PSR ¶¶13, 14; A387, 9/12/16 Sentencing).  This offense level is triggered when a defendant is convicted of violating §922(g)(1) and has two prior felony convictions for either a

27

crime of violence or a controlled substance offense. See §2K2.1(a)(2). In Warren's case, he had one prior Maryland conviction for robbery with a dangerous or deadly weapon (PSR ¶¶27, 28, 29)[4], one prior Maryland conviction for distribution of heroin (PSR ¶30), and one prior Maryland conviction for possession with intent to distribute cocaine (PSR ¶¶14, 33). Because the firearm had an obliterated serial number, 4 additional levels were added, see §2K2.1(b)(4)(B) (PSR ¶15; A387). This resulted in an adjusted offense level of 28 (PSR ¶29; A387).

Warren qualified as an armed career criminal based on the same prior convictions as above, which triggered an increased offense level: it was 33, rather than 28. See §924(e); §4B1.4(b)(3)(B) (A387, 9/12/16 Sentencing; PSR ¶¶20, 22). Due to his storied criminal past, Warren's criminal history category was V (A387).

As an armed career criminal, Warren faced a mandatory minimum term of 15 years of incarceration. See §924(e) (PSR ¶70; A387). With a total offense level of 33 and a criminal history category of V, his advisory Guidelines Range was 210-62 months of incarceration (A387). The District Court granted Warren's request for a variance and sentenced him to 192 months of incarceration (A331-32, 8/25/16 Hearing; A399, 9/12/16 Sentencing).

---

[4] There is no dispute that these incidents involved one victim and therefore were treated properly as one conviction (A14).

Now, on appeal, Warren challenges two of his three qualifying ACCA predicates.  As noted above, in Issue II, he challenges the qualification of his Maryland conviction for robbery with a dangerous or deadly weapon as a serious felony.  In Issue III, he questions whether his conviction for Maryland distribution of heroin qualifies as a serious drug offense.

If Warren prevails in his challenge to even one of these convictions, he no longer qualifies as an armed career criminal and thus is no longer subject to the statutory mandatory minimum sentence of 15 years.  Instead, his statutory maximum sentence is 10 years of incarceration.  See §924(a)(2).  His Guidelines Range is also impacted in this scenario:  his remaining two qualifying predicates would result in an adjusted offense level of 28, see §§2K2.1(a)(2), 2K2.1(b)(4)(B).  With a criminal history score of V, his advisory Guidelines Range would be 130-62 months of incarceration.

If Warren prevails in demonstrating that neither of these convictions qualify as predicates, his adjusted offense level would be 24, see §§2K2.1(a)(4)(A), 2K2.1(b)(4)(B).  With a criminal history score of V, his advisory Guidelines Range would be 92-115 months of incarceration.

**B.     Application Of ACCA Necessitates A Multi-Step Process With Close Allegiance To The Statutes At Issue.**

ACCA defines a violent felony as, inter alia, an offense which has as an element the use, attempted use, or threatened use of physical force against the person of another.  18 U.S.C. §924(e)(2)(B).  Commonly known as the "force" clause, a conviction qualifies only if the offense requires force that is capable of causing physical pain or injury to another person.  <u>Johnson v. United States</u>, 559 U.S. 133, 140 (2010).

The answer to the question of whether a prior conviction qualifies as an ACCA violent felony and inherently requires force of this nature is not straightforward.  Instead, the analysis is multilayered and requires patience.

Courts begin by applying the formal categorical approach, comparing the statute of conviction to the "federal generic offense."  <u>Descamps v. United States</u>, 133 S. Ct. 2276, 2281 (2013).  If the elements of the statute of conviction match an ACCA definition or are narrower than required by ACCA, the conviction qualifies as an ACCA predicate.  <u>See</u> <u>Taylor v. United States</u>, 495 U.S. 575, 559 (1990); <u>Mathis v. United States</u>, 136 S. Ct. 2243, 2248 (2016).   If the elements of the prior offense are broader than ACCA, the prior conviction is not an ACCA predicate.  <u>Mathis</u>, 136 S. Ct. at 2251.  Importantly, the formal categorical approach only

applies to statutes which are indivisible, that is, statutes that do "not contain[] alternative elements." Descamps, 133 S. Ct. at 2281.

There is an exception, however. The Supreme Court has recognized another approach, termed the modified categorical approach, that is warranted for some overbroad statutes that not only include the elements of the ACCA definition, but that also criminalize other conduct. As explained in Descamps, 133 S. Ct. at 2290, a statute may be "divisible," meaning that it is written disjunctively, with one or more alternative phrases meeting the ACCA definition. A divisible statute "effectively creates several different crimes" when it "lists multiple, alternative elements." Id. at 2284. In considering a prior conviction under a divisible statute, a sentencing court may "go beyond the mere fact of conviction in the narrow range of cases in which the indictment or information and the jury instructions actually required the jury to find all of the elements of [the ACCA definition] even though the defendant was convicted under a statute" criminalizing broader conduct. Taylor, 495 U.S. at 577. A sentencing court may examine what are termed "Shepard" documents, such as "the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." Shepard, 544 U.S. at 26. Significantly, either

31

approach, the formal or modified categorical, contains a common "central feature: a focus on the elements, rather than the facts, of a crime." <u>Descamps</u>, 133 S. Ct. at 2285.

### C.    The Multi-Step Approach Demonstrates That Warren's Maryland Armed Robbery Conviction Qualifies As An ACCA Predicate.

To determine whether a conviction qualifies under ACCA, then, the "threshold question" is "whether [a] statute is divisible." <u>United States v. Jones</u>, 740 F.3d 127, 134 (3d Cir. 2014). With regard to Warren's Maryland conviction for robbery with a dangerous or deadly weapon, the District Court answered this question correctly, as it did the cascading series of questions brought to bear when application of ACCA is in play.

### 1.    Maryland Robbery Is Divisible And "With A Dangerous Or Deadly Weapon" Is An Element Of The Offense.

The Maryland statute to which Warren pled guilty is Article 27 §487 of the Maryland Criminal Code:

(a)    A person may not commit or attempt to commit a robbery under § 486 of this subheading with a dangerous or deadly weapon.

(b)    A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 20 years.

Art. 27 §487.[5] "Robbery," in turn, "retains its judicially determined meaning," except that a "robbery conviction requires proof of intent to deprive another of property; or (2) Robbery includes obtaining the service of another by force or threat of force." §486(b)(1). The state defines a "dangerous or deadly weapon" to include "anything used or designed to be used in destroying, defeating, or injuring an enemy, or as an instrument of offensive or defensive combat." Handy v. State, 357 Md. 685, 691, 693 (2000) (quotation omitted). "Simple" robbery under §486, as defined by Maryland courts, is: "the felonious taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear." Fetrow v. State, 156 Md. App. 675, 686 (2004) (quoting Metheny v. State, 359 Md. 576, 605 (2000)).

From these definitions, it is plain that Maryland robbery comprises multiple, alternative versions of a crime, and therefore that it is divisible. See Descamps, 133 S. Ct. 2284; Mathis, 136 S. Ct. at 2248. Maryland, through "combining the common law and a statute, created—at least for federal law purposes—two separate crimes: simple robbery and robbery with a dangerous or deadly weapon." United States v.

---

[5] There is no dispute that the current Maryland armed robbery statute is found at Md. Code §3-403 and that it contains no substantive differences from the version in effect at the time of Warren's conviction. Likewise, the parties have never disputed that "dangerous" and "deadly" do not carry different meanings, but are instead are coterminus.

Redrick, 841 F.3d 478, 483 (D.C. Cir. 2016), cert. denied, No.16-8925, 2017 WL 1539993 (U.S. May 30, 2017); see also United States v. Toomer, No.01-573, 2017 WL 1508842, at *5 (E.D. Pa. Apr. 27, 2017).

This conclusion brings to the fore Warren's first rally against the District Court's decision.  He insists that he was convicted of common-law robbery and that "with a dangerous or deadly weapon" is a means of a carrying out a Maryland robbery, not an element (Warren Br.15-16).  His thought continues:  if "with a dangerous or deadly weapon" is not an element, then Maryland robbery is broader than the generic definition of robbery because Maryland robbery can be committed without physical force (i.e. "putting in fear").  His reasoning, he argues, flows from Maryland law, which he views as controlling (Warren Br.15-16).  But, Warren is incorrect on many fronts, not the least of which is that he was convicted not of common-law robbery, but robbery with a dangerous or deadly weapon (SA287-308; SA94-95; SA375).

As for Warren's means-elements distinction, the Supreme Court directs the process by which this contention is answered.  In Mathis, 136 S. Ct. at 2256, the Supreme Court explained that "[the] first task for a sentencing court faced with an alternatively phrased statute is to determine whether its listed items are elements or means."  "Elements," said the Court, are what the jury must find beyond a reasonable

34

doubt at trial or are what the defendant necessarily admits at a plea hearing. Id. at 2248. Facts that "need neither be found by a jury nor admitted by a defendant" are irrelevant for purposes of determining whether a prior conviction is an ACCA predicate. Id.

Here, the alternatives of Maryland robbery trigger different punishments: a 20-year statutory maximum penalty applies to robbery with a dangerous or deadly weapon and a 15-year maximum penalty applies to simple robbery. See 27 Md. Code §§486(d), 487. To trigger the 20-year sentence, a jury must find, beyond a reasonable doubt, "with a dangerous or deadly weapon." Toomer, 2017 WL 1508842, at *5. As Mathis, 136 S. Ct. at 2256, makes clear, this difference in punishment and requisite action by the jury renders "with a dangerous or deadly weapon" an element. See Redrick, 841 F.3d at 483. As the District Court observed, this conclusion also flows from Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), which holds that only a jury, and not a judge, may find facts that increase a maximum penalty, except for the simple fact of a prior conviction because "any facts that increase the prescribed range of penalties to which a criminal defendant is exposed are elements of the crime" (A17, Amended Tent. Findings).

Warren, however, is unconvinced that this is the correct conclusion because as he sees it, not only does Maryland law control the analysis, state law establishes

that Maryland treats a dangerous or deadly weapon as a sentencing factor, not as an element of robbery (Warren Br.16). But, Warren is simply incorrect.

There can be no doubt that this issue is one of federal law. See Johnson, 559 U.S. at 138; see also United States v. Moore, 149 F. Supp.3d 177, 179-80 (D.D.C. 2016). Indeed, as the Court of Appeals for the D.C. Circuit has explained, considering the question from a federal perspective serves the purposes of ACCA, "which avoids treating similarly situated offenders differently under the Act's enhancement provisions." Redrick, 841 F.3d at 483 (citing Taylor, 495 U.S. 582). Warren seems to suspect that this is correct: he fails to address the District Court's discussion of Apprendi and its inevitable impact on his case.

And, it is true, as Warren argues, that Maryland's highest court, its Court of Appeals, has said that robbery with a dangerous or deadly weapon is not a separate substantive offense and that the use of a dangerous or deadly weapon fixes the penalty (Warren Br.15). But, this does not tell the whole story of Maryland law.

Warren overlooks that Maryland courts recognize, regardless of the label attached to the offense of robbery with a dangerous or deadly weapon, that the jury nonetheless must find beyond a reasonable doubt "with a dangerous or deadly weapon." De facto, if not de jure, "with a dangerous or deadly weapon" is an element under Maryland law. In fact, the court in Redrick, 841 F.3d at 483, so found:

36

"Because Maryland treats this issue exactly as if it were an element under federal law, we consider an element that creates an effectively distinct crime for the purposes of" ACCA.   See also Toomer, 2017 WL 1508842, at *5.

This is conclusion is manifest when considering the cases Warren cites, as well as those he does not.  Warren is correct, for example, that in Whack v.  State, 288 Md. 137, 140 (1980), Maryland's highest court did state that robbery was a single offense.  But, that court also explained that "the use of a weapon to intimidate the victim of a robbery [is] an aggravating factor, warranting the enhanced penalty of" the statute.  Id. at 149; see also Conyers v. State, 345 Md. 525, 796-97 (1997) ("Robbery with a deadly weapon is not a separate substantive offense, but if the State can prove that a defendant used a deadly weapon during the commission of a robbery, the defendant is subject to harsher penalties."); Teixeira v. State, 213 Md. App. 664, 681 (2013) (same) (Warren Br.15-16).

But, a case that Warren does not cite (and upon which the District Court relied, correctly so), is Wadlow v.  State, 335 Md. 122 (1994) (A19, Amended Tent. Findings).   There, the Maryland Court of Appeals explained that "robbery is ordinarily characterized as one offense, with the division between armed robbery and simple robbery being for the purpose of punishment, but the charge must be specific and the determination of the seriousness of the offense is for the trier of

37

fact." <u>Id.</u> at 128.   Accordingly, "where the legislature has prescribed different sentences for the same offense, depending upon a particular circumstance of the offense, . . . the presence of that circumstance must be alleged in the charging document, and must be determined by the trier of fact applying the reasonable doubt standard." <u>Id.</u> at 129.[6]  The necessary conclusion, then, is that under both Maryland and federal law, "with a deadly or dangerous weapon" is an element of Maryland armed robbery.

---

[6]  <u>See also</u> <u>Handy</u>, 357 Md. at 691, 694 ("This Court has previously noted that robbery with a dangerous or deadly weapon is not a separate substantive offense, but if the State can prove that a defendant used a dangerous or deadly weapon during the commission of a robbery, the defendant is subject to harsher penalties.") (citations & quotations omitted); <u>Snyder v. State</u>, No.01848, 2017 WL 1058573, at *12 (Md. Ct. Spec. App. Mar. 21, 2017) (explaining that robbery is a lesser included offense of robbery with a deadly weapon "because the latter contains the added element of a dangerous weapon"); <u>Ganey v. State</u>, No.0416, 2017 WL 999475, at *6 (Md. Ct. Spec. App. Mar. 15, 2017) ("Because the trial court correctly determined as a matter of law that the air pistol here qualifies as a dangerous weapon, the jury was permitted to determine whether appellant actually committed the robbery with a dangerous weapon"); <u>Fortune v. State</u>, No.0547, 2016 WL 1749767, at *9 (Md. Ct. Spec. App. May 3, 2016) (finding sufficient evidence to convict where "six trial witnesses testified that [Fortune] approached them with what appeared to be a deadly weapon (i.e., a gun) and used it to frighten them into surrendering their personal property to [him]."); <u>Brooks v. State</u>, No.0164, 2016 WL 7587712, at *5 (Md. Ct. Spec. App. Dec. 27, 2016) (noting that instruction which instructed the jury that "the state must prove that the defendant committed the robbery by using a dangerous weapon," "tracks the Maryland Pattern Jury Instruction on robbery with a dangerous weapon almost 'word for word'" but reversing conviction due to additional sentence in the instruction that relieved the state of its burden of proving beyond a reasonable doubt that defendant used BB gun in a dangerous or deadly manner).

### 2.    Applying The Modified Categorical Approach, Warren Pled Guilty To Robbery With A Dangerous Or Deadly Weapon.

Maryland robbery is divisible and "with a dangerous or deadly weapon" is an element.  Consequently, the modified categorical approach is available.  The next step is consideration of <u>Shepard</u> documents to determine which of the alternative offenses—simple robbery or robbery with a dangerous or deadly weapon—provided the basis for Warren's conviction.  See <u>Descamps</u>, 133 S. Ct. at 2281; <u>see also</u> <u>Mathis</u>, 136 S. Ct. at 2253.  Notably, to this part of the analysis, Warren raises no objection whatsoever.  This must be a tacit concession by Warren that, if the analysis survives to the point of consideration of <u>Shepard</u> documents, the District Court ruled correctly.

In any event, the <u>Shepard</u> documents confirm that Warren was charged with, and pled guilty to, robbery with a dangerous or deadly weapon (SA287-308; SA94-95; SA375).  His Maryland criminal information alleged that Warren "feloniously with a dangerous and deadly weapon, did rob aforesaid complainant and violently did steal from the said Complainant"; he entered a plea of guilty to this charge, and his potential maximum sentence was 20 years of incarceration (SA19, Amended Tent. Findings).  Accordingly, the District Court was correct in its conclusion that Warren's prior conviction was, in fact, for Maryland armed robbery.

### 3.    Maryland Armed Robbery Requires Force That Is Capable Of Causing Physical Pain Or Injury To Anther Person.

Having determined that Maryland robbery is divisible, that "with a dangerous or deadly weapon" is an element of Maryland armed robbery, and that Warren pled guilty to robbery with a dangerous or deadly weapon, the final question is whether such a conviction contains the requisite force to qualify as a violent felony.  It does.

Maryland's highest court has explained that "[t]he hallmark of robbery . . . is the presence of force or threat of force, the latter of which also is referred to as intimidation."  Coles v. State, 374 Md. 114, 123 (2003).  The state defines a "dangerous or deadly weapon" to include "anything used or designed to be used in destroying, defeating, or injuring an enemy, or as an instrument of offensive or defensive combat."  Handy, 357 Md. at 693 (quotation omitted); see also Brooks v. State, 314 Md. 585, 600 (1989).  Accordingly, Maryland deems a dangerous or deadly weapon "dangerous or deadly because it can cause such physical pain or injury to another person."  Moore, 149 F. Supp.3d at 182; see also Brooks, 314 Md. at 599 (dangerous weapons are those "that may be used with dangerous or deadly effect.").  And, the "use of violence" denotes "actual physical force," while "putting the victim in fear" denotes "constructive force"—i.e., "intimidation or an intent to put the victim in fear."  Fetrow, 156 Md. App. at 687-88.

40

The Supreme Court in <u>Johnson</u>, 559 U.S. at 138, has established that "physical force" must be "force . . . capable of causing physical pain or injury to another person." By definition and as a matter of federal law, Maryland robbery with a dangerous or deadly weapon is committed with this level and type of force. <u>See</u> <u>Redrick</u>, 841 F.3d at 484; <u>Moore</u>, 149 F. Supp.3d at 182.[7] Certainly, the requirement of "use" of a dangerous or deadly weapon supplies, at a minimum, a "threat" of physical force against the person of another. And because the means employed is a "dangerous or deadly weapon," the required degree of force—that is, "violent force"—is present. <u>Redrick</u>, 841 F.3d at 484. The court in <u>Moore</u>, 149 F. Supp. 3d at 182, explained this perfectly: "the bar" set by <u>Johnson</u> "is not as high as [defendants] seem[] to think, since the weapon must simply be 'capable of causing

---

[7] <u>See also</u> <u>United States v. Garrison</u>, 612 F. App'x 655, 657 (4th Cir. 2015) (per curiam) (affirming district court's conclusion that prior Maryland conviction for robbery with a dangerous weapon is ACCA predicate); <u>United States v. Strevig</u>, 663 F. App'x 908, 914 (11th Cir. 2016) (Maryland robbery qualifies under Guidelines' residual clause because offense requires "the use or threatened use of force against the victim . . . sufficient to overcome the victim's resistance or put the victim in fear of bodily harm") (per curiam); <u>United States v. Riley</u>, 856 F.3d 326, 328-29 (4th Cir. 2017) (Maryland robbery with a dangerous weapon qualifies under residual clause of the Guidelines; not reaching question of whether simple robbery and armed robbery are separate offenses, but "if they are, robbery with a dangerous weapon is a fortiori a crime of violence. Maryland robbery undoubtedly presents a serious potential risk of physical injury to another").

physical pain or injury.'" Id. (quoting Johnson, 559 U.S. at 140). This is "[n]ot agony—just pain. Not mutilation—just injury." Id.

Warren's comeback to this is that Maryland armed robbery cannot qualify as an ACCA "use of force" predicate because other weapons could be used that do not supply the requisite "physical force against the person of another" (Warren Br.20-21). Putting aside the dubious proposition that the weapons Warren must have in mind could be used without at least some level of physical force, see United States v. Castleman, 134 S. Ct. 1405, 1415 (2014) (reasoning that poison and other "indirect" causes of physical harm require common-law "force"),[8] Warren's effort in this respect is prohibited "legal imagination." Gonzales v. Duenas–Alvarez, 549 U.S. 183, 193 (2007). In its effort to extrude clarity from ACCA, the Supreme Court has admonished courts to pinpoint "realistic probabilit[ies]," not "theoretical possibilit[ies]. Id.; see also Moncrieffe v. Holder, 133 S. Ct. 1678, 1684–85 (2013). Warren's contention ends with this prohibition imposed by the Supreme Court.

In any event, Warren overlooks that even if some other weapon, say poison, was used, "it is the force against the victim that matters." Toomer, 2017 WL

---

[8]See also United States v. Rice, 813 F.3d 704, 705 (8th Cir. 2016) (construing Castleman as indicating that indirect weapons are not categorically non-forceful), cert. denied, 137 S. Ct. 59 (2016); United States v. McDaniels, 147 F. Supp.3d 427, 433 (E.D. Va. 2015) (same).

1508842, at *6; <u>see also</u> <u>Redrick</u>, 841 F.3d at 484–85.  With this type of weapon, "[a] defendant can exert physical force against a victim even if the victim is not aware of the force before it impacts him or her."  <u>Toomer</u>, 2017 WL 1508842, at *6.

Warren pivots to the property argument, maintaining that because Maryland robbery "can be committed by threatening injury to property it logically follows that Maryland robbery with a dangerous or deadly weapon can also be accomplished by threatening injury to one's property with a weapon" (Warren Br.22).  As <u>Redrick</u>, 841 F.3d at 485, paraphrases this contention, "If you don't give me your money, I'll shoot up your Mercedes."

Warren's contention is specious.  It fails to take into account <u>Snowden v. State</u>, 321 Md. 612, 618 (1991), in which Maryland's highest court explained robbery: "Robbery is a compound larceny. It is a larceny from the person accomplished by either an assault (putting in fear) or a battery (violence)."  And, under Maryland law, assault and battery both require force or threatened force against a person; both also require that the target of the force be a person, not property.  <u>Redrick</u>, 841 F.3d at 485; <u>Toomer</u>, 2017 WL 1508842, at *6.  In short, "Weapons are 'deadly' to humans, not property."  <u>Redrick</u>, 841 F.3d at 485.[9]

_____

[9] Warren's turn to <u>Giles v. State</u>, 8 Md. App. 721 (1970), and <u>Douglas v. State</u>, 9 Md. App. 647 (1970), does not change this result (Warren Br.17-21).  These decisions not only predate <u>Snowden</u>, but neither <u>Giles</u> nor <u>Douglas</u> actually involved

From beginning to end, then, a conviction for Maryland robbery with a dangerous or deadly weapon qualifies as an ACCA predicate under the force clause. The District Court so ruled and this Court should affirm that decision.

threats against property, and the portions upon which Warren relies are dicta (A21, Amended Tent. Findings).  <u>See</u> <u>Toomer</u>, 2017 WL 1508842, at *6 n.11.

44

### III.    Warren's Maryland Conviction For Distribution Of Heroin Is A Serious Drug Offense Under ACCA.

Warren's second challenge to his ACCA status is directed to his Maryland conviction for distribution of heroin (Warren Br.23-28).   He believes that this conviction does not qualify as a serious drug offense under ACCA based on a new, singular argument:  his reading of Maryland's definition of "distribution" includes "offer to sell," a phrase that does not appear in the federal definition of "distribution" applicable to ACCA.   The consequence, Warren maintains, is that "Maryland's distribution element is therefore more broadly defined than its federal equivalent" (Warren Br.27).   This overbreadth, he concludes, prevents his Maryland conviction for distribution of heroin from qualifying as a serious drug offense under ACCA.

To his credit, Warren acknowledges that his argument is new and that he consequently faces plain error review (Warren Br.23).   This familiar standard requires Warren to establish (1) an error; (2) that is plain; and (3) that affected his substantial rights.   See Olano, 507 U.S. at 736 (quotation marks omitted).   If he satisfies these burdens, he must then convince the Court to exercise its discretion to award relief by exposing the error as one that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."   Id.  Warren's burden is "very heavy" and, concomitantly, this Court's power to reverse the District Court's ruling is "limited" and "circumscribed."   Id. at 734.  The following discussion demonstrates

that, under any standard and considering Warren's position from a number of perspectives, he cannot prevail.

### A.   Maryland Distribution Of Heroin Is A Serious Drug Offense Because It "Involves" The Distribution Of A Controlled Substance.

While Warren tries to frame the issue as turning on the term "distribute," the actual issue is whether Maryland distribution of heroin—even if it does include an offer to sell heroin (a view with which the Government disagrees, as explained herein)—is a serious drug offense.  That is, whether it is an offense "involving manufacturing, distributing, or possessing with intent to manufacture or distribute," a controlled substance.

The answer to this question is yes.  This answer must begin with the Court's decision in Gibbs, 656 F.3d 180, where the Court, faced with a similar issue, construed "involved" as used in ACCA.  Further supporting this conclusion is ample authority from three other courts of appeals where, faced with the same argument presented by Warren—that a state's definition of distribute includes an "offer to sell"—the courts looked to ACCA's use of the term "involved" to decide the issue. See United States v. Vickers, 540 F.3d 356 (5th Cir. 2008); United States v. Bynum, 669 F.3d 880 (8th Cir. 2012); United States v. Whindleton, 797 F.3d 105 (1st Cir. 2015), cert. denied, 137 S. Ct. 179 (Oct. 3, 2016).

46

1. **Used In ACCA To Define A Serious Drug Offense, The Term "Involving" Is Construed Broadly.**

Gibbs, 656 F.3d at 182, presented the question of whether a Delaware conviction for wearing body armor while committing a felony "involv[ed]" manufacturing, distributing, or possessing, with intent to manufacture or distribute, a controlled substance" and thus qualified as a serious drug offense under ACCA. To answer this question, the Court began with well-established canons of statutory interpretation: the analysis starts with the statute itself and gives effect to the Congressional intent behind the statute's enactment. See id. at 184-85; see also Leocal v. Ashcroft, 543 U.S. 1, 12 (2004) (courts "must give effect to every word of a statute wherever possible"); Connecticut Nat'l Bank v. Germaine, 503 U.S. 249, 254-55 (1992) (Congress "says in a statute what it means and means in a statute what it says.").

With these precepts as tools, the Court "start[ed] with the text of ACCA." Id. at 184. Gibbs determined that the "plain meaning of 'involve' is 'to relate closely' or to 'connect closely.'" Id. (quoting United States v. McKenney, 450 F.3d 39, 43 (1st Cir. 2006)). Gibbs read "involving" broadly, as "expanding the meaning of a serious drug offense beyond the precise offenses of distributing, manufacturing, or possessing, and as encompassing as well offenses that are related to or connected with such conduct." Id. at 184-85 (citing United States v. King, 325 F.3d 110, 113

47

(2d Cir. 2003)).  Congress used this "broad terminology" to define the category of serious state drug offenses without any reference to or limitation by federal or state statutes, to reference the entire class of serious state drug offenses, and to "carve the class of serious state drug crimes broadly."  Id. at 185.  Gibbs explained that "[i]n adopting this position, [the Court is] conform[ing] with all courts of appeals that have addressed the scope of the definition of a serious drug offense."  Id. (citing Vickers, 540 F.3d at 365 ("The word 'involving' is an exceedingly broad term for a statute")).[10]

Indeed, had Congress intended to limit the definition of "serious drug offense," "it could have done so" as it had done in other statutes by use of limiting terms.  Gibbs, 656 F.3d at 185.  Instead, in ACCA, Gibbs explained, Congress took

---

[10] See also McKenney, 450 F.3d at 42 ("By using 'involving,' Congress captured more offenses than just those that 'are in fact' the manufacture, distribution, or possession of, with intent to distribute, a controlled substance."); United States v. Alexander, 331 F.3d 116, 131 (D.C. Cir. 2003) ("the definition of 'serious drug offense' does not speak in specifics; instead, it defines the term to include an entire class of state offenses 'involving' certain activities, namely, 'manufacturing, distributing, or possessing with intent to manufacture or distribute' a controlled substance"); King, 325 F.3d at 113 ("The word 'involving' has expansive connotations, and we think it must be construed as extending the focus of §924(e) beyond the precise offenses of distributing, manufacturing, or possessing, and as encompassing as well offenses [here, attempt to possess with intent to distribute] that are related to or connected with such conduct."); United States v. Brandon, 247 F.3d 186, 191 (4th Cir. 2001) ("[T]he word 'involving' itself suggests that the subsection should be read expansively.").  See also Whindleton, 797 F.3d at 109 (same).

a different approach and "adopted a broad interpretation of 'a serious drug offense' because it intended to define an "entire class of state offenses 'involving' certain activities, namely, 'manufacturing, distributing, or possessing with intent to manufacture or distribute' a controlled substance." Id. (citations & quotations omitted).[11]

    Gibbs, 656 F.3d at 185-86, noted however that a broad reading of "involving" did not amount to a carte blanche conclusion that every state drug offense is also a serious drug offense under ACCA. Instead, "[t]he relationship must not be too remote or tangential." Id. at 185. When this question is posed with regard to Maryland distribution of heroin the clear answer is that the offense is related to and connected with manufacturing, distributing, or possessing, with intent to manufacture or distribute, a controlled substance.

> **2.** **Maryland Distribution Of Heroin Is Closely Related And Connected Closely To Manufacturing, Distributing, Or Possessing A Controlled Substance.**

Following the "approach outlined in Taylor," the question of whether a state offense is closely related or connected to manufacturing, distributing, or possessing

---

[11] Applying this same broad interpretation of "involving," courts have interpreted ACCA's language to include conspiring or attempting to manufacture, distribute, or possess with the intent to distribute drugs, as well as aiding and abetting the distribution of drugs. See Whindleton, 797 F. 3d at 109 (and citing cases).

a controlled substance asks "whether the proscribed conduct is an inherent part or result of the generic crime of conviction . . . or, stated somewhat differently, whether the abstract crime intrinsically involves the proscribed conduct." <u>Gibbs</u>, 656 F.3d at 188 (quoting <u>Brandon</u>, 247 F.3d at 191). There can be no doubt that even if Maryland includes "offer to sell" as part of its definition of "distribute" (which, as discussed below, it does not), Maryland distribution of heroin is "an inherent part or result of the generic crime" of the federal offense of distribution of heroin. <u>See</u> <u>United States v. Villella</u>, No. CR 06-06, 2017 WL 1519548, at *10 (W.D. Pa. Apr. 27, 2017) (even assuming Georgia defines "sell" as "offer to sell," Georgia offense was a serious drug offense, applying <u>Gibbs</u>, <u>Bynum</u>, and <u>Whindleton</u>). Both offenses share the common and "ultimate goal" of the distribution of a controlled substance. <u>Whindleton</u>, 797 F.3d at 111.

The Court of Appeals for the Fifth Circuit came to this same conclusion in <u>Vickers</u>, 540 F.3d at 364-65. The court considered whether a Texas distribution statute that included "offer to sell" qualified as a serious drug offense. <u>Vickers</u> ruled that the state offense was a serious drug offense because the "expansiveness of the word 'involving' supports that Congress was bringing into the statute's reach those who intentionally enter the highly dangerous drug distribution world." <u>Id.</u> at 365. "Being in the drug marketplace as a seller . . . is the kind of self-identification as a

potentially violent person that Congress was reaching by the ACCA." <u>Id.</u> at 365-66. The Eighth Circuit in <u>Bynum</u>, 669 F.3d at 886, agreed with this analysis and applied it when considering a Minnesota distribution statute that included an "offer to sell." Similarly, the First Circuit in <u>Whindleton</u>, 797 F.3d at 111, concluded that a New York statute prohibiting knowing, selling or offering to sell narcotics "is necessarily related to and connected with its ultimate goal, the distribution of a controlled substance."

These results obtained even considering statutory differences, such the Texas requirement that a defendant "need not have any drugs to sell or even intend ever to obtain the drugs he is purporting to sell." The broad interpretation of "involving" still controls: a Texas defendant who knowingly offers to sell drugs even though he has none to sell is still "in the marketplace as a seller—even if, hypothetically, the individual did not possess any drugs at that time—[he] is the kind of self-identification as a potentially violent person that Congress was reaching" by enacting ACCA. <u>Vickers</u>, 540 F.3d at 365-66. <u>See also Bynum</u>, 669 F.3d at 886-87 (same); <u>Whindleton</u>, 797 F.3d at 110-11 (same).

This "straightforward" interpretation of ACCA derived in <u>Gibbs</u> and applied in <u>Vickers</u>, <u>Bynum</u>, and <u>Whindleton</u>, is logical, reasonable, and fair. <u>See Vickers</u>,

51

540 F.3d at 366.    There can be no doubt, then, that Maryland distribution of heroin is a serious drug offense for purposes of ACCA.

### B.    Maryland "Distribute" Substantially Corresponds To The Federal Definition of "Distribute" And Therefore, Maryland Distribution Of Heroin Categorically Qualifies As A Serious Drug Offense.

Even if Warren's view is engaged—that the definitions of "distribute" are determinative—his argument still fails to persuade.    Maryland's definition of "distribute" substantially corresponds with the federal definition of "distribution," rendering meritless Warren's argument of overbreadth.

Warren entered a plea of guilty to distribution of heroin in violation of Article 27 §286(a)(1) of the Maryland Code (SA117; SA309-14; A319-333; SA95; SA275-84; A375-80; PSR ¶30).    At the time of Warren's offense, §286(a)(1) of Article 27 of the Maryland Code made it unlawful:

> (1) to manufacture, distribute, or dispense, or to possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance [.]

Art. 27 §286(a)(1).[12]    For purposes of §286, Maryland defined "distribute" as "mean[ing] to deliver a controlled dangerous substance."    Art. 27 §277(l).    See also

---

[12] Currently, this provision is found at Md. Code §5-602.    It is undisputed that this version contains no substantive change from the version in effect at the time of Warren's conviction.

State v. Giddens, 335 Md. 205, 217 (1994).   Title 21 U.S.C. §802(11) defines "distribute" as "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical."

Before going further, note that Warren's effort to read the definitions as mis-matched (and thus giving rise to a means/elements distinction and concerns of overbreadth) rests on a faulty foundation:   his definition of "distribution" is incorrect.   He relies on two sources, both faulty.   First, he cites to Rosenberg v. State, 12 Md. App. 20, 22 (1971) (Warren Br.26).   That case, however, did not address distribution of a dangerous controlled substance under §286; it concentrated on common nuisance under Article 27 §291.   Second, Warren supports his argument that "distribute" includes "offer to sell" with reliance on jury instructions (Warren Br.26).   These materials do not control:   it is the statute that matters. See Taylor, 495 U.S. at 559.

Returning to the applicable statutory definitions, comparison of them to one another, as the categorical approach requires, yields the necessary conclusion that the Maryland definition of "distribute," "substantially corresponds" to the federal definition of "distribute."   Taylor, 495 U.S. at 602.   Indeed, the definitions essentially "mirror[]" one another:  both speak to delivery of a controlled substance. See United States v. Marrerro, 743 F.3d 389, 401 (3d Cir. 2014), abrogated on other

grounds as recognized by United States v. Calabretta, 831 F.3d 128, 135 (3d Cir. 2016).

Maryland excepts "dispensing" by the terms of the statute; federal law accomplishes this by its definition.  It is true that the federal definition excepts "administering," while the Maryland definition does not.  But, this minor variation does not prevent the definitions from "substantially" corresponding:  the essence of both is prohibition of trafficking of controlled substances.  While in theory a person could violate the Maryland statute by administering heroin or by possessing it with intent to administer it, rather than distributing it or possessing it with intent to distribute it, Warren cannot cite any authority to suggest that §286(a)(1) has ever been applied in this manner.[13]  See United States v. White, 837 F.3d 1225, 1230 (11th Cir. 2016) (explaining that defendant must come forward with state case prosecuting "administering", otherwise the argument becomes a prohibited hypothetical); United States v. Teran-Salas, 767 F.3d 453, 460–62 (5th Cir. 2014) (same), cert. denied, 135 S. Ct. 1892 (2015).  Any such argument by Warren, then,

---

[13] Indeed, Maryland addresses administration of a controlled dangerous substance through a separate statute.  See Cunningham v. State, 318 Md. 182, 187-88 (1989) (discussing Art. 27 §287, making unlawful possession or administration of any controlled dangerous substance absent specified circumstances); Stallard v. State, 225 Md. App. 400, 410 (2015) (same with regard to §5-601).

becomes a prohibited "theoretical possibility" that Maryland would apply its statute in this manner. Moncrieffe, 133 S. Ct. at 1685.

Recall, finally, that the District Court ruled that Warren's Maryland conviction for distribution of heroin qualified as a serious drug offense and ACCA predicate. As Warren agreed, §286 is divisible, thus triggering review of Shepard documents (A23, Amended Tent. Findings; A446). The District Court deemed "the record . . . clear" that Warren's Maryland conviction qualified as a serious drug offense (A23). The indictment charged that Warren "unlawfully did distribute" and the docket revealed a plea of guilty to that charge (A23; SA327; SA331; SA375). With the act of distribution completed, as the indictment alleged, Maryland's definition of distribution, even if it could include "offer to sell," does not change this analysis or its outcome.

This lengthy discussion demonstrates that the District Court committed no error, plain or otherwise, in relying upon Warren's Maryland conviction for distribution of heroin. See United States v. Jackson, 849 F.3d 540, 544 (3d Cir. 2017) (To be a "plain" error, the error must be "clear under current law."). Instead, Warren had the requisite three predicates and he properly faced a mandatory minimum term of 15 years of incarceration. See §924(e). The District Court's ultimate sentence of 192 months of incarceration was proper and should be affirmed.

## **CONCLUSION**

For all of these reasons, the Court should affirm the judgment of the District

Court.

Respectfully submitted,

SOO C. SONG
Acting United States Attorney

By:    /s/ Laura Schleich Irwin
       Laura Schleich Irwin
       Assistant U.S. Attorney

Date:   June 16, 2017

# <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that I am an Assistant United States Attorney for the Western District of Pennsylvania, that I am filing the attached Brief for Appellee, and:

(1)    this Brief complies with the length limitations of Fed. R. App. P. 32(a)(7) because this Brief contains ***12,261*** words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and thus does not exceed the 13,000-word limit;

(2)    this Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because it has been prepared using a Microsoft WORD 2010 word-processing system and it is in a proportionally-spaced typeface, namely Times New Roman, that is at least 14 points;

(3)    the text of the electronic PDF Brief is identical to the text of the paper copies of the Brief and Appendix; and

(4)    the electronic PDF Brief has been prepared on a computer that is automatically protected by a virus detection program, namely a continuously-updated version of Trend Micro OfficeScan, and no virus was detected.

/s/Laura Schleich Irwin
Laura Schleich Irwin
Assistant U.S. Attorney

Dated:  June 16, 2017

## CERTIFICATION OF FILING AND SERVICE

I hereby certify that on June 16, 2017, I caused the Brief for Appellee to be filed with the Clerk of this Court by (a) electronic filing in the PDF form using the Circuit's electronic filing system, and (b) paper filing of an original and six paper copies using postage-prepaid first-class mail.

I also certify that on June 16, 2017, I caused the Brief to be served:

[X] by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system.

[X] by service of one paper copy by postage-prepaid first-class mail, on:

R. Damien Schorr
1015 Irwin Drive
Pittsburgh, PA 15236


/s/Laura Schleich Irwin
Laura Schleich Irwin
Assistant U.S. Attorney


Dated: June 16, 2017